# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

TEXAS BANKERS ASSOCIATION
203 W. 10th St.
Austin, TX 78701

AMARILLO CHAMBER OF
COMMERCE
1000 S. Polk St.
Amarillo, TX 79101

AMERICAN BANKERS
ASSOCIATION
1333 New Hampshire Ave. NW,
Washington, DC 20036

CHAMBER OF COMMERCE OF
THE UNITED STATES OF
AMERICA
1615 H St., N.W.
Washington, DC 20062-2000

LONGVIEW CHAMBER OF
COMMERCE
410 N. Center St.
Longview, TX 75601

INDEPENDENT COMMUNITY
BANKERS OF AMERICA
1615 L St NW, Ste. 900
Washington, DC 20036

INDEPENDENT BANKERS
ASSOCIATION OF TEXAS
1700 Rio Grande St. Ste. 100
Austin, TX 78701

*Plaintiffs,*

Civil Case No.: _____

1

v.

OFFICE OF THE COMPTROLLER
OF THE CURRENCY and MICHAEL
J. HSU in his official capacity as
Acting Comptroller of the Currency,
400 7th St. SW
Washington, DC 20219

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM and
JEROME POWELL in his official
capacity as Chairman of the Board of
Governors
Constitution Ave NW & 20th St. NW
Washington, DC 20551

FEDERAL DEPOSIT INSURANCE
CORPORATION and MARTIN
GRUENBERG in his official capacity
as Chairman of the FDIC
550 17th St NW
Washington, DC 20429

    *Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The Texas Bankers Association, the Amarillo Chamber of Commerce, the

American Bankers Association, the Chamber of Commerce of the United States of

America, the Longview Chamber of Commerce, the Independent Community

Bankers of America, and the Independent Bankers Association of Texas

2

(collectively "Plaintiffs"), by and through their undersigned counsel and on behalf of their members, allege as follows:

## INTRODUCTION

1.     Plaintiffs seek review under the Administrative Procedure Act ("APA") of regulations recently promulgated by the Board of Governors of the Federal Reserve System ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC"), and the Office of the Comptroller of the Currency ("OCC") (collectively, the "Agencies") pursuant to the Community Reinvestment Act of 1977 ("CRA"), 12 U.S.C. § 2901 *et. seq*., published at 12 C.F.R. §§ 25.12, 228.12, 345.12, 89 Fed. Reg. 6574 (Feb. 1, 2024) (to be codified at 12 C.F.R. §§ 25, 228, and 345).  (hereinafter the "Final Rules").  The Final Rules work a wholesale and unlawful change to a statutory and regulatory regime that, for nearly five decades, has successfully encouraged lending in low- and moderate-income neighborhoods throughout the United States.

2.     The CRA is a landmark piece of legislation that Congress enacted in 1977 to reverse years of government policies and private market actions that deprived lower-income areas of credit due to "redlining"—the practice of refusing to extend credit in certain neighborhoods deemed too risky (primarily low-income

3

and inner-city neighborhoods).[1]  The law encourages banks to do more lending to low- and moderate-income borrowers in the local communities where they have a physical presence and accept deposits, not simply to borrowers in affluent parts of those communities.

3.      To achieve these ends, Congress required each supervisory banking agency, in connection with its examination of an institution, to "assess the institution's record of meeting the ***credit needs*** of its entire ***community***, including low- and moderate-income neighborhoods, consistent with the safe and sound operation of such institution." 12 U.S.C. § 2903(a)(1) (emphasis added).[2]  The statute requires the Agencies to examine each bank periodically and to issue a written public report, including a rating, that evaluates the bank's CRA performance in each geographic area where the bank has a main office, branch office, or other facility that accepts deposits.  *See* 12 U.S.C. § 2906(b)(1)(B).

---

[1] *See* RICHARD D. MARSICO, DEMOCRATIZING CAPITAL: THE HISTORY, LAW AND REFORM OF THE COMMUNITY REINVESTMENT ACT 11 (2005) ("The legislative history of the Community Reinvestment Act shows that the purpose of the CRA was to end the bank practice known as redlining—refusing to lend in certain neighborhoods, especially low-income, predominantly minority, and inner city neighborhoods—due to perceived credit risks and to increase the amount of money banks lend in their local communities").

[2] The CRA applies to banking institutions with deposits insured by the FDIC, including national banks, savings associations and state-chartered commercial and savings banks.  The statute does not apply to credit unions, insurance companies, securities companies, or other nonbank institutions.

4

These geographic areas are referred to as "assessment areas," or under the Final Rules, "Facility-Based Assessment Areas."

4.      The statute, as implemented and consistently interpreted by the Agencies in prior rules, has been an unqualified success.  According to data published in 2022 by the Agencies and the Consumer Financial Protection Bureau, banks provided more than $227 billion in capital to low- and moderate-income communities in the form of mortgages and small business loans, and an additional $151 billion in community development loans.[3]  While the CRA has been amended several times, Congress has never changed the statute's focus from the communities where banks have a physical deposit-taking presence.

5.      As set forth in detail below, the Agencies have abandoned the statute's geographic, deposit-taking touchstone in favor of additional sweeping assessment areas—"Retail Lending Assessment Areas" and "Outside Retail Lending Areas"—that have no connection to a bank's physical deposit-taking presence.  They also plan to assess large institutions' *deposit* products, contrary to the statute's explicit direction to focus on the "credit needs" of the community.

---

[3] Press Release, Federal Financial Institutions Examination Council, *Federal Bank Regulatory Agencies Release 2022 Small Business, Small Farm, and Community Development Lending Data* (Dec. 20, 2023), https://www.ffiec.gov/press/pr121523.htm; Consumer Financial Protection Bureau, *2022 HMDA Data on Mortgage Lending Now Available* (Mar. 20, 2023), https://www.consumerfinance.gov/about-us/newsroom/2022-hmda-data-on-mortgage-lending-now-available/.

And the Agencies wrap these statutory excesses up in a complicated and burdensome regime that denies banks notice about the benchmarks against which they will be assessed, is not justified by its purported benefits, and may ultimately result in reduced lending to the very populations that the CRA was designed to benefit.

6.      In light of these problems, Plaintiffs respectfully request that the Court enjoin, hold unlawful, vacate, and set aside the Final Rules as well as the Community Reinvestment Act Interagency Questions and Answers Regarding Community Investment Guidance, 81 Fed. Reg. 48506 (2016), insofar as they relate to answers regarding interpretation of the §___.24—Service Test, *id*. at 48452–43.  Plaintiffs also respectfully request that the Court declare that the Final Rules violate the CRA and APA and all other relief laid out in the Prayer for Relief.

**PARTIES**

7.      Plaintiff Texas Bankers Association ("TBA"), based in Austin, Texas, is the oldest and largest state bankers association in the United States.  Founded in 1885, the TBA is a member-based organization representing the interests of more than 400 member banks—comprised of community and regional banks, bank holding companies and savings institutions across the state of Texas—with over $1

trillion in combined assets.  The TBA lobbies for sound financial and economic policy on both a nationwide basis and in the state of Texas.

8.      Plaintiff Amarillo Chamber of Commerce ("Amarillo Chamber"), based in Amarillo, Texas, is a voluntary organization established in 1926 to be the leader for the improvement of the economy of Amarillo.  Its aim is to improve all segments of the area economy by stimulating not only economic expansion, but also growth and improvement in cultural, social, educational, environmental, and governmental services in the region. The Amarillo Chamber works with its voluntary business members and other groups to keep Amarillo's economic conditions at a level where business people are willing to risk their resources there in hopes of making a profit.  The Amarillo Chamber is pleased to advocate for and represent its members' interests in front of various government bodies.  The Amarillo Chamber's members include banks subject to and adversely affected by the Final Rules.

9.      Plaintiff American Bankers Association ("ABA") is the principal national trade association of the financial services industry in the United States. Founded in 1875, the ABA is the voice for the nation's $23.7 trillion banking industry, which is comprised of small, regional, and large banks that together employ more than 2.1 million people.  ABA members are located in each of the

7

fifty States and the District of Columbia, including some that operate in this District.

10.     The TBA, ABA, U.S. Chamber, ICBA, and IBAT submitted detailed comment letters to the Agencies pinpointing their concerns about the validity of the proposed CRA rules and the considerable burdens associated with them.[4] Many of their members submitted separate comment letters as well explaining how the proposed regulations would harm them.

