# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

TEXAS BANKERS ASSOCIATION
203 W. 10th St.
Austin, TX 78701

AMARILLO CHAMBER OF
COMMERCE
1000 S. Polk St.
Amarillo, TX 79101

AMERICAN BANKERS
ASSOCIATION
1333 New Hampshire Ave. NW,
Washington, DC 20036

CHAMBER OF COMMERCE OF
THE UNITED STATES OF
AMERICA
1615 H Street, N.W.
Washington, DC 20062

LONGVIEW CHAMBER OF
COMMERCE
410 N. Center St.
Longview, TX 75601

INDEPENDENT COMMUNITY
BANKERS OF AMERICA
1615 L St NW, Ste. 900
Washington, DC 20036

Civil Case No.: 2:24-cv-00025

INDEPENDENT BANKERS
ASSOCIATION OF TEXAS
1700 Rio Grande St, Ste. 100
Austin, TX 78701

     *Plaintiffs*,


     v.


OFFICE OF THE COMPTROLLER
OF THE CURRENCY and MICHAEL
J. HSU in his official capacity as
Acting Comptroller of the Currency,
400 7th St. SW
Washington, DC 20219


BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM and
JEROME POWELL in his official
capacity as Chairman of the Board of
Governors
Constitution Ave NW & 20th St. NW
Washington, DC 20551


FEDERAL DEPOSIT INSURANCE
CORPORATION and MARTIN
GRUENBERG in his official capacity
as Chairman of the FDIC
550 17th St NW
Washington, DC 20429


     *Defendants*.

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1
II.     BACKGROUND ..................................................................................................3
        A.      The Community Reinvestment Act .......................................................3
        B.      The Substance of the Final Rules..........................................................5
        C.      The Final Rules: Effective Dates ..........................................................7
III.    ARGUMENT........................................................................................................8
        A.      The Legal Standard for a Preliminary Injunction ..................................8
        B.      Plaintiffs Have a Substantial Likelihood of Success on the Merits Because
                the Final Rules Exceed the Agencies' Statutory Authority. ...................9
                1.      The Final Rules Violate the CRA's Instruction to Evaluate a Bank
                        Only Based on its Performance within its Community. ............................9
                2.      The Final Rules Violate the Statutory Instruction to Focus on
                        Responsiveness to Credit Needs. ............................................16
        C.      There is a Substantial Threat of Irreparable Harm Absent Injunctive
                Relief....................................................................................18
        D.      The Balance of Equities and the Public Interest Weigh in Plaintiffs' Favor. ........20
IV.     CONCLUSION...................................................................................................21

# TABLE OF AUTHORITIES

*Biden v. Nebraska*, ___U.S.___, 143 S. Ct. 2355 .......................................................14

*Daniels Health Scis. L.L.C. v. Vascular Health Scis. L.L.C.,* 710 F.3d 579 (5th Cir. 2013)...........8

*District of Columbia v. Heller*, 554 U.S. 570 (2008).....................................................13

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ......................20

*Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022) ....................................................8, 18

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................................20

*Restaurant Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593 (5th Cir. 2023) ..................................19

*Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022) (per curiam) ...........................................................................8

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) ............................................................18

*Texas v. United States,* 40 F.4th 205 (5th Cir. 2022).....................................................20

*Texas v. United States*, 515 F. Supp. 3d 627 (S.D. Tex. 2021)...............................................8

*Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015) *aff'd*, 809 F.3d 134 (5th Cir. 2015) .......................................................................................8

*United States v. Kaluza*, 780 F.3d 647 (5th Cir. 2015)....................................................9

*United States v. Moore*, 71 F.4th 392 (5th Cir. 2023) ...................................................13

*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989) .............................................9

*Vanderstok v. BlackHawk Manufacturing Grp. Inc.*, 639 F. Supp. 3d 722 (N.D. Tex. 2022) ....................................................................................18, 20

*Vanderstok v. Garland*, 625 F. Supp. 3d 570 (N.D. Tex. 2022).............................................9

*Wages & White Lion Invs., L.L.C. v. FDA*, 16 F. 4th 1130 (5th Cir. 2021).............................8, 18

*West Virginia v. Environmental Prot. Agency*, 597 U.S. 697 (2022) ....................................13, 15

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...........................................20

## STATUTES AND REGULATIONS

12 C.F.R. § 25.24(d)(4) .................................................................................................17

12 C.F.R. § 228.12(k) ...................................................................................................11

12 C.F.R. § 228.41(a) ..............................................................................................11, 13

58 Fed. Reg. 51735 .......................................................................................................15

81 Fed. Reg. 48542 .......................................................................................................17

87 Fed. Reg. 33884 .........................................................................................................7

89 Fed. Reg. 6574 ..................................................................1, 2, 6, 7, 14, 16, 17, 18, 19

5 U.S.C. § 702 ...............................................................................................................18

12 U.S.C. § 2901 .............................................................................................1, 4, 10, 14, 16

12 U.S.C. § 2902 ...........................................................................................................12

12 U.S.C. § 2903 ...............................................................................................1, 4, 9, 10, 16

12 U.S.C. § 2906 ...............................................................................................1, 4, 9, 10, 13

## OTHER AUTHORITIES

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL
   TEXTS (2012) ...........................................................................................................14

Community Reinvestment Modernization Act of 2000, H.R. 4893, 106th Cong. ........14

Community Reinvestment Modernization Act of 2001, H.R. 865, 107th Cong. ..........14

Community Reinvestment Modernization Act of 2007, H.R. 1289, 110th Cong. ........14

Community Reinvestment Modernization Act of 2009, H.R. 1479, 111th Cong. ........14