11.     Plaintiff Chamber of Commerce of the United States of America (the "U.S. Chamber") is the world's largest business federation.  It represents approximately 300,000 direct members—including numerous institutions that will be affected by the Final Rules—and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry

---

[4] *See* Texas Bankers Association, Texas Bankers Association Comments on Community Reinvestment Act Proposal (Docket ID OCC-2022-0002; Docket No. R-1769, RIN 7100-AG29; RIN 3064-AF81) (August 5, 2022), https://www.fdic.gov/resources/regulations/federal-register-publications/2022/2022-community-reinvestment-act-3064-af81-c-201.pdf; American Bankers Association, Joint ABA and State Bankers Association Letter to the Agencies on the Proposed CRA Overhaul (Aug. 5, 2022), https://www.aba.com/advocacy/policy-analysis/letter-to-the-agencies-on-the-proposed-cra-overhaul; Chamber of Commerce of the United States of America, U.S. Chamber Comments on the Community Reinvestment Act (Aug. 5, 2022), https://www.centerforcapitalmarkets.com/letter/u-s-chamber-comments-on-community-reinvestment-act/; Independent Community Bankers of America, Comment Letter Re: Community Reinvestment Act Regulations (RIN 3064-AF81; DOCKET ID OCC-2022-0002, RIN 1557-AF15; DOCKET NO. R–1769, RIN 7100–AG29) (August 5, 2022), https://www.icba.org/docs/default-source/icba/advocacy-documents/letters-to-regulators/comments-on-cra-modernization-proposal.pdf; Independent Bankers Association of Texas, Comment Letter Re: RIN 1557-AF15; RIN 3064-AF81; RIN 7100-AF) (July 27, 2022), https://ibat.org/ibats-cra-comment-letter/.

sector, and from every region of the country. An important function of the U.S. Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the U.S. Chamber regularly litigates cases, like this one, that raise issues of concern to the nation's business community.

12.     Plaintiff Longview Chamber of Commerce ("Longview Chamber"), based in Longview, Texas, is a voluntary representative organization of businesses and professionals who have joined together for the betterment of business, development of tourism, development of downtown Longview potential, and the overall quality of life in Longview. Part of the Longview Chamber of Commerce's mission is to advocate for its members in a variety of government settings. The Longview Chamber's members include banks subject to and adversely affected by the Final Rules.

13.     Plaintiff Independent Community Bankers of America ("ICBA") is the only national trade association dedicated exclusively to community banks. ICBA's membership consists of thousands of community banks – more than one-half of the total depository institutions in the United States. With nearly 50,000 locations nationwide, community banks employ nearly 700,000 Americans. ICBA members are located in each of the fifty States and the District of Columbia,

including some that operate in this District.  ICBA's members include banks subject to and adversely affected by the Final Rules.

14.     Plaintiff Independent Bankers Association of Texas ("IBAT"), based in Austin, Texas, is the largest state community banking organization in the nation. Formed in 1974, IBAT boasts a membership comprised of more than 2,000 banks and branches in 700 Texas communities, including this district. IBAT's member banks range in estimated size from $27 million to $50 billion in assets and include banks subject to and adversely affected by the Final Rules.

15.     Defendant Board of Governors of the Federal Reserve is the main governing body of the Federal Reserve System.  In coordination with the Federal Open Markets Committee and twelve federal reserve banks, the Federal Reserve conducts the nation's monetary policy.  The Federal Reserve regulates, *inter alia*, state-chartered banks that choose to become members of the Federal Reserve System as well as holding companies of banks and savings associations.  Jerome Powell chairs the Federal Reserve Board of Governors and is named in his official capacity only.

16.     Defendant OCC is an independent bureau of the U.S. Department of the Treasury.  It charters, regulates, and supervises all national banks and federal savings associations along with branches and agencies of foreign banks.  Michael

J. Hsu serves as the Acting Comptroller of the Currency and is named in his official capacity only.

17.    Defendant FDIC is a federal agency that insures deposits and has primary supervisory authority over state-chartered banks and savings associations that are not members of the Federal Reserve System.  Martin Gruenberg serves as the chairman of the FDIC Board of Directors and is named in his official capacity only.

**JURISDICTION AND VENUE**

18.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which gives this Court jurisdiction over all civil actions "arising under the Constitution, laws or treaties of the United States."  Plaintiffs' claims raise federal questions under the Administrative Procedure Act regarding the CRA.

19.    Venue is proper in this District under 28 U.S.C. § 1391(e) because Plaintiff Amarillo Chamber of Commerce resides in this District, and members of the TBA, ABA, U.S. Chamber, IBAT, and ICBA are headquartered in and do business in this District.

20.    Each of the Plaintiffs has members who are subject to examination under the CRA and will be regulated—and injured—by these burdensome Final Rules.  Given the immense scale and complexity of the Final Rules, banks must begin preparing to comply immediately; thus, they are already incurring substantial

11

costs that will be unrecoverable in the event the Final Rules are vacated.  These costs include revamping long-term CRA infrastructure, hiring additional information technology and CRA compliance personnel, and engaging contractors to assist with related needs.  Although in the Final Rules the Agencies promised to provide tools to assist banks with complying with the CRA and understanding its new (and unlawful) provisions, the Agencies have yet to do so.  Banks have thus already begun spending substantial time and resources to decipher the byzantine regulations and tests on their own.

21.    Some banks will seek to minimize the direct costs caused by the Final Rules by curtailing lending to avoid triggering new assessment areas; even those banks, however, risk suffering non-compensable damage in the form of increased compliance costs, reputational harm and the loss of existing and new business relationships.  Some banks have already concluded that they will be forced to scuttle plans to expand due to fears that expansion would subject them to additional CRA assessments in new—and unfamiliar—locales.  Yet even these banks will be subject to some assessments outside of their physical deposit-taking footprint (explained below) and must hire new staff and build out new data capabilities to manage CRA assessments in those areas.  Enjoining and setting aside these Final Rules would avoid those harms and allow the existing (and successful) compliance process to continue.

22.    All Plaintiffs have members that would otherwise have standing to sue in their own right. *See Association of Am. Physicians & Surgeons, Inc. v. Texas Medical Bd.*, 627 F.3d 547, 550–51 & n.2 (5th Cir. 2010).

23.    The U.S. Chamber's purpose is, among other things, to advocate for policies that help businesses create jobs and grow the United States economy. The purpose of the Amarillo Chamber, the Longview Chamber, the ICBA, and the IBAT is similar. In this litigation, they seek to protect their interests in helping member banks create jobs and grow the United States economy, including in low- and moderate-income areas. This is germane to the Plaintiffs' purpose and confers associational standing. *See id.*

24.    The ABA and TBA represent and support banks of all sizes. In this litigation, they seek to protect their interests in supporting member banks in complying with lawful agency regulations. This is germane to the Plaintiffs' purpose and confers associational standing. *See id.*

25.    This litigation does not require the participation of individual member banks because the claims for relief can be proven with evidence from representative members and neither the evidence nor the remedies require participation of individual members. Moreover, by their very terms, the Final Rules apply to all banks. All Plaintiffs have associational standing. *See id.*

13

## I.    STATUTORY AND REGULATORY BACKGROUND

### A.    The Community Reinvestment Act

26.    The CRA was enacted in 1977 to remedy decades of government-sponsored and private party redlining.  Borrowers in low- and moderate-income communities were sometimes deemed unworthy of credit solely because of where they lived, a problem that was exacerbated by government policies that discouraged lending in those communities.  Credit was not always extended evenly throughout a bank's entire local community.  As Senator Proxmire explained at the time: "By redlining . . . I am talking about the fact that banks and savings and loans will take their deposits from a community and instead of reinvesting them in that community, they will actually or figuratively draw a red line on a map around the areas of their city, sometimes in the inner city, sometimes in the older neighborhoods, sometimes ethnic and sometimes black, but often encompassing a great area of their neighborhood."  123 Cong. Rec. 17630 (June 6, 1977) (statement of Sen. Proxmire).

27.    When enacting the CRA, Congress purposefully declined to create a system of government-imposed credit allocation.  *Lee v. Bd. of Governors of the Fed. Rsrv. Sys.*, 118 F.3d 905, 913 (2d Cir. 1997) (describing the CRA as "not a directive to undertake any particular program or to provide credit to any particular individual").  Instead, it declared its purpose to require each supervising agency "to

14

use its authority when examining financial institutions, to encourage such

institutions to help meet the credit needs of the local communities in which they

are chartered consistent with the safe and sound operation of such institutions."  12

U.S.C. § 2901(b).  In accordance with that purpose, Congress did not specify the

amounts, the types, the terms, or the recipients of loans in previous red-lined

communities.  *See* 12 U.S.C. § 2901(b).  The Agencies have avoided a prescriptive,

quota-based approach to CRA evaluations precisely to avoid allegations that the

Agencies were imposing credit-allocation.  *See* Michael S. Barr*, Credit Where It

Counts: The Community Reinvestment Act and its Critics*, 80 N.Y. Univ. L. Rev.