Consumer Financial Protection Bureau, *2022 HMDA Data on Mortgage Lending Now
   Available*, Mar. 20, 2023, https://www.consumerfinance.gov/about-
   us/newsroom/2022-hmda-data-on-mortgage-lending-now-available/.......................4

Federal Financial Institutions Examination Council, *Federal Bank Regulatory Agencies
   Release 2022 Small Business, Small Farm, and Community Development Lending
   Data*, Dec. 20, 2023, https://www.ffiec.gov/press/pr121523.htm ...............................4

Making Communities Stronger through the Community Reinvestment Act, H.R. 8833,
   117th Cong. .............................................................................................................15

Office of the Comptroller of the Currency, *CRA Performance Evaluations*,
  https://occ.gov/publications-and-resources/tools/index-cra-search.html..............................3, 5

RICHARD D. MARSICO, DEMOCRATIZING CAPITAL: THE HISTORY, LAW, AND REFORM OF
  THE COMMUNITY REINVESTMENT ACT (2005) ...........................................................................3

Statement on the Community Reinvestment Act Final Rule by Governor Michelle W.
  Bowman, Federal Reserve Board (October 24, 2023)......................................................12, 14

Statement by Jonathan McKernan, Director, FDIC Board of Directors, on the Final Rule
  Implementing the Community Reinvestment Act (October 24, 2023).........................5, 12, 14

Statement by Vice Chairman Travis Hill on the Final Rule on Community Reinvestment
  Act Regulations (October 24, 2023) ...........................................................................................5

U.S. Congress, Sen. Committee on Banking, Housing and Urban Affairs, *Community
  Credit Needs*, S. 406 (95th Cong. 1st Sess.) (Mar. 23–25, 1977).............................................3

Webster's *Collegiate Dictionary* (1974).....................................................................................10

Webster's *Third New International Dictionary* (1981) ................................................................10

## I.       INTRODUCTION

The Community Reinvestment Act of 1977 ("CRA"), 12 U.S.C. § 2901 *et. seq.*, is a landmark piece of legislation that Congress enacted to reverse years of government policies and private market actions that deprived lower-income areas of credit due to "redlining"—the practice of refusing to extend credit in certain neighborhoods deemed too risky (primarily low-income and inner-city neighborhoods). Congress found that regulated financial institutions have "a continuing and affirmative obligation to help meet the credit needs of the local communities in which they are chartered." 12 U.S.C. § 2901(a)(3). Consistent with this finding, the CRA instructs the banking agencies to "assess" a financial institution's "record of meeting the *credit* needs of its entire *community*, including low-and-moderate income neighborhoods, consistent with the safe and sound operation of such institution." *Id*. § 2903(a)(1) (emphases added). Under the statute, these assessments must separately evaluate each metropolitan area in which a regulated bank maintains one or more branch offices or deposit-taking facilities, such as a deposit-taking ATM. *Id.* §§ 2906(b)(1)(B), 2906(e)(1). The statute, accordingly, imposes obligations on banks with respect to *credit needs* of the *communities* in which they have a physical presence and accept deposits.

The Board of Governors of the Federal Reserve System ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC"), and the Office of the Comptroller of the Currency ("OCC") (collectively "the Agencies"),[1] however, recently published regulations in the Federal Register, 89 Fed. Reg. 6574 (Feb. 1, 2024) (to be codified at 12 C.F.R. §§ 25, 228, and 345) (hereinafter the "Final Rules"), that ignore these critical statutory limitations in at least two

---

[1] The OCC is the primary regulator for national banks, while the Federal Reserve is the primary regulator for bank holding companies and some state banks. The FDIC is the primary regulator for state banks that are not members of the Federal Reserve.

1

obvious respects.  *First*, the Agencies seek to assess banks outside of the geographies in which they have a physical presence and accept deposits, and *second*, the Agencies seek to assess banks on their deposit products, rather than on their response to the credit needs of their communities. Each departure from the statutory text is plain on the face of the Final Rules, and each provides an independently sufficient basis for vacatur.

Because their members will suffer irreparable harm if forced to comply with these Final Rules before this challenge can be heard on the merits, Plaintiffs—the Texas Bankers Association, Amarillo Chamber of Commerce, American Bankers Association, Chamber of Commerce of the United States of America, Longview Chamber of Commerce, the Independent Community Bankers of America, and the Independent Bankers Association of Texas— respectfully request that this Court enter a preliminary injunction.  Banks have already begun assessing the nearly 650 pages in the Federal Register that make up these Final Rules and updating their operations to ensure compliance with new and onerous data collection, validation, and reporting requirements for broad assessment areas throughout the country.  That process— which will require banks to, among other things, develop and test new computer programs and data collection capabilities, conduct program planning and analyses, hire more information technology ("IT") and compliance personnel, conduct extensive staff training, upgrade vendor relationships, and modify strategic plans to position themselves for the January 1, 2026 operational start date—will be time-consuming and costly.  *See generally* App. 001–059, Exs. 1– 10; *see also infra* Parts III(C), (D).  Even the Agencies concede that banks will spend hundreds of thousands of hours and over $90 million to comply with the Final Rules within the first twelve months.  89 Fed. Reg. 7106.  And none of these implementation costs will be recoverable even if this Court determines that the Agencies have exceeded their statutory authority.

This irreparable harm far outweighs any interest that the Agencies or public may have in forcing banks to continue efforts to comply with the Final Rules while this litigation is pending. Under the current CRA rules, almost all banks receive an "Outstanding" or "Satisfactory" rating[2]—removing any doubt that the present regime is serving the low- and moderate-income borrowers whom Congress sought to benefit. The Agencies' goal to modernize the statute and expand banks' CRA obligations, to the tune of tens of millions of dollars in compliance costs, is not a sufficient basis for upending the status quo before Plaintiffs' claims can be heard on the merits. A preliminary injunction is plainly warranted.