513, 600 (2005); *see also* Glenn Canner, *The Community Reinvestment Act and

Credit Allocation*, 8 Fed. Res. Bull. 117, 118–19 (1982) (Congress did not require

a bank to "make any specific number of loans in any targeted geographic area")

(quoting *Community Credit Needs: Hearings on S. 406 Before the Sen. Comm. On

Banking, Housing, and Urban Affairs*, 95th Cong.2d Sess., 392, 393 (1977)).

28.     Rather than imposing a system of credit allocation, Congress

instructed the Agencies to assess an "institution's record of meeting the credit

needs of its entire community, including low- and moderate-income

neighborhoods," 12 U.S.C. § 2903(a)(1), and to "take such record into account" in

their evaluation of a bank's application for approval to open a branch, relocate a

main or branch office, or merge with another institution, 12 U.S.C. § 2903(a)(2).

15

Accordingly, the Agencies prepare written evaluations of each institution's CRA performance, assign a rating to that performance, and disclose that rating to the public.  12 U.S.C. § 2905.

29.    Congress focused on areas where banks have a physical presence and accept deposits.  *See* 12 U.S.C. § 2906(b)(1)(B) (CRA assessments "shall be presented separately for each metropolitan area in which a regulated depository institution maintains one or more domestic branch offices").  The only exception in the statute is for banks that predominately serve military personnel who are not located within a defined geographic area; those institutions are given the option to define their "'entire community' to include [their] entire deposit customer base without regard to geographic proximity."  12 U.S.C. § 2902(4).  As a result, 12 C.F.R. § 228.41(f) provides that: "Notwithstanding the requirements of this section, a bank whose business predominantly consists of serving the needs of military personnel or their dependents who are not located within a defined geographic area may delineate its entire deposit customer base as its assessment area."  Since Congress knew how to expand the reach of the statute, but did so only with respect to banks primarily serving military personnel, there is no merit to the Agencies' argument that they can, at will, extend the geographic reach of the statute for all other banks.

16

30.     What is more, even in the broader, military application of the term "entire community," Congress *still* required that the focus be on a bank's "deposit customer base," not where the bank conducted its retail lending.  This exception proves the rule: for a non-military bank, the evaluation may only take place where the bank has deposit-taking facilities.  The statute's carve-out for military banks reflects Congress's understanding that the CRA is otherwise limited to a bank's physical deposit-taking footprint.

## B.     CRA Examinations and Ratings

31.     As noted above, the Agencies implement the CRA through a supervisory examination process.  The statute provides that the Agencies "shall assess" a financial institution's "record of meeting the ***credit*** needs of its entire community, including low-and moderate-income neighborhoods."  12 U.S.C. § 2903(a)(1) (emphasis added).  It further specifies that evaluations "shall be presented separately for each metropolitan area in which a regulated depository institution maintains one or more domestic branch offices."  *Id.* § 2906(b)(1)(B).

32.     Consistent with the statutory text, the Agencies have long focused their assessments on a bank's performance meeting credit needs in areas where it has a physical deposit-taking presence.  This geographic nexus makes eminent sense because a bank's ability to make significant and meaningful CRA contributions requires cultivating relationships with creditworthy low- and

17

moderate-income borrowers and reflects a bank's knowledge of and relationships within the communities where it has a physical presence. *See, e.g.*, 87 Fed. Reg. 33, 884, 33,945 (June 3, 2022) ("The agencies recognize that many banks, especially large banks, frequently employ dedicated CRA teams with strong relationships to the community to ensure that the bank appropriately identifies and helps to meet community credit and community development needs.").

33.    To assess whether banks were meeting their communities' "credit needs," examiners have scrutinized lending, investment, and credit-related services.  For decades, the Agencies have evaluated home mortgages, small business loans, and small farms loans under the aptly-named "Lending Test." They have also considered investments that meet credit needs, such as providing funding for Community Development Financial Institutions that provide microcredit to small businesses or non-profits, under an "Investment Test."  And examiners have assessed services that banks provide to facilitate access to credit in their communities, such as branch locations and hours and credit-related volunteer efforts, under a "Service Test."  Importantly, each of these tests has been tethered to a bank's local community.

34.    The Agencies took the results of these tests and "prepare[d] a written evaluation of the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods."  12 U.S.C.

§ 2906(a).  Banks were then assigned a CRA rating.  There have traditionally been four rating categories: "Outstanding," "Satisfactory" (which has been further divided into "High Satisfactory" and "Low Satisfactory" for component tests), "Needs to Improve," and "Substantial Noncompliance."

35.    Anything below "Satisfactory" for a bank's overall CRA rating can lead to significant business restrictions.  For example, the Agencies consider a bank's CRA rating whenever a bank seeks regulatory approval to establish a new domestic branch; relocate a main office or branch; merge, consolidate with, or acquire the assets or assume the liabilities of an insured depository institution; or obtain a national bank charter or deposit insurance.  *See* 12 C.F.R. § 25.29 (Effect of CRA Performance on Applications).  A less-than-Satisfactory rating impedes a bank and any parent financial holding company from commencing an expanded set of financial activities or from acquiring an entity engaged in those activities.  *See* 12 U.S.C. § 1843(l)(2); 12 U.S.C. § 2903(c)(1)(A).  In addition, local governments, as well as the public, consider a bank's CRA rating in determining which banks to patronize.  Thus, by law and in practice, a less-than-Satisfactory rating locks a bank out of significant business opportunities.

**C.     The Final Rules**

36.     The Agencies issued a Notice of Proposed Rulemaking on June 3,

2022.  *See* 87 Fed. Reg. 33884 (June 3, 2022).

37.     The Final Rules were approved by the Agencies on October 24, 2023,

but were not published in the Federal Register until February 1, 2024.

38.     The FDIC board voted 3-2 in favor of the Final Rules, with Vice

Chairman Travis Hill and Director Jonathan McKernan in dissent.  *See Statement*

*by Jonathan McKernan, Director, FDIC, Board of Directors, on the Final Rule*

*Implementing the Community Reinvestment Act* (Oct. 24, 2023),

https://www.fdic.gov/news/speeches/2023/spoct2423f.html (hereinafter "Director

McKernan Statement"); *Statement by Vice Chairman Travis Hill on the Final Rule*

*on Community Reinvestment Act Regulations* (Oct. 24, 2023),

www.fdic.gov/news/speeches/2023/spoct2423c.html (hereinafter "Vice Chairman

Hill Statement").  At the Federal Reserve Board, a member of the Board of

Governors, Michelle W. Bowman, also issued a forceful dissent.  *See* Governor

Michelle W. Bowman, *Statement on the Community Reinvestment Act Final Rule*

(Oct. 24, 2023),

https://www.federalreserve.gov/aboutthefed/boardmeetings/files/bowman-

statement-20231024.pdf (hereinafter "Governor Bowman Statement").

39.     The new regulatory scheme—requiring a staggering 649 three-columned pages to articulate—is extraordinarily and unnecessarily complex.  The Final Rules are "by far the longest rulemaking the FDIC has ever issued," according to FDIC Vice Chairman Travis Hill.[5]  As FDIC Director McKernan noted in his dissent concerning the unpublished version of the Final Rules: "The approximately 60,000 words of rule text (including appendices), which contains more than 40 benchmarks and 20 metrics, are enough to preclude anyone from comprehending the rule as a whole.  More problematically, big chunks of the rule remain unfinished works in progress."[6]  As Governor Bowman noted: "The length, complexity, and number of required changes suggests that we will need an implementation phase that exceeds the two years adopted in the final rule." Governor Bowman Statement at 11.

40.     To begin, the Final Rules divide regulated banks into "small" (defined as less than $600 million in assets), "intermediate" (defined as having between $600 million and $2 billion in assets), and "large" (defined as having greater than $2 billion in assets), and impose additional requirements on "large" banks with assets over $10 billion.  The Final Rules apply differently to banks in these different asset categories.

---

[5] Vice Chairman Hill Statement.

[6] Director McKernan Statement.