## II.    BACKGROUND

### A.    The Community Reinvestment Act

As noted above, Congress enacted the CRA in 1977 to address the significant problem of redlining, through which borrowers in low or moderate-income communities were sometimes deemed unworthy of credit solely because of where they lived.[3] Congress was of the view that banks had an obligation to serve the credit needs of the *entire* community where banks accepted deposits, not just affluent parts of those communities. *See* U.S. Congress, Sen. Committee on Banking, Housing and Urban Affairs, *Community Credit Needs*, S. 406 (95th Cong. 1st Sess.) (Mar. 23–25, 1977) at 1–49. Accordingly, the statute explains that its purpose is "to help meet

---

[2] *See* Office of the Comptroller of the Currency, *CRA Performance Evaluations*, https://occ.gov/publications-and-resources/tools/index-cra-search.html.

[3] *See* RICHARD D. MARSICO, DEMOCRATIZING CAPITAL: THE HISTORY, LAW AND REFORM OF THE COMMUNITY REINVESTMENT ACT 11 (2005) ("The legislative history of the Community Reinvestment Act shows that the purpose of the CRA was to end the bank practice known as redlining—refusing to lend in certain neighborhoods, especially low-income, predominantly minority, and inner city neighborhoods—due to perceived credit risks and to increase the amount of money banks lend in their local communities.").

the credit needs of the local communities in which [banks] are chartered consistent with the safe and sound operation of such institutions."  12 U.S.C. § 2901(b).

To achieve that purpose, the CRA instructed each supervisory banking Agency—the FDIC, the OCC, and the Federal Reserve—"in connection with its examination of a financial institution . . . [to] assess the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods, consistent with the safe and sound operation of such institution."  12 U.S.C. § 2903(a)(1).  And it instructed the Agencies to "take such record into account in its evaluation of an application for a deposit facility by such institution."  *Id.* § 2903(a)(2).  It further instructed the Agencies to prepare a written evaluation "separately for each metropolitan area in which a regulated depository institution maintains one or more domestic branch offices," *id.* § 2906(b)(1)(B), and to assign the institution a "rating" of "Outstanding," "Satisfactory," "Needs to improve," or "Substantial noncompliance." *Id.* § 2906(b)(1)(A)(iii), (b)(2).

The CRA has been immensely successful.  For more than 45 years, banks have extended trillions of dollars of credit to serve the needs of low- and moderate-income individuals in their communities.  In 2022 alone, banks provided more than $227 billion in capital to low- and moderate-income individuals and businesses in the form of mortgages and small business loans, and an additional $151 billion in community development loans.[4]  And in their most recent CRA

---

[4] Federal Financial Institutions Examination Council, *Federal Bank Regulatory Agencies Release 2022 Small Business, Small Farm, and Community Development Lending Data*, Dec. 20, 2023, https://www.ffiec.gov/press/pr121523.htm; Consumer Financial Protection Bureau, *2022 HMDA Data on Mortgage Lending Now Available*, Mar. 20, 2023, https://www.consumerfinance.gov/about-us/newsroom/2022-hmda-data-on-mortgage-lending-now-available/.

assessments, more than 98% of banks received either an "Outstanding" or a "Satisfactory" CRA rating.[5]

## B.    The Substance of the Final Rules

Spanning 649 triple-column pages, the Final Rules are "by far the longest rulemaking the FDIC has ever issued."[6]   But they are not just of epic proportion; the Final Rules are also of Byzantine complexity.  They fashion four new performance tests, which include a confusing number of quantitative and qualitative sub-tests that could produce hundreds of scores, conclusions, and ratings.  And those scores, conclusions, and ratings are keyed not merely to a bank's performance in places where a bank has a physical presence and accepts deposits, but across geographies that could include an entire state or, indeed, anywhere a bank makes a retail loan.  As FDIC Director McKernan noted in his dissent[7]: "The approximately 60,000 words of rule text (including appendices), which contains more than 40 benchmarks and 20 metrics, are enough to preclude anyone from comprehending the rule as a whole.  More problematically, big chunks of the rule remain unfinished works in progress."[8]

Two of the new performance tests announced in the Final Rules are of particular relevance here.  First, the Agencies adopted a "Retail Lending Test" that evaluates the

---

[5] *See* Office of the Comptroller of the Currency, *CRA Performance Evaluations*, https://occ.gov/publications-and-resources/tools/index-cra-search.html.

[6] Statement by Vice Chairman Travis Hill on the Final Rule on Community Reinvestment Act Regulations (October 24, 2023), https://www.fdic.gov/news/speeches/2023/spoct2423c.html.

[7] The FDIC Board voted 3-2 in favor of the Final Rules, with Vice Chairman Travis Hill and Director Jonathan McKernan in dissent.  *See supra* fn. 6; *infra* fn. 8.

[8] Statement by Jonathan McKernan, Director, FDIC Board of Directors, on the Final Rule Implementing the Community Reinvestment Act (October 24, 2023), https://www.fdic.gov/news/speeches/2023/spoct2423f.html (hereinafter "Director McKernan Statement").

performance of certain banks in "Retail Lending Assessment Areas" and "Outside Retail Lending Areas." A Retail Lending Assessment Area consists of any metropolitan statistical area or the combined non-metropolitan statistical areas of a state in which a bank that does not originate 80% of its loans within its Facility-Based Assessment Areas (*i.e.,* areas where the bank takes deposits through physical facilities like branches and deposit-taking ATMs) originated at least 150 closed-end home mortgage loans or at least 400 small business loans in each of the two preceding calendar years. 89 Fed. Reg. 6577. Many large banks will have several Retail Lending Assessment Areas under the Final Rules, and at least two banks will have more than 100 new assessment areas. *See id.* at 6740 (Table 1 of § __.17), 6754 (Table 4 of § __.17).