41.     The Final Rules impose four performance tests that radically differ from the tests in effect under the prior regulatory framework.  Each depends on complex, new scoring formulas that ignore statutory boundaries (*i.e.*, geography) and introduce new categories subject to CRA analysis (*i.e.* deposit products): (1) the "Retail Lending Test;" (2) the "Retail Services and Products Test;" (3) the "Community Development Financing Test;" and (4) the "Community Development Services Test."  This chart summarizes the four tests and the banks to whom they apply:

## Performance Tests

| | Retail Lending Test | Retail Services & Products Test | Community Development Financing Test | Community Development Services Test |
|---|---|---|---|---|
| **Who is Evaluated** | • Large and Intermediate Banks<br>• Small Banks subject to Lending Test; or may opt-in to new test | • Large Banks | • Large Banks<br>• Intermediate Banks subject to existing CD test; or may opt-in to new test | • Large Banks |
| **What it Evaluates** | • This two-part test measures the total dollar volume of a bank's retail lending in each Facility-Based Assessment Area against its deposits, and then compares its performance against peer market volume and demographic benchmarks.<br>• Banks' lending performances are then evaluated for each qualifying Major Product Line in each assessment area, which can include closed-end mortgages, small business loans, small farm loans, or auto loans (for majority auto lenders only). | • This test utilizes benchmarks and comparators to assess a bank's CRA performance based on the quality of its delivery systems (e.g., branch availability and remote services) and the number of credit and deposit services offered to and utilized by Low- and Moderate-Income customers. | • This test measures the extent to which a bank meets the community development and investment needs in its assessment areas.<br>• The test uses a metric calculated as the ratio of a bank's community development loans and investments to its deposits, which is compared with market benchmarks for each assessment area. | • This test qualitatively reviews the extent to which a bank provides community development services for Low- and Moderate-Income borrowers in its assessment areas.<br>• Factors to be considered include a bank's number of service hours, number and type of services offered, and participation by bank executives. |

42.     The Retail Lending Test is a complex, two-part test.  It starts with a "Retail Lending Volume Screen" that measures the total dollar volume of a bank's retail lending in each Facility-Based Assessment Area against its deposits (which,

in turn, requires some banks to track and report deposit data at the local level), and then compares the bank's performance against peer market volume and demographic benchmarks.  89 Fed. Reg. 6788.  Banks that underperform on the Retail Lending Volume Screen receive a failing rating (either "Needs to Improve" or "Substantial Noncompliance") in the Facility-Based Assessment Area, unless the examiner decides that there is an acceptable explanation.

43.    The Retail Lending Test then analyzes a bank's lending performance for each qualifying "Major Product Line" in each assessment area, as compared with market benchmarks and community benchmarks in those areas.[7]  Major Product Lines include any of three retail loan categories (closed-end mortgages, small farm loans, and small business loans) that individually constitute 15% or more, based on a combination of loan dollars and loan count, of a bank's retail lending across all the product lines in a given assessment area.  Major Product Lines can also include automobile loans if such lending constitutes 50% or more of a bank's retail lending.

---

[7] As explained by the Agencies, market benchmarks "reflect the aggregate lending to low- and moderate-income census tracts or low- and moderate-income borrowers or lower-revenue small businesses or small farms in the [Retail Lending Test Area] by reporting lenders."  89 Fed. Reg. 6788.  These benchmarks assess a bank's lending relative to its peers.  Community benchmarks "reflect the demographics of an area," and assess a bank's lending relative to those demographics.  *Id*. at 6841.  These demographics include "the percentage of owner-occupied housing units that are in census tracts of different income levels, the percentage of families that are low-income, and the percentage of small businesses or small farms of different revenue levels in an area."  *Id*.

44.     The Retail Lending Test accounts for 40% of a large bank's CRA rating and 50% of an intermediate bank's CRA rating.

45.     The Retail Services and Products Test utilizes benchmarks to assess a bank's CRA performance based on its branch availability, remote services, and digital channels, as well as the number of credit and deposit services offered to and utilized by low- and moderate-income customers.  It also evaluates whether banks offer deposit products with low-cost features, such as no overdraft or non-sufficient fund fees, no or low minimum opening balances, no or low monthly maintenance fees, and free or low-cost check-cashing and bill-pay services, as well as the uptake and usage of accounts with these features by customers in low- and moderate-income areas.  This test accounts for 10% of a large bank's CRA rating.

46.     The Community Development Financing Test seeks to measure the extent to which a large bank (and intermediate banks that elect to be evaluated under this test) meets community development and investment needs in its assessment areas.  The test uses a metric calculated as the ratio of a bank's community development loans and investments to its deposits, which is then compared with market benchmarks for each Facilities-Based Assessment Area and at the state, multistate metropolitan statistical area, and institution levels.  It considers loans that promote affordable housing and other social goals such as disaster preparedness, weather resiliency, and financial literacy.  The Final Rules

24

also include a qualitative impact review of these community development loans and investments.  This test accounts for 40% of a large bank's CRA rating.

47.    The Community Development Services Test applies to large banks.  It assesses the extent to which a bank provides community development services such as financial counseling for low- and moderate-income borrowers in its assessment areas.  The Final Rules include both a qualitative review of community development services data and an impact and responsiveness review intended "to assess services that are particularly responsive to community needs."[8]  This test counts for 10% of a bank's CRA rating.

48.    Each of these tests includes multiple sub-parts and sub-parts of sub-parts that render the Final Rules exceedingly complex and burdensome to implement.  In addition, the Final Rules impose extensive new data collection and maintenance requirements in service of these tests.

49.    The Final Rules will take effect on April 1, 2024.  The Final Rules require banks to begin complying with most of the provisions (those involving new tests, definitions, and data collection and maintenance requirements) by January 1, 2026, with reporting requirements becoming applicable on January 1, 2027.  Banks are required to begin reporting data consistent with the Final Rules every April 1

---

[8] Memorandum from Staff to the Board of Governors, Final Rule Amending Community Reinvestment Act Regulations (Regulation BB) 3 (Oct. 16, 2023), https://www.federalreserve.gov/aboutthefed/boardmeetings/files/cra-memo-20231024.pdf.

beginning April 1, 2027.  89 Fed. Reg. 6578–79.  Given the complexity of the
Final Rules and the changes that must occur, banks cannot wait until 2025 or 2026
to make these changes.  They must act now, as the OCC itself acknowledges an
estimated compliance cost in excess of $90 million for the first 12 months after
publication.  89 Fed. Reg. 7106.

### D.    The Final Rules Exceed the Agencies' Statutory Authority

50.    A federal agency is a creature of statute.  It has only those powers
conferred upon it by Congress.  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374
(1986).  The Agencies exceeded their powers in two significant ways here.  First,
the Agencies will begin assessing banks' activities outside of the locations where
they maintain a physical presence and accept deposits, thus ignoring the critical
geographic limits that Congress incorporated into the CRA.  Second, the Agencies
will assess banks' *deposit* products rather than the *credit* products that Congress
targeted in the statute.

### 1.    The Agencies Ignore the Geographic Limits of the CRA

51.    The Agencies' consideration of banks' activities outside their deposit-
taking footprint is most evident in the new Retail Lending Test.  This test accounts
for 40% of large banks' CRA ratings and 50% of intermediate banks' CRA ratings.
89 Fed. Reg. 7129–30.

52.     As mentioned above, the Retail Lending Test adds "Retail Lending Assessment Areas" for any large bank that does not conduct more than 80% of its retail lending inside of its Facility-Based Assessment Areas. *Id*. at 6577.  A Retail Lending Assessment Area consists of any metropolitan statistical area or the combined non-metropolitan statistical areas of a state in which the bank originated at least 150 closed-end home mortgage loans or at least 400 small business loans in each of the two preceding calendar years. *Id.*  The Final Rules expressly exclude from these newly-minted assessment areas any areas that are part of the bank's Facility Based Assessment Areas—those tied to a bank's physical branches or ATMs where the bank accepts deposits.  Many large banks will have several Retail Lending Assessment Areas under the Final Rules. *See id*. at 6740.  The Agencies admit that at least two banks will have more than 100 new assessment areas. *See id*. at 6754.

53.     The Agencies also consider retail lending performance for every large bank and some intermediate banks in an "Outside Retail Lending Area"—the nationwide area outside the banks' Facility Based Assessment Areas and Retail Lending Assessment Areas that measures lending that occurs anywhere else. *Id*. at 6577.  By definition, Outside Retail Lending Areas (like Retail Lending Assessment Areas) encompass the *exact opposite* of the communities in which a bank accepts deposits.

27

54.     These new assessment areas exceed the Agencies' powers under the statute.  As noted above, when Congress enacted the CRA, it focused on areas where banks have a physical presence and accept deposits, and it instructed agencies to assess a bank's "record of meeting the credit needs of its entire *community*, including low- and moderate-income neighborhoods, consistent with the safe and sound operation of such institution."  12 U.S.C. § 2903(a)(1) (emphasis added).