An Outside Retail Lending Area is the nationwide area outside the bank's Facility Based Assessment Areas and Retail Lending Assessment Areas where it made any other CRA-relevant loans. *Id.* at 6577. By definition, Retail Lending Assessment Areas and Outside Retail Lending Areas have no connection to a bank's physical, deposit-taking footprint. *See id.* Disregarding not only the plain language of the statute but also decades of practice, the Final Rules make lending activity rather than deposit-taking activity the trigger for a bank's obligation to help meet credit needs. The Retail Lending Test accounts for 40% of large banks' CRA ratings and 50% of intermediate banks' CRA ratings. *Id.* at 7026, 7047.

The second test of relevance to this motion is the Retail Services and Products Test, which generally utilizes benchmarks and comparators to assess a bank's CRA performance based on the services and products that it offers. On the services side, the Agencies will assess branch availability, branch services (including whether the branches offer "[f]ree or low-cost check cashing services," "reasonably priced international remittance services," and "electronic benefit transfers"), remote service availability, and digital delivery systems (including "[t]he number of *checking and savings accounts* opened each calendar year during the evaluation period digitally

6

and through other delivery systems in low-, moderate-, middle-, and upper-income census tracts"). *Id*. at 7120–21. On the products side, the Agencies will evaluate, among other things, whether banks offer *deposit* products with low-cost features, such as no overdraft or non-sufficient fund fees, no or low minimum opening balances, no or low monthly maintenance fees, and free or low-cost check-cashing and bill-pay services, as well as the uptake and usage of accounts with these features by customers in low- and moderate-income areas. *Id*. at 7121–22. This test accounts for 10% of a large bank's CRA rating. *Id*. at 7026.

Along with these tests, the rules also prescribe a series of data collection, maintenance, and reporting requirements, primarily relating to deposit information. The Agencies plan to use this information in conducting assessments under the Final Rules. *Id.*

### C.     The Final Rules: Effective Dates

The Agencies issued a Notice of Proposed Rulemaking on June 3, 2022. *See* 87 Fed. Reg. 33884 (June 3, 2022). The Final Rules were announced by the Agencies on October 24, 2023, but were not published in the Federal Register until February 1, 2024. They will take effect on April 1, 2024. 89 Fed. Reg. 6578.

The Final Rules require banks to begin complying with most of the provisions (those involving new tests, definitions, and data collection and maintenance requirements) by January 1, 2026. *Id.* Reporting requirements start on January 1, 2027. *Id*. at 6579. Banks must begin reporting data consistent with the Final Rules every April 1st beginning April 1, 2027. *Id.* As a practical matter, January 1, 2026, the date on which compliance with the Final Rules must begin, starts the first performance periods. However, as explained below, given the magnitude of the changes, banks are already incurring substantial, non-recoverable compliance costs to prepare for implementing the Final Rules and, as the Agencies concede, *see id.* at 7106, will spend over $90 million in the first year alone.

III.    ARGUMENT

A.    The Legal Standard for a Preliminary Injunction

"The decision to grant or deny a preliminary injunction lies within the sound discretion of the trial court." *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *3 (5th Cir. Feb. 17, 2022) (per curiam) (citing *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989)). A preliminary injunction is intended to preserve the status quo to protect the plaintiff from irreparable injury and preserve the court's power to render a meaningful decision. *Id.* at *4.

In this Circuit, plaintiffs are entitled to a preliminary injunction if they demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any threatened harm to the party sought to be enjoined; and (4) that granting the injunction will not disserve the public interest. *Louisiana v. Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022).

While "[t]he first two factors are the most critical," *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F. 4th 1130, 1142 (5th Cir. 2021), no particular factor is dispositive. Rather, "the Court must weigh each factor against the others and against the form and magnitude of the relief requested." *Id*. (citation omitted). A strong showing on one factor can compensate for a less strong position on another. *See Texas v. United States*, 515 F. Supp. 3d 627, 631 (S.D. Tex. 2021) (citing *State of Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975)). Plaintiffs must demonstrate a substantial likelihood of success on "at least one" claim. *Texas v. United States*, 86 F. Supp. 3d 591, 672 (S.D. Tex. 2015) *aff'd*, 809 F.3d 134 (5th Cir. 2015). This means Plaintiffs need only establish a *prima facie* case. *Daniels Health Scis. L.L.C. v. Vascular Health Scis. L.L.C.,* 710 F.3d 579, 582 (5th Cir. 2013).

8

B.     **Plaintiffs Have a Substantial Likelihood of Success on the Merits Because the Final Rules Exceed the Agencies' Statutory Authority.**

Although there are myriad problems with the Final Rules set forth in the Complaint, this Motion primarily addresses two glaring issues of statutory overreach—assessments of areas outside a bank's physical deposit-taking footprint and assessments of a bank's deposit products. Each contravenes the plain text of the CRA, and each is an independent and sufficient basis to establish Plaintiffs' likelihood of success on the merits.

1.     **The Final Rules Violate the CRA's Instruction to Evaluate a Bank Only Based on its Performance within its Community.**

When "the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enters., Inc*., 489 U.S. 235, 241 (1989) (citation omitted).  The Court "begin[s] with the assumption that the words were meant to express their ordinary meaning." *United States v. Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015) (citation and internal quotation marks omitted); *see also Vanderstok v. Garland*, 625 F. Supp. 3d 570, 578–79 (N.D. Tex. 2022).