55.     Although Congress did not itself define the word "community," the statutory indicia confirm that it used this term in the ordinary sense as referring to a geographic subunit along the lines of a county or town.  When "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms."  *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (citation omitted).  Webster's *Collegiate Dictionary* (1974) defines "community" as "[a] people with common interests living in a particular area," and "a group of people with a common characteristic or interest living together *within* a larger society."[9]  Likewise, Webster's *Third New International Dictionary* (1981) defines "community" as "the people living in a particular place or region and usu[ally]

---

[9] *Community*, WEBSTER'S COLLEGIATE DICTIONARY (1974) (emphasis added).

linked by common interests," describing such spaces as "small [and] compact . . .."[10]

56.    In sections 2901(a)(3) and (b), Congress confirmed that banks were required to meet the needs of their "local communities," not the credit needs of their entire state or nation.  12 U.S.C. §§ 2901(a), (b).  Webster's *Collegiate Dictionary* (1974) defines "local" as "not general or widespread," and "primarily serving the needs of a particular limited district," as in "a local or particular branch . . . of an organization."[11]  Webster's *Third New International Dictionary* (1981) defines "local" as "not general or widespread" and "primarily serving the needs of a particular limited district, often a community or minor political subdivision . . . applicable in or relating to such a district only."[12]  These circumscribed meanings are at odds with the Agencies' expansive reading of the term to include much larger geographies where banks have no physical bank presence.

57.    This ordinary understanding of "community" fits neatly within other indicia of meaning from the CRA itself.  For example, that meaning is consistent with the focus in § 2903(a)(1) on lending in particular *neighborhoods*, a

---

[10] *Community*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981).

[11] *Local*, WEBSTER'S COLLEGIATE DICTIONARY (1974).

[12] *Local*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981).

subdivision that would be considered dramatically below one's entire state or country but as just one geographic subunit down from a town, county, or a "local community." One would not ordinarily refer to the "nation, including particular neighborhoods." Similarly, that ordinary meaning of "community" is consistent with the CRA's instruction to present a separate written evaluation for each metropolitan area in which a bank has one or more "domestic branch" offices, defined as "any branch office or other facility of a regulated financial institution that accepts deposits, located in any State." *See* 12 U.S.C. § 2906(b)(1)(B), (e)(1). And it fits with the CRA's instruction that a supervisory agency should also prepare an evaluation of an "institution's record of performance" within a "multistate metropolitan area" if it "maintains domestic branches in 2 or more States within [that] multistate metropolitan area." 12 U.S.C. § 2906(d)(2). These instructions to focus on the branch-level or, in some multistate cases on a single metropolitan area, would make little sense if the CRA's definition of "community" were simply anywhere a bank's retail loan customers are located. Indeed, given this focus of the statute, it is perhaps no surprise that the CRA instructs the supervisory agencies to take an institution's CRA record "into account in its evaluation of an application for a deposit facility by such institution," a matter of predominantly local concern. 12 U.S.C. § 2903(a)(2).

30

58.     Further, the statute's express authorization that "[a] financial institution whose business predominantly consists of serving the needs of military personnel who are not located within a defined geographic area may define its 'entire community' to include its entire deposit customer base without regard to geographic proximity" would make little sense if "community" could otherwise be characterized at a nationwide level.  *See* 12 U.S.C. § 2902(4).

59.     The statutory term "community" thus has a clear meaning, evident from the statutory text and context, and reinforced by legislative history that focuses on communities where banks have a physical presence and accept deposits. Congress was concerned with the geographical mismatch between deposit-taking activities and lending activities.  It understood that banks were using deposits collected from throughout the local communities in which they were located, but disproportionately funding loans and other extensions of credit to affluent portions of those communities.  In the CRA, Congress encouraged banks to reinvest in *all* parts of the communities from which they took deposits, not just the wealthy neighborhoods.

60.     Since its enactment, regulations issued pursuant to the CRA have adhered to this geographic, deposit-taking focus.  *See, e.g.,* 12 C.F.R. § 228.41(c) (defining assessment areas to include the census tracts encompassing a bank's deposit-taking facilities as well as the adjoining census tracts).

31

61.     The Final Rules ignore this geographic limitation, instead assessing banks on lending that occurs in Retail Lending Assessment Areas and Outside Retail Lending Areas where they have no physical presence and, therefore, reduced ability to identify and meet community needs.

62.     The Agencies acknowledge that the statute does not define the term "community," but nonetheless assume the supposed authority to "determine[], based on their supervisory experience and expertise, that for at least certain banks, the bank's 'entire community' can reasonably be considered to include those geographic areas where the bank's retail loan borrowers are located."  89 Fed. Reg. 6759.  The Agencies rely heavily on the authority delegated to them "to carry out the purposes" of the CRA, but that authority does not give the Agencies' authority to ignore the plain text of the CRA.  And even Congress's statement of purpose focused on "local communities," a phrase that cannot be understood as capaciously as the Agencies would need it to be read to ignore the geographic limitations of deposit-taking branches.

63.     An agency is not free to write its own law.  As the Department of the Treasury has recognized, "[i]n 1977, most banks were local businesses that collected deposits through a finite number of branches, did not operate statewide, and were prohibited from operating on an interstate basis."  United States Department of the Treasury, *Community Reinvestment Act – Findings and*

32

*Recommendations* (April 3, 2018),

https://home.treasury.gov/sites/default/files/2018-04/4-3-
18%20CRA%20memo.pdf.  That had not changed even when the last major
revisions to the CRA regulations were made in 1995.  *See* 166 Cong. Rec. H2576
(2020) (statement of Rep. Patrick McHenry) (explaining that "banking [still]
received most of their deposits through branches" in 1995, and thus "the old
regulations that are on the books still rely heavily on branch locations").  In fact,
this was the understanding of the Agencies in their 2005 regulations, 70 Fed. Reg.
44256 (Aug. 2, 2005), which the Final Rules displace.  The Agencies may believe
that developments in the banking world justify changes to the CRA, but, as Federal
Reserve Governor Bowman observed in her dissent: "Congress, not the banking
agencies, is responsible for modernizing the statute."  Governor Bowman
Statement at 5; *see also* Director McKernan Statement ("I have not seen a
convincing argument that we have the authority to consider lending activities
outside a bank's facility-based assessment areas.").

     64.    Additionally, even if the CRA could be read to encompass the
authority the Agencies claim, the Supreme Court has made it clear that courts must
"presume that Congress intends to make major policy decisions itself, not leave
those decisions to agencies."  *West Virginia v. EPA*, 597 U.S. 697, 722–23 (2022).
Here, the Agencies have rejected the geographic limits of the CRA, claiming for

themselves the boundless power to impose regulations on banks in any

"geographic areas where [a] bank's retail loan borrowers are located" without

regard for the guardrails placed by Congress.  Thus, it is crucial at this juncture that

this Court rein in the Agencies' faulty interpretation of their powers under this

statute.  In cases like this one, where the Agencies' assertion of authority

implicates major questions, "something more than a merely plausible textual basis

for the agency action is necessary.  The agency instead must point to clear

congressional authorization for the power it claims."  *Id.*

### 2.    The Agencies Ignore the CRA's Focus on Credit

65.    The second significant statutory error that the Agencies make is to

depart from the statute's focus on *credit*.  This departure can predominantly be

seen in the Retail Services and Products Test, each component of which builds in

consideration of bank activities outside of the credit space.

66.    At a high level, the services component of that test assesses branch

availability, branch services (including whether the branches offer "[f]ree or low-

cost check cashing services," "reasonably priced international remittance services,"

and "electronic benefit transfers"), remote service availability, and digital delivery

systems (including "[t]he number of checking and savings accounts opened each

calendar year during the evaluation period digitally and through other delivery

systems in low-, moderate-, middle-, and upper-income census tracts"). *See* 89 Fed. Reg. 7120–21.

67.     The products component of that test evaluates credit products and, in the case of certain large banks, "a bank's deposit products." *Id*. at 7121.  This evaluation assesses whether such banks offer deposit products with "low-cost features, including but not limited to, deposit products with no overdraft or insufficient funds fees, no or low minimum opening balance, no or low monthly maintenance fees, or free or low-cost check-cashing and bill-pay services"; other features like "immediate access to funds for customers cashing government, payroll, or bank-issued checks"; or "[f]eatures facilitating inclusivity of access by individuals without banking or credit histories or with adverse banking histories." *Id*.  As part of its assessment, the Agencies will consider not merely the availability of these deposit products but the "usage" and the "[m]arketing, partnerships, and other activities that the bank has undertaken to promote awareness and use of" these products by low- and moderate-income individuals, families, or households." *Id*. at 7122.  There is no independent requirement that banks offer these product features, so by doing so, the Agencies offer more evidence that they are placing their own policy preferences above those of Congress.