The CRA instructs that the Agencies "shall assess" a bank's "record of meeting the credit needs of its entire community, including low-and moderate-income neighborhoods, consistent with the safe and sound operation of such institution."  12 U.S.C. § 2903(a)(1).  These assessments must separately evaluate each metropolitan area in which a bank maintains one or more branch offices or deposit-taking facilities, such as an ATM.  *Id*. §§ 2906(b)(1)(B), 2906(e)(1).  And the CRA instructs the Agencies to then "take such record into account in its evaluation of an application for a deposit facility by such institution."  *Id*. § 2903(a)(2).  The purpose of these assessments is "to encourage [financial] institutions to help meet the credit needs of the local communities in which they are chartered consistent with the safe and sound

9

operation of such institutions."  *Id.* § 2901(b).  In other words, Congress limited CRA assessment areas to those communities surrounding a bank's deposit-taking facilities.

Although Congress did not itself define the word "community," the statutory indicia confirm that it used this term in the ordinary sense as referring to a geographic subunit along the lines of a town.  Webster's *Third New International Dictionary* (1981) defines "community" as "a body of individuals organized into a unit or manifesting usually with awareness of some unifying trait[;] . . . the people living in a particular place or region and usually linked by common interests."  In sections 2901(a)(3) and (b), Congress clarified that banks were required to meet the needs of their "local communities," not the credit needs of their entire state or nation. 12 U.S.C. §§ 2901(a), (b).  Webster's *Collegiate Dictionary* (1974) defines "local" as "not general or widespread," and "primarily serving the needs of a particular limited district."  Likewise, Webster's *Third New International Dictionary* (1981) defines "local" as "not general or widespread" and "primarily serving the needs of a particular limited district, often a community or minor political subdivision . . . applicable in or relating to such a district only."

Further support for this circumscribed, ordinary meaning of "community" is found elsewhere in the statute.  It only makes sense for the CRA to instruct the Agencies to consider a bank's lending separately for "each *metropolitan area* in which a regulated depository institution maintains one or more domestic branches," 12 U.S.C. § 2906(b)(1)(B) (emphasis added), and to impose consequences with respect to applications for particular deposit facilities, *id.* § 2903(a)(2), if one considers "community" and "local communities" at this geographic sublevel. It likewise makes sense that Congress referred to a purpose of serving "local" communities and that it referred to the geographical subunit of "low- and moderate-income *neighborhoods*" in emphasizing the need to serve a bank's entire community.  Neighborhoods would ordinarily be understood as one geographic subunit down from a "local community."  One would not

ordinarily refer to the "nation, including particular neighborhoods."  Instead, in the United States, one would refer to the nation as a whole, including particular States, or to States as a whole, including particular counties, moving down one geographic subunit at a time.  That is exactly what Congress did here.  In sum, the textual features of the statute are all consistent with the long-term understanding that the CRA focuses on lending in the particular, defined, and limited geographic areas in which a bank's deposit-taking facilities are located.

That ordinary understanding also aligns with Congress's purpose.  Congress was concerned with the geographical mismatch between deposit-taking activities and lending activities.  It understood that banks were using deposits collected from throughout the local communities in which they were located, but disproportionately funding loans and other extensions of credit to affluent portions of those communities.[9]  In the CRA, Congress encouraged banks to reinvest in *all* parts of the communities from which they took deposits, not just the wealthy neighborhoods.

In addition, since its enactment, regulations issued pursuant to the CRA have reflected this focus on a bank's physical, deposit-taking footprint.  *See, e.g.,* 12 C.F.R. § 228.41.  The Agencies have always required bank examiners to focus on bank-designated "assessment areas," which are "geographies in which the bank has its main office, its branches, and its deposit-taking ATMs, as well as the surrounding geographies in which the bank has originated or purchased a substantial portion of its loans."  *See id*. §§ 228.41(a), (b), & (g) ("Assessment area delineation"); *see also id*. § 228.12(k) (defining "geography" as a census tract); *id.* § 228.41(c) (defining assessment areas as those census tracts encompassing the bank's deposit-taking

_____

[9] *See supra* fn. 3.

11

facilities, and the census tracts surrounding those facilities).  The Agencies have thus followed Congress's mandate in their implementing regulations, until now.

Although the Final Rules continue to incorporate the traditional deposit-focused Facility Based Assessment Areas, the newly-minted Retail Lending Assessment Areas and Outside Retail Lending Areas will assess banks on their activities far beyond communities where the bank has a physical, deposit-taking presence, sweeping in any location in the United States where the bank makes a retail loan.  89 Fed. Reg. 6577.  This expansion exceeds the Agencies' powers under the statute,[10] as both Jonathan McKernan of the FDIC and Michelle Bowman of the Federal Reserve Board have recognized.[11]  This expanded meaning strays from the Agencies' prior reading of the term, the CRA's text, and Congress's intent—all of which make clear that the term "community" refers to the areas in which a bank is physically present and accepts deposits.

Congress certainly knew how to alter the geographic focus of the CRA when necessary. The one exception it created to the CRA requirement that assessment areas be defined geographically based on banks' physical, deposit-taking presence is for banks serving military personnel.  Congress provided, in 12 U.S.C. § 2902(4), that "[a] financial institution whose business predominately consists of serving the needs of military personnel who are not located within a defined geographic area may define its 'entire community' to include its entire deposit

---

[10] While the Final Rules (as opposed to the Proposed Rules) seek to decrease both the number of banks impacted by the Retail Lending Assessment Area requirements and the number of such assessment areas these banks will have, once the Agencies have unilaterally expanded their authority to regulate outside a bank's deposit-based community, there is no limit on how far they might go, including what the Agencies may do down the road to further increase the number of Retail Lending Assessment Areas.