68.     Each component of this test thus assesses banks on products or services that are not "credit" products or services.  But Congress's instruction to

35

the Agencies was explicit: to "assess the institution's record of meeting the *credit needs* of its entire community."  12 U.S.C. § 2903(b)(1).  Congress knew the difference between "credit" and "deposit" activities.  Indeed, in its findings and statement of purpose, Congress recognized that communities have "need for credit services as well as deposit services" but explicitly emphasized its goal in the CRA "to encourage such institutions to help meet the *credit needs*" of their local communities.  *Id.* § 2901.  And it repeated that instruction in the operative part of the statute, instructing agencies to assess an institution's "record of meeting the *credit* needs of its entire community" and "take such record into account in its evaluation of an application for a deposit facility."  *Id.* § 2903(a).

69.    That focus on credit makes sense, as Congress was concerned about the mismatch between banks accepting deposits from low- and moderate-income borrowers but not serving those borrowers with their credit products.

70.    In the Final Rules, the Agencies claim statutory authority to evaluate large bank deposit products based on their assertion "that there is a sufficient nexus between deposit products and the provision of credit" because, for example, "individuals improve their financial stability and build wealth through deposit accounts," "deposit products can help consumers qualify for loans by facilitating consumers' savings so that they can post collateral and to pay transaction costs,"

36

and "deposit products are a pathway for a bank customer to establish an ongoing relationship with a bank." 89 Fed. Reg. 6943–44.

71.    All of these things could be true, however, and it still would not enlarge the authority granted to the Agencies by the statute.  Congress could have instructed the Agencies more broadly to assess an institution's record of supporting the financial health of low- and moderate-income borrowers.  It likewise could have recognized any nexus between credit and deposit products and instructed Agencies to assess an institution's record of supporting the credit and deposit needs of low- and moderate-income borrowers.  It did not do so.

72.    The Agencies note that the existing regulations allow them generally to consider "[t]he range of services provided in low-, moderate-, middle-, and upper-income geographies and the degree to which the services are tailored to meet the needs of those geographies," *see* 12 C.F.R. § 25.24(d)(4), and that certain questions and answers released in 2016 have interpreted this language broadly to include some deposit products, *see* 81 Fed. Reg. 48542–43.  But interpretive letters cannot change the underlying statute.  And the fact that the Agencies did not claim such sweeping authority until 2016 only underscores the disconnect between the Agencies' approach and the meaning of this 1977 statute.

73.    Likewise, the Agencies seem to suggest that their assessment of deposit products is in some way permissible because the Final Rules instruct that

37

the "evaluation of a bank's retail banking products . . . may only contribute positively to the bank's Retail Services and Products Test conclusion." 89 Fed. Reg. 6951. But as an initial matter, the Agencies gave no such instruction for the services part of the test, *id.*, which means that banks may still be penalized for failing to open digitally a certain number of checking and savings accounts. And given the Agencies' clearly stated intention to compare banks against each other throughout the Final Rules, banks will feel forced to compete with each other on the products side. In any event, they have no authority to assess the institution's deposit products in the first instance. Such assessment imposes real compliance costs on a bank, even setting aside the penalty that may result from such assessment.

### E.   Arbitrary and Capricious Agency Actions

74.   The Final Rules also offer myriad examples of unreasoned and unreasonable decision making. The CRA requires periodic evaluation of a bank's CRA performance, but the Final Rules leave banks guessing about what areas will be assessed, which products will qualify for CRA evaluation, and what market benchmarks they must meet in order to earn a "Satisfactory," much less an "Outstanding," rating. Further, the costs of the Final Rules are enormous, both at the implementation stage and on an annual basis going forward. Yet the Agencies offer no predictions, let alone evidence, that the Final Rules will lead to more

lending of the sort that the CRA was designed to encourage.  To the contrary, the Agencies turn a blind eye to the substantial likelihood that these Final Rules will actually reduce lending to low- and moderate-income borrowers.

75.     Such decision making violates the APA.  *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).  Three examples follow.

### 1.     The Final Rules' application to unknown areas and products, and the use of unknown benchmarks

76.     The Final Rules are arbitrary and capricious because they deprive banks of notice concerning the areas and products that will be assessed and the market benchmarks against which their performance will be evaluated.

77.     *First*, the Final Rules establish that the evaluation period for most banks will be three years.  However, the Final Rules include a two-year lookback for purposes of determining whether and how many Retail Lending Assessment Areas a bank will have.  As a result, Retail Lending Assessment Areas and their attendant requirements may be triggered during the middle of an evaluation period, leaving the bank with no notice to ensure that it is operating within the parameters of the Final Rules for that particular Retail Lending Assessment Area.  The Final Rules arbitrarily deprive banks of timely notice of the areas in which their CRA performance will be evaluated so that they can tailor their activities to the idiosyncrasies of the various tests established by the Final Rules for achieving "Satisfactory" or better CRA ratings in those areas.  If the Agencies intend to

39

assess banks outside of areas where they have a physical presence and take deposits, they must ensure that the banks can identify those areas before the evaluation period begins, as it can take significant time—sometimes years—to build up the volume of CRA-qualifying loans.

78.     *Second*, the Retail Lending Test in the Final Rules requires large banks to track and report retail lending in any assessment area for three or four separate "major product lines."[13]  89 Fed. Reg. 7118.  If any category of loans comprises 15% or more of a bank's retail lending in that assessment area based on a combination of loan dollars and loan count (which may not be knowable until the end of the evaluation period), and the bank's lending meets or exceeds a retail lending volume threshold, the Agencies will evaluate the bank's CRA performance for that credit product.  *Id*. at 7139.  Once again, this is arbitrary and capricious because banks do not know with certainty which retail products will meet the 15% threshold and be subject to evaluation until the examination period closes.

---

[13] The Final Rules require the collection and evaluation of automobile loan data for large banks that are majority automobile lenders.  The Agencies explained that, for those banks, "the agencies evaluate the distribution of a bank's originated and purchased automobile loans, including indirect automobile loans, in facility-based assessment areas or outside retail lending area in which automobile loans constitute a major product line."  89 Fed. Reg. 6825.  For a given geographical area (either a Facility-Based Assessment Area or Outside Retail Lending Area), automobile loans constitute a "major product line" for a majority automobile lending bank if, based on a combination of loan dollars and loan counts, those loans comprise at least 15% of the bank's retail lending there.  *Id*. at 6613, 6817, 6829.

79.     *Third*, the Retail Lending Test evaluates a bank's CRA performance compared to market benchmarks.[14]  To earn an "Outstanding" rating, a bank must exceed 115% of a market lending benchmark based on peer lending; a "High Satisfactory" score requires at least 105% of the market benchmark.  This comparative testing methodology is unreasonable, because a peer-based standard based on contemporaneous lending metrics, *see id.* at 7118–19, cannot be known until after the evaluation period ends and all banks have publicly reported their data for the final year of the period.  As a practical matter, rather than having clarity about the level of lending needed to earn an "Outstanding" or "Satisfactory" CRA rating under the market benchmarks, banks now are left to guess whether their CRA lending will be sufficient and may feel pressure to engage in risky lending, contrary to the intent of the CRA, as they are forced to compete against each other for these ratings.  For some banks, achieving 105% or more of the market benchmark may be economically untenable, particularly in assessment areas outside of their local communities where they do not have a physical presence and would be required to increase their efforts and expenditures just to

---

[14] Based on historic data, community benchmarks are substantially higher than market benchmarks in a number of geographic areas, indicating that it would be extremely difficult for banks to meet those community benchmarks.  Thus, banks are left to choose between an unattainable benchmark or an unknown benchmark; as a practical matter, they will not know the benchmark they have to meet to obtain a particular CRA rating until after the end of the evaluation period.  *See id*. at 6787–88.

41

achieve a passing score under the Final Rules' requirements.  And if banks come to

perceive these benchmarks to be unattainable, many will likely reduce or wholly

eliminate their business in Retail Lending Assessment Areas.

### 2.      Cost-Benefit Analysis

80.     Section 302(a) of the Riegle Community Development and

Regulatory Improvement Act of 1994 expressly requires the Agencies, "[i]n

determining the effective date and administrative compliance requirements for new

regulations that impose additional reporting, disclosure, or other requirements on

insured depository institutions," to "consider, consistent with the principles of

safety and soundness and the public interest" both "any administrative burdens that

such regulations would place on depository institutions" and "the benefits of such

regulations."  12 U.S.C. § 4802.  And the Administrative Procedure Act requires

the Agencies to use reasoned decision-making in carrying out that mandate.  Yet

here, the Agencies' cost/benefit analysis is anything but reasoned.

81.     The Final Rules subject many banks, particularly intermediate and

large banks, to significant compliance burdens.  Banks must collect and report far

more data than ever before.  Aside from data already tracked and reported under

prior regulations, there are new and onerous data collection, validation, and

reporting requirements for deposits data, retail services data on digital delivery

systems, retail services data on responsive deposit products, community

development loan and investment data, community development services data, and Major Product Lines (including, for some banks, automobile loans not previously subject to CRA reporting), and obligations to provide such data for a broader range of assessment areas (Retail Lending Assessment Areas and Outside Retail Lending Areas).