[11] *See supra* fn. 8 & accompanying text; *see also* Governor Michelle W. Bowman, *Statement on the Community Reinvestment Act Final Rule* 5 (Oct. 24, 2023), https://www.federalreserve.gov/aboutthefed/boardmeetings/files/bowman-statement-20231024.pdf (hereinafter "Governor Bowman Statement").

customer base without regard to geographic proximity."  As a result, 12 C.F.R. § 228.41(f) provides that: "Notwithstanding the requirements of this section, a bank whose business predominantly consists of serving the needs of military personnel or their dependents who are not located within a defined geographic area may delineate its entire deposit customer base as its assessment area."  Since Congress knew how to expand the reach of the statute, but did so only for banks serving military personnel, there is no merit to the Agencies' argument that they can, at will and without limitation, extend the geographic reach of the statute for all other banks.

What is more, even in the broader, military application of the term "entire community," Congress *still* required that the focus be on a bank's "deposit customer base," not where the bank conducted its retail lending.  This is true in the rest of the statute as well.  For decades, a bank's assessment area(s) have been determined based on where a bank maintains one or more branch office(s) or deposit-taking facilities, such as an ATM.  12 U.S.C. §§ 2906(b)(1)(B), 2906(e)(1).  It is deposit activity that has long triggered CRA assessment areas, not retail lending.  The Final Rules turn the statutory language on its head, triggering CRA assessment areas not only outside of a bank's physical, deposit-taking footprint, but based on retail lending.

The fact that the CRA itself does not expressly define the term "community" does not mean the Agencies have *carte blanche* to interpret it as they see fit.  When there is no statutory definition of a term, a court looks to the understanding of the term at the time of the statute's enactment, to the common sense meaning of the term, and to the purposes of the statute as well as the entire statutory scheme.  *See, e.g.*, *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *District of Columbia v. Heller*, 554 U.S. 570, 576–77 (2008) (describing the importance of interpreting a text based on how its words and phrases were used in their normal and ordinary usage); *see also United States*

13

*v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023) (emphasizing the need to examine the context of the statute); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 16 (2012) ("In their full context, words mean what they conveyed to reasonable people at the time they were written.").[12]  And as explained above, those indicia all confirm that the CRA does not authorize the Agencies to examine banks outside of the communities in which they have branches or other deposit-taking facilities.  Indeed, the expressed statutory purpose is confined to the term "local communities."  12 U.S.C. § 2901.

The Agencies' contrary interpretation of "community" is rooted not in the text, but in the Agencies' assessment of what would be better policy.  *See* 89 Fed. Reg. 6748.  Specifically, the Agencies claim that because the statute does not expressly "define what geographic units the agencies should use in assessing a bank's record of meeting the credit needs of its entire community," it is reasonable to interpret the term to sweep in the entire country to "adapt[] to ongoing changes in the banking industry."  *See id.*  But the statutory text is not so malleable.  As Governor Bowman observed in her dissent: "Congress, not the banking agencies, is responsible for modernizing the statute."  Governor Bowman Statement at 5; *see also* Director McKernan Statement ("I have not seen a convincing argument that we have the authority to consider lending activities outside a bank's facility-based assessment areas.").  Congress has considered and either rejected or not acted on legislation that would substantially amend the CRA much like the Final Rules.  *See, e.g.*, Community Reinvestment Modernization Act of 2000, H.R. 4893, 106th Cong. (2000); Community Reinvestment Modernization Act of 2001, H.R. 865, 107th Cong. (2001); Community Reinvestment Modernization Act of 2007, H.R. 1289, 110th Cong.

---

[12] As Justice Barrett recently put it: "To strip a word from its context is to strip that word of its meaning."  *Biden v. Nebraska*, ____ U.S. ____, 143 S. Ct. 2355, 2378 (Barrett, J., concurring).

(2007); Community Reinvestment Modernization Act of 2009, H.R. 1479, 111th Cong. (2009); Making Communities Stronger through the Community Reinvestment Act, H.R. 8833, 117th Cong. (2022).  The Agencies may not substitute their judgment for that of Congress.

The Agencies' interpretation of the CRA also runs afoul of the Major Questions Doctrine. Under that doctrine, when an agency claims authority to resolve issues of political and economic significance that one would ordinarily expect Congress to resolve in the first instance, the agency must have more than a "merely plausible textual basis for the agency action." *West Virginia*, 597 U.S. at 723.  "The agency instead must point to 'clear congressional authorization' for the power it claims." *Id*. (citing *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)); *see also* Exec. Order No. 12866, 58 Fed. Reg. 51735 (1993) (requiring agencies to assess potential costs and benefits of "significant" rules).  This is especially true when, as here, "the history and the breadth of the authority that the agency has asserted" is so expansive.  *West Virginia*, 597 U.S. at 721 (internal citation and quotation omitted).  Here, the power that the Agencies claim—to "modernize" the CRA based on their assessment of its purposes and without constraint of the text—implicates major political and economic matters that one would expect Congress to resolve in the first instance.  Not only do the Agencies purport to assess a bank's CRA performance anywhere they make a retail loan, they claim the power to regulate a bank's deposit products as well.  Nothing in the plain language of the CRA provides the Agencies the clear authorization required to support their expansive interpretation of the limits of the CRA.

For all of these reasons, the statute unambiguously precludes the Agencies from assessing a bank's CRA performance outside its physical, deposit-taking footprint, and the Final Rules must be vacated.  Plaintiffs have thus demonstrated a probability of success on the merits on this basis.