82.     For the first time, some banks now will be required to geocode information on deposits in a manner that cannot be captured by their current systems.  Specifically, the Final Rules require these banks to collect the dollar amount of their deposits at the county level based on deposit location.  While many banks have systems that capture customer addresses for the purposes of their customer identification programs, many of those systems are not designed to aggregate the information at the county level.

83.     For many banks, the task of updating their data collection and compliance monitoring systems to comply with the Final Rules will be time-consuming and costly.  Not only must banks develop and test new computer programs and data collection capabilities, they must also conduct program planning and analyses, upgrade vendor relationships, hire more compliance personnel and conduct extensive staff training.  Banks also will be required to cultivate relationships in new assessment areas to facilitate the identification and

pursuit of sound low- and moderate-income lending opportunities, or to purchase low- and moderate-income loans.

84.    Compliance with the Final Rules will be especially burdensome given that banks may be required to implement the new CRA regulations in tandem with the proposed Basel III capital regulations and the CFPB's anticipated final small business lending data collection rule (Dodd-Frank Act § 1071), that is stayed as to covered financial institutions pending the Supreme Court's decision on the CFPB's funding mechanism but may become effective after that. *See Texas Bankers Ass'n v. Consumer Fin. Prot. Bureau*, No. 7:23-CV-00144, 2023 WL 8480105, at *3 (S.D. Tex. Oct. 26, 2023). For many banks, the same staff will be charged with implementing these new regulations, particularly as it pertains to overhauling technology systems and standing up new data collection and reporting mechanisms. This three-pronged implementation will make the time pressures of the implementation period particularly acute and increase competition for a scarce supply of third-party vendor resources. The pressures are exacerbated by the consequences of failure: compliance shortcomings and failures associated with data collection and reporting are often cited by regulators as a basis for enforcement actions, including sizeable civil money penalties, even though the CRA itself has no enforcement mechanism.

85.    Given the pressures that the Final Rules will place upon banks' existing staff, banks will be required to both rely more heavily on outside vendors and increase the number of internal personnel they employ.  Even under the status quo, many banks depend on software vendors and core operating system providers to furnish services for compliance with the existing CRA framework.  Many of Plaintiffs' members will need to hire outside vendors to assist with compliance with the Final Rules.  Some members report that they will also need to boost the number of full-time CRA personnel they directly employ under the Final Rules.

86.    Defendant OCC estimates the overall compliance burden in just the first 12 months to be $91.8 million.  89 Fed. Reg. 7106.  Of this amount, the OCC estimates that the costs will be broken down approximately as follows: $7.9 million for banks to undertake increased data collection, recordkeeping or reporting; $82 million for large banks to collect, maintain, and report annually geographic data on deposits; and $1.9 million for certain banks to prepare and submit compliant strategic plans.  *Id*.  The Agencies also calculate that, industry-wide, banks will expend between approximately 105,500 and 235,000 hours *each year* in reporting, recordkeeping, and disclosures.  *Id*.

87.    The ABA surveyed members about their estimated compliance costs associated with the proposed rule (which proposed an initial 12-month compliance period, rather than the 2-year period under the Final Rules).  Over 100 banks

45

responded.  30 large banks with assets of $2 to $10 billion had average estimated implementation costs in the first 12 months of $121,649 per bank.  31 large banks with assets over $10 billion had average estimated implementation costs in the first 12 months of $3,223,081 per bank.  Extrapolating these numbers to the 417 large banks with assets between $2 billion and $10 billion, and the 160 large banks with assets over $10 billion, results in estimated implementation costs of $566,420,592.  When the estimated costs for intermediate and small banks are also considered, the initial first-year implementation costs exceed $600 million—more than 6 times the OCC's estimate of $91.8 million.  And even assuming that some costs could be saved in light of the two-year implementation period that the Agencies adopted in the Final Rule, the costs would be still be far higher than the OCC's estimate.

88.    Setting aside the underestimation of the actual compliance burden of these Final Rules, the Agencies fail to explain how the benefits could possibly outweigh that burden.  The Agencies alternate between justifying these burdens as necessary to calculate market benchmarks for deposits and lending volumes needed for the new tests, *see, e.g.,* 87 Fed. Reg. at 33995, and outright dismissing the impact of these burdens upon banks.  *See, e.g.,* 89 Fed. Reg. 6969, 7062, 7073.  They emphasize, for example, that they have tailored the burdens to "those banks with the greatest capacity to meet the rule's requirements and lend to their

communities," *id*. at 7107, but that does not mean that those requirements are justified in the first instance.

89.     For example, the Agencies assert that "including the distribution of these banks' deposits by depositor location is an important aspect of the effort to modernize CRA," *id*. at 7073, and would "result in more accurate metrics and benchmarks," *id*.  But the Agencies fail to explain why credit needs are mathematically correlated to deposits to begin with.  Moreover, they fail to appreciate that considering geocoded deposit information to set the market benchmarks may in fact unfairly skew CRA assessments because many corporate deposits emanate not from where a given corporation is headquartered, but where the treasurer happens to be located.  And the Agencies fail to rationally explain why this data, which they acknowledge will impose significant burdens, is necessary for evaluating large banks with greater than $10 billion in assets when the data found in the FDIC Summary of Deposits is sufficient for analyzing all others.  Requiring banks, collectively, to incur more than a half billion dollars of additional compliance costs to implement the Final Rules should not be such a casual undertaking.

90.     The Agencies' analysis of the benefits of the Final Rules is notably sparse.  The Agencies do not attempt to quantify any purported increase in credit or lending to low- and moderate-income borrowers that is expected to result from

their promulgation; the most they offer is that "the agencies believe the use of metrics and data in the final rule is appropriately tailored to encourage, rather than deter, reinvestment in hard to serve areas." *Id*. at 6586. Consequently, any benefit to low- or moderate-income borrowers or communities from these Final Rules is purely speculative. And although the Agencies reference purported benefits of transparency and consistency in their evaluations, they fail to explain why the existing framework is insufficient on those bases. Transparency for transparency's sake is not a sufficient basis for imposing the significant compliance burden in these Final Rules.

### 3. The Agencies' Apparent Failure to Consider the Real-World Impact of the Final Rules

91.     The Final Rules are largely devoid of reasoned analysis that addresses their real-world consequences. For example, the Agencies failed to consider the extent to which the cumulative effect of heightened performance measures and the construction of Retail Lending Assessment Areas and Outside Retail Lending Areas could result in the reduction of product and service offerings in certain markets. This is despite noting commenters' concerns that this expansion would create significant challenges to banks for the following reasons: (i) "certain bank characteristics, including a limited capacity to serve an entire county, a limited branch network in a county, and the location of the bank's branch or branches, could make it challenging to serve an entire county"; (ii) "serving a

48

facility-based assessment area composed of whole counties [c]ould be so
challenging that it would require the bank to divert resources from other programs,
including those that serve low- or moderate-income communities"; and (iii)
"characteristics of a county could make it challenging to serve the entirety of that
county, including the geographic size or other geographic characteristics, economic
characteristics, the population and population density, and the level of competition
among other banks in the county." *Id*. at 6732.  The Agencies also do not provide
sufficient data and analysis on whether the creation of Retail Lending Assessment
Areas will result in the development of CRA "hot spots"—or the exacerbation of
existing hot spots—that will command increased premiums for the purchase of the
finite number of low- and moderate-income loans in those locations, potentially
loosening credit standards and leading to unsound lending practices.[15]  Rather, the
Agencies simply presume that banks will not modify their business strategies to
reflect the costs and risks of the Final Rules.

92.    While the Agencies may indeed have introduced through the Final
Rules "more rigor and stricter standards," 87 Fed. Reg. 33988, what they have
failed to do is produce any meaningful evidence that the new burdensome tests will

---

[15] By "hot spots," Plaintiffs are describing areas wherein sound low- and moderate-income
lending opportunities are particularly limited, encouraging banks active in those areas to
scramble in order to amass the most lending opportunities possible—and thereby position
themselves best to achieve a satisfactory CRA score.

increase lending in low- or moderate-income communities—the very purpose of the CRA.  Indeed, these rules may have just the opposite effect.  Some banks may elect not to lend, or to scale back lending, in areas outside their geographic deposit-taking footprint to avoid triggering assessment areas outside their local community.  All this was done, as Governor Bowman stated, with "no discussion or explanation for why currently satisfactory practices will no longer be satisfactory."  Governor Bowman Statement at 8.