## 2. The Final Rules Violate the Statutory Instruction to Focus on Responsiveness to Credit Needs.

The second major statutory error in the Final Rules is its authorization for the Agencies to assess deposit products. As noted above, Congress's instruction to the Agencies in the CRA was explicit: to "assess the institution's record of meeting the *credit needs* of its entire community." 12 U.S.C. § 2903(b)(1). Congress knew the difference between "credit" and "deposit" activities. Indeed, in its findings and statement of purpose, Congress recognized that communities have "need for credit services as well as deposit services," but Congress explicitly emphasized its goal in the CRA: "to encourage such institutions to help meet the *credit needs*" of their local communities. *Id.* § 2901. And it repeated that instruction in the operative part of the statute, instructing agencies to assess an institution's "record of meeting the *credit* needs of its entire community" and "take such record into account in its evaluation of an application for a deposit facility." *Id.* § 2903(a). That focus on credit makes sense, as Congress was concerned about the mismatch between banks accepting deposits from low- and moderate-income borrowers but not serving those borrowers with their credit products.

The Final Rules, however, expressly require the Agencies to assess deposits on both the services and products side of the new Retail Services and Products Test. On the services side, the Agencies must consider the number of checking and savings accounts opened each calendar year during the evaluation period digitally and through other delivery systems in low-, moderate, middle-, and upper-income census tracts. 89 Fed. Reg. 7120–21. And on the products side, the Agencies must assess whether banks offer deposit products with certain "low-cost features," such as deposit products with no overdraft or insufficient funds fees, or other features facilitating access by individuals without banking or credit histories or with adverse banking histories. *Id.* at

16

7121.  And the latter assessment will include not just the availability of those products, but their usage as well.

The Agencies claim "that there is a sufficient nexus between deposit products and the provision of credit" for these inquiries because, for example, "individuals improve their financial stability and build wealth through deposit accounts," "deposit products can help consumers qualify for loans by facilitating consumers' savings so that they can post collateral and to pay transaction costs," and "deposit products are a pathway for a bank customer to establish an ongoing relationship with a bank."  *Id*. at 6943–44.

All of these things could be true, however, and it still would not enlarge the authority granted to the Agencies by the statute.  Congress could have instructed the Agencies more broadly to assess an institution's record of supporting the financial health of low- and moderate-income borrowers.  It likewise could have recognized any nexus between credit and deposit products and instructed Agencies to assess an institution's record of supporting the credit and deposit needs of low- and moderate-income borrowers.  It did not do so.

The Agencies note that the existing regulations allow them generally to consider "[t]he range of services provided in low-, moderate-, middle-, and upper-income geographies and the degree to which the services are tailored to meet the needs of those geographies," *see* 12 C.F.R. § 25.24(d)(4), and that certain questions and answers released in 2016 have interpreted this language broadly to include some deposit products, *see* 81 Fed. Reg. 48542, 48543 (Jul. 25, 2016).  But interpretive letters cannot change the underlying statute.  And the fact that the Agencies claimed no such authority until 2016 only underscores the disconnect between the Agencies' approach and the meaning of this 1977 statute.

Likewise, the Agencies seem to suggest that their assessment of deposit products is in some way permissible because the Final Rules instruct that the "evaluation of a bank's retail

17

banking products . . . may only contribute positively to the bank's Retail Services and Products

Test conclusion." 89 Fed. Reg. 6951. But that assertion ignores both that the Agencies gave no

such instruction for the services part of the test, *id.*, which means that banks may still be

penalized for failing to open digitally a certain number of checking and savings accounts, and

that other aspects of the rule will force banks to compete with each other even on the products

side. In any event, the Agencies have no authority under the CRA to assess the institution's

deposit products in the first place.

Here, again, Plaintiffs have demonstrated a probability of success on the merits.

### C.    There is a Substantial Threat of Irreparable Harm Absent Injunctive Relief.

The Fifth Circuit has recognized that because the APA waives sovereign immunity only

for "relief other than damages," 5 U.S.C. § 702, a plaintiff who will not be able to recover

monies spent to comply with a new regulatory regime will, in the event the rules are overturned,

have suffered irreparable injury. *See Louisiana v. Biden*, 55 F.4th at 1033–34 ("[C]omplying

with a regulation later held invalid almost always produces the irreparable harm of

nonrecoverable compliance costs.") (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200,

220–21 (1994) (Scalia, J. concurring)); *see also Texas v. EPA*, 829 F.3d 405, 433 (5th Cir.

2016).[13]

The OCC itself estimates the initial compliance burden in the first 12 months starting

April 1, 2024 to be $91.8 million. 89 Fed. Reg. 7106.[14] The Agencies calculate that, industry-

---

[13] Accord *Wages & White Lion Invs.*, 16 F.4th at 1142; *Vanderstok v. BlackHawk Manufacturing Group Inc.*, 639 F. Supp. 3d 722, 728 (N.D. Tex. 2022) ("[W]here costs are nonrecoverable because the government-defendant enjoys sovereign immunity from monetary damages, as is the case here, irreparable harm is generally satisfied.").

[14] Of this amount, the OCC estimates that the costs will be broken down approximately as follows: $7.9 million for banks to undertake increased data collection, recordkeeping or

wide, banks will expend between approximately 105,500 and 235,000 hours in reporting, recordkeeping, and disclosures.  *Id.*