93.    Many member banks represented by Plaintiffs will need to take immediate steps to comply with the expansive data collection and reporting requirements in the Final Rules.  These are substantial and non-compensable compliance costs, which will by their very nature force businesses to immediately forgo other pressing business priorities.  This is not reasoned decision-making.  Imposing such burdens with little evidence or justification is the epitome of arbitrary and capricious rulemaking.

## CLAIMS FOR RELIEF

## COUNT I

## Violation of the Administrative Procedure Act: Exceeds Statutory Authority

## (5 U.S.C. § 706(2)(A), (C))

94.    Plaintiffs repeat and reincorporate all their prior allegations.

95.    Under the APA, "a reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A), (C).  It is well-established that Executive Branch agencies lack authority to rewrite Congress's plain language under the guise of interpretation, and no deference is owed when an agency acts in contravention of a statute.  Moreover, "[a]n agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority."  *Colo. River Indian Tribes v. Nat. Indian Gaming Commission*, 466 F.3d 134, 139 (2006).

96.    The Final Rules exceed the Agencies' statutory authority by assessing banks on their responsiveness to credit needs outside of their geographic deposit-taking footprint.  The CRA authorizes Agencies only to assess a bank's "record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods, consistent with the safe and sound operation of such institution.  12 U.S.C. § 2903(a)(1).  Community is used in its ordinary sense, as a delineation of a local geographic area around a bank's deposit-taking facilities, like a branch or a deposit-taking ATM.  The only statutory exception is for banks that predominately serve military personnel; in that special circumstance, the statute permits a bank to define its entire community to include out-of-footprint geographies.  The Agencies' more expansive interpretation of "community" to

encompass large areas where banks have no deposit-taking footprint would thus not be entitled to deference, even if they had claimed it, which they did not.

97.     Moreover, the Retail Services and Products Test exceeds the Agencies' statutory authority under the CRA by assessing banks on their digital delivery systems and deposit products.  The CRA instructs the Agencies to "assess [an] institution's record of meeting the ***credit needs*** of its entire community, including low- and moderate-income neighborhoods."  12 U.S.C. § 2903(a)(1) (emphasis added).  Congress knew the difference between deposit needs and credit needs, *see, e.g.*, 12 U.S.C. § 2901, and its explicit choice to focus on *credit* needs cabins the Agencies' authority.  The Final Rules, however, provide that Agencies will assess banks' deposit products, both in terms of their features and the numbers opened.

98.     Agency action is not permissible if the agency has acted in excess of its statutory authority. *Michigan v. EPA*, 576 U.S. 743 (2015), makes it clear that a "necessary or appropriate" provision in an agency's authorizing statute, such as the one at issue here, does not empower the agency to pursue rulemaking that is not otherwise authorized by Congress.  Moreover, for questions of political and economic significance, the Supreme Court, construing the "major question doctrine," held that a "merely plausible textual basis for the agency action" is not enough; instead, "the agency instead must point to 'clear congressional

authorization' for the power it claims." *West Virginia*, 597 U.S. at 723 (citing

*Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).  Even if the Final Rules'

attempt to regulate banks in a geographically boundless manner could be

understood as consistent with the authority conveyed by the CRA—and again, they

cannot—their promulgation would be a clear example of economically significant

agency action taken in the absence of the requisite "clear congressional

authorization." *See id.*

99.     The CRA has been politically significant since it was enacted in 1977.

An agency action is politically significant if Congress has been "engaged in robust

debates" over bills authorizing something like the agency's action.  *Brown v. U.S.*

*Department of Education*, 640 F. Supp. 3d 644, 664 (N.D. Tex. 2022) (citing *West*

*Virginia*, 597 U.S. at 743 (Gorsuch, J., concurring)), *vacated on other grounds*.  If

Congress "considered and rejected" such bills, "that too may be a sign that an

agency is attempting to work around the legislative process to resolve for itself a

question of great political significance."  *Id.*  In this case, Congress has not only,

on many occasions, considered and rejected legislation that would substantially

amend the CRA,[16] but Congress has before it and has failed to act upon a bill that

---

[16] *See, e.g.,* Community Reinvestment Modernization Act of 2000, H.R. 4893, 106th Cong. (2000); Community Reinvestment Modernization Act of 2001, H.R. 865, 107th Cong. (2001); Community Reinvestment Modernization Act of 2007, H.R. 1289, 110th Cong. (2007); Community Reinvestment Modernization Act of 2009, H.R. 1479, 111th Cong. (2009).

would make some of the changes the Final Rules attempt to make.  *See* Making

Communities Stronger through the Community Reinvestment Act, H.R. 8833,

117th Cong. (2022).

## COUNT II

## Violation of the Administrative Procedure Act: Arbitrary and Capricious
## (5 U.S.C. § 706(2)(A))

100.   Plaintiffs repeat and reincorporate all their prior allegations.

101.   The APA requires a court to "hold unlawful and set aside agency

action, findings, and conclusions found to be arbitrary, capricious, or an abuse of

discretion."  5 U.S.C. § 706(2)(A).  To meet the APA's requirements, federal

agencies must engage in "reasoned decision-making."  *Michigan v. EPA*, 576 U.S.

743, 750 (2015).  An agency action is arbitrary and capricious if the agency "has

relied on factors which Congress has not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its decision

that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983) (internal quotation marks omitted); *see also Encino Motorcars*, 579 U.S. at

220–22; *Community Financial Services of America, Ltd. v. Consumer Financial*

*Protection Bureau*, 51 F.4th 616, 629 (5th Cir. 2022).  Additionally, when an

agency decides to depart from decades-long past practices and administrative interpretations, it must "acknowledge the change and offer a reasoned explanation for it." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) (citing *Encino Motorcars, LLC*, 579 U.S. at 221–22).

102.   The arbitrary and capricious nature of the Final Rules is apparent on many fronts, including:

> a.   By failing to give banks reasonable notice of the areas and products that will be assessed and the market benchmarks against which their performance will be evaluated;
>
> b.   By failing to conduct an adequate cost benefit analysis; and
>
> c.   By failing to consider the real-world consequences of the Final Rules.

103.   In sum, the length and complexity of these Final Rules cannot conceal the fundamental lack of reasoned decision making in the Agencies' push to "modernize" the CRA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for an order and judgment in their favor and against defendants comprising the following relief:

1.   A declaration that the Final Rules violate the CRA and the APA;

2.      An order and judgment holding unlawful, enjoining, and setting aside the Final Rules as illegal or otherwise impermissible;

3.      An order and judgment holding unlawful, enjoining, and setting aside the Community Reinvestment Act Interagency Questions and Answers Regarding Community Investment Guidance, 81 Fed. Reg. 48506 (2016), insofar as they relate to answers regarding interpretation of the §___.24—Service Test, 81 Fed. Reg. 48452-43;

3.      Costs and attorneys' fees pursuant to any applicable statute or authority; and

4.      Any other relief that the Court deems just and appropriate.

DATED: February 5, 2024                Respectfully submitted,

                                       */s/ Thomas C. Riney*
                                       UNDERWOOD LAW FIRM, P.C.
                                       Thomas C. Riney (Texas Bar No. 16935100)
                                       Slater Elza (Texas Bar No. 24000747)
                                       PO 9158
                                       Amarillo, Texas 79105
                                       (806) 376-5613
                                       (806) 349-9474
                                       tom.riney@uwlaw.com
                                       slater.elza@uwlaw.com

                                       WILLIAMS & CONNOLLY LLP
                                       Ryan Scarborough (*pro hac vice*
                                       forthcoming)
                                       Jesse Smallwood (*pro hac vice* forthcoming)
                                       William R. Murray, Jr. (*pro hac vice*
                                       forthcoming)

Richard A. Olderman (*pro hac vice* forthcoming)
Alex Gaudio (*pro hac vice* forthcoming)
Armani Madison (*pro hac vice* forthcoming)
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
rscarborough@wc.com
jsmallwood@wc.com
bmurray@wc.com
rolderman@wc.com
agaudio@wc.com
amadison@wc.com

*Attorneys for Plaintiffs*

AMERICAN BANKERS ASSOCIATION
Thomas Pinder (*pro hac vice* forthcoming)
Andrew Doersam (*pro hac vice* forthcoming)
1333 New Hampshire Ave. NW
Washington, DC 20036
tpinder@aba.com
adoersam@aba.com

*Attorneys for Plaintiff American Bankers Association*

U.S. CHAMBER LITIGATION CENTER
Jennifer B. Dickey (*pro hac vice* forthcoming)
Maria C. Monaghan (*pro hac vice* forthcoming)
1615 H Street NW
Washington, DC 20062
jdickey@USChamber.com
mmonaghan@USChamber.com

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*