As the attached declarations explain, the changes required by the Final Rules are of such scale and complexity that banks must take immediate steps if they are to comply with the Final Rules' January 1, 2026 start date.  *See, e.g.*, App. 003, Ex. 1, Decl. of Texas Bankers Association ¶ 8; App. 009, Ex. 2, Decl. of Jason Harrison ¶¶ 7–8; App. 016–017, Ex. 3, Decl. of American Bankers Association ¶¶ 9–10; App. 024, Ex. 4, Decl. of Thomas Quaadman ¶¶ 9–10; App. 031, Ex. 5, Decl. of Kelly Hall  ¶¶ 7–8; App. 040–41, Ex. 6, Decl. of Independent Community Bankers of America ¶¶ 16–17; App. 045, Ex. 7, Decl. of Independent Bankers Association of Texas ¶ 8; App. 048, Ex. 8, Decl. of Anonymous Bank A ¶¶ 4–8; App. 052–054, Ex. 9, Decl. of Anonymous Bank B ¶¶ 4–6, 10; App. 057–058, Ex. 10, Decl. of Anonymous Bank C ¶ ¶ 3–5. To illustrate, the Final Rules will require complicated and time-consuming system overhauls and database updates.  *E.g.,* App. 009, Ex. 2, Decl. of Jason Harrison ¶ 8.  Not only must banks develop and test new computer programs and data collection capabilities, they must also conduct program planning and analyses, upgrade vendor relationships, hire more IT, compliance and lending personnel, and conduct extensive staff training.  *E.g.* App. 009–10, Ex. 2 (Decl. of Jason Harrison ¶¶ 9–10.  All these expenses and more will be required for banks to comply with the Final Rules.  Such expenses satisfy the Fifth Circuit's test for irreparable harm.  *See Restaurant Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 600 (5th Cir. 2023).

---

reporting; $82 million for large banks to collect, maintain, and report annually geographic data on deposits; and $1.9 million for certain banks to prepare and submit compliant strategic plans. Putting aside the fact that its calculation dramatically underestimates the actual compliance burden, and that the CRA is a credit statute only, nearly 90% of the OCC's estimated costs is attributable to collecting and reporting deposit data that has no connection to extensions of credit.

Banks must begin preparing to comply immediately; thus, they are already incurring substantial costs that will be unrecoverable even if the Final Rules are struck down.  *E.g.* App. 009, Ex. 2, Decl. of Jason Harrison ¶ 7; App. 023, Ex. 4, Decl. of Thomas Quaadman ¶ 8.  Every day that the Final Rules remain in effect is a day that banks will continue incurring these costs.  There can be no doubt, therefore, that even if Plaintiffs ultimately prevail in this lawsuit, their members will suffer irreparable harm absent a preliminary injunction.

### D.    The Balance of Equities and the Public Interest Weigh in Plaintiffs' Favor.

The final two elements of the standard for a grant of preliminary injunctive relief—the balance of equities and the public interest—"merge" when the government is a party.  *Vanderstok*, 639 F. Supp. 3d at 727; *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).  In this assessment, the Court weighs "the competing claims of injury and [ ] consider[s] the effect on each party of the granting or withholding of the requested relief," while also considering the public consequences of granting injunctive relief.  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal citations omitted).

Here, the balance of harms favors the Plaintiffs.  The CRA is working well.  Over 98% of banks achieved an Outstanding or Satisfactory rating in their most recent assessment and there is no evidence that a few months' delay will have a material impact of any kind.  Further, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *Texas v. United States,* 40 F.4th 205, 229 (5th Cir. 2022); *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.").  The public interest is particularly strong where, as here, the Agencies have overstepped their statutory authority.

20

Further, in this case, the Agencies made no finding—and present no evidence—that the Final Rules will result in a single additional CRA loan, much less enough additional CRA lending to offset the Final Rules' substantial compliance costs.  In fact, as the declarations of Anonymous Banks A and B and the ICBA make clear, the Final Rules will cause some banks to retrench and reduce lending in certain locations to minimize compliance costs.  App. 048–049, Ex. 8, Decl. of Anonymous Bank A ¶ ¶ 8–10; App. 053, Ex. 9, Decl. of Anonymous Bank B ¶ 8; App. 038, Ex. 6, Decl. of Independent Community Bankers of America ¶ 12 (explaining that, of the bank respondents to an ICBA survey, 28.6% will reduce lending to avoid triggering RLAAs under the Final Rules and another 25.6% are unsure if they will reduce lending).  A preliminary injunction, therefore, is in the public interest.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs request that the Court issue a preliminary injunction preserving the *status quo* until it renders a decision on the merits.

DATED: February 9, 2024

Respectfully submitted,

*/s/ Thomas C. Riney*
UNDERWOOD LAW FIRM, P.C.
Thomas C. Riney (Texas Bar Number 16935100)
Slater Elza (Texas Bar Number 24000747)
PO Box 9158
Amarillo, Texas 79105
(806) 376-5613
(806) 349-9474
tom.riney@uwlaw.com
slater.elza@uwlaw.com

WILLIAMS & CONNOLLY LLP
Ryan Scarborough (*pro hac vice* pending)
Jesse Smallwood (*pro hac vice* pending)
William R. Murray, Jr. (*pro hac vice* pending)
Richard A. Olderman (*pro hac vice* pending)
Alex Gaudio (*pro hac vice* pending)
Armani Madison (*pro hac vice* pending)
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
rscarborough@wc.com
jsmallwood@wc.com
bmurray@wc.com
rolderman@wc.com
agaudio@wc.com
amadison@wc.com

*Attorneys for Plaintiffs*


AMERICAN BANKERS ASSOCIATION
Thomas Pinder (*pro hac vice* pending)
Andrew Doersam (*pro hac vice* pending)
1333 New Hampshire Ave. NW
Washington, DC 20036
tpinder@aba.com
adoersam@aba.com

*Attorneys for Plaintiff American Bankers
Association*


U.S. CHAMBER LITIGATION CENTER
Jennifer B. Dickey (*pro hac vice* pending)
Maria C. Monaghan (*pro hac vice* pending)
1615 H Street NW
Washington, DC 20062

*Attorneys for Plaintiff Chamber of Commerce of the
United States of America*

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 9, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, thereby serving this document on all attorneys of record in this case. Pursuant to Local Rule 5.1, I further certify that the foregoing document is available for viewing and downloading on ECF.

*/s/Thomas C. Riney*_____