# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# AMARILLO DIVISION

TEXAS BANKERS ASSOCIATION
203 W. 10th St.
Austin, TX 78701

AMARILLO CHAMBER OF
COMMERCE
1000 S. Polk St.
Amarillo, TX 79101

AMERICAN BANKERS
ASSOCIATION
1333 New Hampshire Ave. NW,
Washington, DC 20036

CHAMBER OF COMMERCE OF
THE UNITED STATES OF
AMERICA
1615 H Street, N.W.
Washington, DC 20062-2000

LONGVIEW CHAMBER OF
COMMERCE
410 N. Center St.
Longview, TX 75601

INDEPENDENT COMMUNITY
BANKERS OF AMERICA
1615 L St NW, Ste. 900
Washington, DC 20036

INDEPENDENT BANKERS
ASSOCIATION OF TEXAS
1700 Rio Grande St, Ste. 100
Austin, TX 78701

Civil Case No.: 2:24-cv-00025

*Plaintiffs*,

v.

OFFICE OF THE COMPTROLLER
OF THE CURRENCY and MICHAEL
J. HSU in his official capacity as
Acting Comptroller of the Currency,
400 7th St. SW
Washington, DC 20219


BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM and
JEROME POWELL in his official
capacity as Chairman of the Board of
Governors
Constitution Ave NW & 20th St. NW
Washington, DC 20551


FEDERAL DEPOSIT INSURANCE
CORPORATION and MARTIN
GRUENBERG in his official capacity
as Chairman of the FDIC
550 17th St NW
Washington, DC 20429


*Defendants*.

## APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The Amarillo Chamber of Commerce, Texas Bankers Association, the American Bankers Association, the Chamber of Commerce of the United States of America, Longview Chamber of Commerce, Independent Community Bankers of America, and Independent Bankers Association of Texas (collectively "Plaintiffs"), by and through their undersigned counsel and on behalf of their members, file this Appendix in Support of Plaintiffs' Motion for a Preliminary Injunction and Brief in Support.  Plaintiffs rely upon the following evidence in support of said Motion and Brief in Support as filed contemporaneously herewith, and the evidence is hereby fully incorporated therein by reference:

| EXHIBIT NUMBER | TITLE OF DOCUMENT | APPENDIX PAGE(S) |
|---|---|---|
| 1 | Declaration of Texas Bankers Association | App. 001 – App. 006 |
| 2 | Declaration of Jason Harrison | App. 007 – App. 013 |
| 3 | Declaration of American Bankers Association | App. 014 – App. 020 |
| 4 | Declaration of Thomas Quaadman | App. 021 – App. 028 |
| 5 | Declaration of Kelly Hall | App. 029 – App. 035 |
| 6 | Declaration of Independent Community Bankers of America | App. 036 – App. 042 |
| 7 | Declaration of Independent Bankers Association of Texas | App. 043 – App. 046 |

| 8 | Declaration of Anonymous Bank A | App. 047 – App. 050 |
| 9 | Declaration of Anonymous Bank B | App. 051 – App. 055 |
| 10 | Declaration of Anonymous Bank C | App. 056 – App. 059 |

DATED: February 9, 2024

Respectfully submitted,

UNDERWOOD LAW FIRM, P.C.
Thomas C. Riney (Texas Bar No. 16935100)
Slater Elza (Texas Bar No. 2400747)
PO 9158
Amarillo, Texas 79105
(806) 376-5613
(806) 349-9474
tom.riney@uwlaw.com
slater.elza@uwlaw.com

WILLIAMS & CONNOLLY LLP
Ryan Scarborough (*pro hac vice* pending)
Jesse Smallwood (*pro hac vice* pending)
William R. Murray, Jr. (*pro hac vice* pending)
Richard A. Olderman (*pro hac vice* pending)
Alex Gaudio (*pro hac vice* pending)
Armani Madison (*pro hac vice* pending)
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
rscarborough@wc.com
jsmallwood@wc.com
bmurray@wc.com
rolderman@wc.com
agaudio@wc.com
amadison@wc.com

*Attorneys for Plaintiffs*

AMERICAN BANKERS ASSOCIATION
Thomas Pinder (*pro hac vice* forthcoming)
Andrew Doersam (*pro hac vice*
forthcoming)
1333 New Hampshire Ave. NW
Washington, DC 20036
tpinder@aba.com
adoersam@aba.com

*Attorneys for Plaintiff American Bankers
Association*

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
Jennifer B. Dickey (*pro hac vice* pending)
Maria C. Monaghan (*pro hac vice* pending)
1615 H Street NW
Washington, DC 20062

*Attorneys for Chamber of Commerce of the
United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, thereby serving this document on all attorneys of record in this case. Pursuant to Local Rule 5.1, I further certify that the foregoing document is available for viewing and downloading on ECF.

## Declaration of Texas Bankers Association

I, Celeste Embrey, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am currently the Executive Vice President, Government Relations & General Counsel of the Texas Bankers Association.  I have been personally involved in efforts to evaluate the new Community Reinvestment Act ("CRA") regulations published in the Federal Register on February 1, 2024 (hereinafter "Final Rules"), and their impact on members of the Texas Bankers Association. I submit this declaration in support of the Complaint and Motion for Preliminary Injunction filed by Texas Bankers Association, Amarillo Chamber of Commerce, American Bankers Association, Chamber of Commerce of the United States of America, Longview Chamber of Commerce, Independent Community Bankers of America, and Independent Bankers Association of Texas. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge and investigation.

2.      Texas Bankers Association ("TBA"), based in Austin, Texas is America's oldest and largest state banking organization. Founded in 1885, TBA is a member-based organization representing the interests of our 388 member banks – comprised of community and regional banks, bank holding companies, and savings institutions across the state of Texas – with over $1 trillion in combined assets. TBA members employ over 238,000 individuals who work to meet the credit and deposit needs of Texas' more than 30,000,000 residents. TBA lobbies for sound financial and economic policy on both a nationwide basis and in the state of Texas.

3.      The purpose of this declaration is to discuss the effects of the new joint rule adopted by the Office of Comptroller of the Currency, Board of Governors of the Federal Reserve System, and Federal Deposit Insurance Corporation (collectively the "Agencies") regarding the Community Reinvestment Act ("CRA") of 1977 (hereinafter the "Final Rules").

1

4.     Under the Final Rules published in the Federal Register on February 1, 2024, TBA has 56 members that are "large banks" with assets of at least $2 billion; of these, 20 have assets over $10 billion.  Our membership includes 91 banks that are "intermediate banks" with assets between $600 million and $2 billion, and 241 banks that are "small banks" with assets less than $600 million as of December 31. I have confirmed that Anonymous Bank A is a member of TBA.

5.     Since the proposed regulations were first published in the Federal Register on June 3, 2022, and the Final Rules were approved by the Agencies on October 24, 2023, I have personally spoken to dozens of bankers about compliance and systems changes necessitated by the Final Rules.

6.     Over one-third of TBA's member banks are fully covered by the Final Rules. Compliance staff at each of these 147 institutions have begun developing their implementation programs in advance of the Final Rules' January 1, 2026, and January 1, 2027, applicability dates.

7.     As heavily regulated entities, banks are required to demonstrate to examiners at the Agencies that they maintain effective compliance management systems and that they are "anticipating and evaluating changes in the institution[s'] operating environment and implementing responses across impacted lines of defense." *See* FDIC Consumer Compliance Examination Manual Section II 3.1. To comply with this supervisory expectation, when there is the presence of new or significantly amended regulations, examiners often require banks to begin to demonstrate "readiness" for implementation of new regulations well in advance of implementation dates. TBA and our members believe there is an existing supervisory expectation

to demonstrate "readiness" for implementation of the Final Rules in advance of implementation dates.

8.      To comply with the Final Rules, TBA members have begun incurring nonrecoverable compliance costs, including building out new information technology capabilities in order to geocode their deposits and track new metrics adopted by the Final Rules. This is particularly challenging for member banks that work with third-party vendors to assist with their CRA compliance because as of yet, there are no existing out-of-the box solutions that have the required data fields and inputs. Implementation will be challenging because banks will need to implement Section 1071 regulations on overlapping timelines as well. Members have already begun taking necessary steps to understand the voluminous requirements of the Final Rules, prepare their budgets for implementation costs, and make decisions about whether they will hire new in-house technical personnel or outside vendors to assist with implementation.

9.      Consumer compliance experts such as the Compliance Alliance (which is owned and endorsed by 36 State Bank Associations including TBA) advised their bank customers to commence compliance preparation steps immediately when the Final Rules were announced and made public. These steps would begin with a review of in-house capacity, procurement of software compliance programs, and hiring and then training personnel (including search firms in almost all cases).  These steps would also include, according to the Compliance Alliance's standard recommendations, implementation of the following start-up processes, among others: check lists; compliance calendar; flowcharts; forms; handouts; matrices; policies; procedures; risk assessments; signage; training tools; videos; webinars; and worksheets.

10.      Additionally, some TBA members will need to hire new CRA compliance personnel. Because of the enormous complexity of the Final Rules and the increased size and

3

number of assessment areas, some banks have concluded that their existing CRA compliance staff will not be sufficient to meet the new demands of the CRA. They will need to hire new staff, and they will need to begin that search now.

11.    For sovereign immunity and other reasons, the TBA's members have no expectation that they could recover these compliance costs from the government if the Final Rules were to be enjoined or vacated.

12.    On an ongoing basis, the Final Rules will be more expensive to comply with than the existing CRA framework. Because the Final Rules propose to assess banks on geographic areas outside of their facility-based assessment areas, members will need to conduct additional compliance efforts, in many cases involving additional compliance personnel. For example, members will have to track constantly their closed-end home mortgage loans, small business loans, small farm loans, and automobile loans to see whether they are approaching thresholds where such loans could become "Major Product Lines" and trigger new assessment areas. And the fact that new assessment areas can be identified *during* an evaluation period only increases the costs for compliance, as members will need to adjust their compliance efforts over the course of the year, often at increased cost.

13.    Given the significant compliance costs associated with new assessment areas outside of their deposit-taking footprint, some members have already begun making plans to scale back lending in certain areas to avoid incurring new assessment areas, costing them valuable business opportunities.

14.    To top it off, the ongoing data collection, maintenance, and reporting requirements that underlie some of the Final Rules' metrics – i.e., geocoding deposits, tracking

4

new responsive checking and savings accounts as they are opened – will represent an increased cost on an ongoing basis, even if the initial investment represents the most dramatic outlay.

15. As TBA pointed out in our August 5, 2022, comment letter on the Community Reinvestment Act Proposal, the changes made to the Retail Lending Test in the Final Rules will make it statistically impossible for all banks in an assessment area, no matter how hard they try, to achieve an "Outstanding" or even a "Satisfactory" rating. The idiosyncratic standards adopted in the Final Rules will result in fewer banks being able to achieve scores of "Satisfactory" or above, despite only 1 percent having a "Needs to Improve" rating today. If the Final Rules' Retail Lending Test had been applied to the facility-based assessment areas in the 2018-2020 time period, 13 percent of banks would have been rated as less than "Satisfactory." Had the test been applied to anticipated retail lending assessment areas and outside retail lending areas, 22 percent and 29 percent of the respective assessment areas would have received failing grades. This results from the imposition of either "community benchmarks" based purely on demographic information that do not accurately reflect the institution's record of meeting the credit needs of its entire community or "market benchmarks" that view one bank's success as another bank's failing.

16. A less than "Satisfactory" CRA rating has important real-world consequences for the Chamber's members. That rating is taken into account by the Agencies when they decide whether to approve a new deposit facility, the relocation of a main office or branch, and various mergers, among other things. *See* 12 C.F.R. § 25.29. That rating can last for *years* until the Agencies deem the bank's performance to be satisfactory. That rating is also publicly available, and a "Needs to Improve" rating can have negative effects on customer good will.

5

17.     Preliminarily enjoining the Final Rules before members are forced to begin incurring even more substantial compliance costs, as described above, would temporarily remedy their harms.

18.     Vacating the Final Rules would remedy the harms discussed above on a more lasting basis, ensuring that members can continue to do important work to reinvest in their local communities without undue disruption, consistent with the expressed will of Congress.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of February, 2024, at Austin, Texas.

_____

Celeste Embrey

6

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION; AMARILLO CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW CHAMBER OF COMMERCE; INDEPENDENT COMMUNITY BANKERS OF AMERICA; INDEPENDENT BANKERS ASSOCIATION OF TEXAS, <br><br> Plaintiffs, <br><br> v. <br><br> OFFICE OF THE COMPTROLLER OF THE CURRENCY and MICHAEL J. HSU in his official capacity as Acting Comptroller of the Currency; BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM and JEROME POWELL in his official capacity as Chairman of the Board of Governors; FEDERAL DEPOSIT INSURANCE CORPORATION; and MARTIN GRUENBERG, in his official capacity as Chairman of the FDIC, <br><br> Defendants. | Case No. _____ <br><br> **DECLARATION OF JASON HARRISON IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

**DECLARATION OF JASON HARRISON**

I, Jason Harrison, declare as follows:

1.      I am the President and CEO of the Amarillo Chamber of Commerce ("the

Amarillo Chamber").  In that capacity, I oversee all of the Amarillo Chamber's operations.  The

1

Amarillo Chamber serves to enhance economic growth of the Amarillo trade area by focusing on education, promotion, and development of the business community, and those areas of the community affecting business.

2.      The purpose of this declaration is to discuss the effects of the new joint rule adopted by the Office of Comptroller of the Currency, Board of Governors of the Federal Reserve System, and Federal Deposit Insurance Corporation regarding the Community Reinvestment Act ("CRA") of 1977 (hereinafter the "Final Rules").

3.      Unless otherwise stated, this Declaration is based upon my personal knowledge and belief, my review of business records of the Amarillo Chamber, and my discussions with members of the Amarillo Chamber.  If called as a witness, I could and would testify competently thereto.

## I.      The Amarillo Chamber's Mission and Members

4.      The Amarillo Chamber of Commerce is a voluntary organization established in 1926 to be the leader for the improvement of the economy of Amarillo.  Our aim in supplying this leadership is to improve all segments of the area economy by stimulating not only economic expansion, but also growth and improvement in cultural, social, educational, environmental, and governmental services in the region. The Amarillo Chamber works with our voluntary business members and other groups to keep Amarillo's economic conditions at a level where business people are willing to risk their resources here in hopes of making a profit.  The Amarillo Chamber is pleased to advocate for and represent its members' interests in front of various government bodies.

5.      The Amarillo Chamber has as members multiple institutions that will be directly affected by the Final Rules, including Anonymous Bank A.

2

II.     **The Impact of the Final Rules on Members' Businesses**

6.      As President and CEO of the Amarillo Chamber, I have worked closely with members to learn the effects that the Final Rules will have on member businesses and the substantial and irreparable harm that will result from them.

A.      **Members have already begun incurring costs to comply with the Final Rules, and those costs will escalate over the next three months.**

7.      Despite a 2-year applicability period for most of the provisions in the Final Rules, the Final Rules' new, burdensome metrics and data collection requirements will require some affected members to begin incurring compliance costs long before Plaintiffs could obtain a final judgment on their claims.  Indeed, some members have already begun to incur such costs.

8.      To comply with the Final Rules, some members will have to build or acquire new information technology to geocode their deposits, as well as to track the new metrics adopted by the Final Rules.  Indeed, the agencies "acknowledge[d] that the final rule will impact bank processes, procedures, programs, systems, and controls," and may be even more challenging for those banks that work with third-party vendors to assist with implementation of rules like these. The implementation task here will be even more expensive and daunting because banks may need to implement both Section 1071 regulations and the amended CRA regulations on overlapping timelines.  Members thus have already begun to take the necessary steps to understand the voluminous requirements, prepare their budgets for implementation, and make decisions about whether they will hire new in-house technical personnel or outside vendors to assist with implementation.

9.      As acknowledged by the Agencies, even setting aside the technical changes that will need to be made to comply with the data collection, maintenance, and reporting requirements, some of our members will need to hire new CRA compliance personnel going

forward because of the enormous complexity of the Final Rules and the increased size and number of assessment areas. To meet the standards for new Retail Lending Assessment Areas or Outside Retail Lending Areas, some members will have to build out new CRA infrastructure in those locations. For example, members have informed us that they will need to start recruiting now if they hope to find new CRA compliance personnel in those far-flung locations. And members will face additional challenges in recruiting such personnel because retail lending assessment areas could change between and during evaluation periods.

10.     The Office of the Comptroller of the Currency estimated "that expenditures to comply with mandates during the first 12-month period of the final rule's implementation will be approximately $91.8 million (approximately $7.9 million associated with increased data collection, recordkeeping or reporting; $82 million for large banks to collect, maintain, and report annually geographic data on deposits; and $1.9 million for banks' strategic plan submissions)." Our members have already begun to incur some of these costs to ensure that they are prepared for the applicability dates.

11.     For sovereign immunity and other reasons, the Amarillo Chamber's members have no expectation that they could recover these compliance costs from the government if the Final Rules were to be enjoined or vacated.

**B.      The Final Rules will harm members if allowed to take effect.**

12.     On an ongoing basis, the Final Rules will be more expensive to comply with than the existing CRA framework. Because the Final Rules will assess banks on geographic areas outside of their facility-based assessment areas, members will need to conduct additional CRA compliance efforts, in many cases involving additional compliance personnel. For example, members have to track constantly their closed-end home mortgage loans, small business loans,

4

small farm loans, and automobile loans to see whether they are approaching thresholds where such loans could become "Major Product Lines" and trigger new assessment areas.  The fact that new assessment areas can be identified *during* an evaluation period only increases the costs for compliance, as members will need to adjust their compliance efforts over the course of the year, often at increased cost.

13.     Given the significant compliance costs associated with new assessment areas outside of their deposit-taking footprint, some members have already started taking concrete steps to scale back lending in certain areas to avoid incurring new assessment areas, costing them valuable business opportunities.

14.     To top it off, the ongoing data collection, maintenance, and reporting requirements that underlie some of the Final Rules' metrics—i.e., geocoding deposits, tracking new responsive checking and savings accounts as they are opened—will represent an increased cost on an ongoing basis, even if the initial investment represents the most dramatic outlay.

15.     The idiosyncratic standards adopted in the Final Rules will also result in fewer banks being able to achieve scores of "Satisfactory" or above, despite only 1 percent having a "Needs to Improve" rating today.  If the Final Rules' Retail Lending Test had been applied to the facility-based assessment areas in the 2018-2020 time period, 13 percent of banks would have been rated as less than "Satisfactory."  Had the test been applied to anticipated retail lending assessment areas and outside retail lending areas, 22 percent and 29 percent of the respective assessment areas would have received failing grades, significantly affecting the banks' ability to achieve an overall "Satisfactory" rating.  This results from the imposition of either "community benchmarks" based purely on demographic information that does not accurately reflect the

App.0011

institution's record of meeting the credit needs of its entire community or "market benchmarks" that view one bank's success as another bank's failing.

16.     A less than "Satisfactory" CRA rating has important real-world consequences for the Amarillo Chamber's members.  That rating is taken into account by the Agencies when they decide whether to approve a new deposit facility, the relocation of a main office or branch, and various mergers, among other things.  That rating can last for *years* until the Agencies deem the bank's performance to be satisfactory.  That rating is also publicly available, and a Needs to Improve rating can have negative effects on customer good will.

**III.    Enjoining the Final Rules Would Remedy Harms to Members.**

17.     Preliminarily enjoining the Final Rules before members are forced to begin incurring even more substantial compliance costs, as described above, would temporarily remedy and limit their harms.

18.     Vacating the Final Rules would remedy the harms discussed above on a more lasting basis, ensuring that members can continue to do important work to reinvest in their local communities without undue disruption, consistent with the expressed will of Congress.

App.0012

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of February, 2024, at Amarillo, Texas.

Jason Harrison

7

## DECLARATION OF AMERICAN BANKERS ASSOCIATION

I, Virginia O'Neill, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am the Executive Vice President, Regulatory Compliance and Policy at the American Bankers Association ("ABA").

2.      ABA is the principal national trade association of the financial services industry in the United States. Founded in 1875, the ABA is the voice for the nation's $23.7 trillion banking industry, which is composed of small, regional, and large banks that together employ more than 2.1 million people.

3.      I have been personally involved in ABA's advocacy regarding efforts by the Board of Governors of the Federal Reserve, Office of the Comptroller of the Currency, and the Federal Deposit Insurance Corporation (collectively the "Agencies") to modernize regulations issued pursuant to the Community Reinvestment Act of 1977 ("CRA"), including the proposed regulations published in the Federal Register on June 3, 2022 ("Proposed Rules"), and the final regulations approved by the Agencies on October 24, 2023, and published in the Federal Register on February 1, 2024 ("Final Rules"). I have spoken directly with many bankers about the Proposed Rules and Final Rules, and I have participated regularly in discussions of ABA's CRA Working Group, which is comprised of 1,600 individuals from 686 ABA member banks. ABA's membership includes depository institutions that are currently subject to the CRA and its implementing regulations, and its members will be covered by the Final Rules and designated under the Final Rules as either "small banks," "intermediate banks," or "large banks" by the Agencies.

4.      I have confirmed that Anonymous Member Banks A, B, and C are members of the ABA.

5.      I submit this declaration in support of the Complaint and Motion for Preliminary Injunction filed by the Texas Bankers Association, Amarillo Chamber of Commerce, ABA, Chamber of Commerce of the United States of America, Longview Chamber of Commerce, Independent Community Bankers of America, and Independent Bankers Association of Texas. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge.

6.      As discussed in ABA's Comment Letter on the Proposed Rules, as well as in the Complaint, the Final Rules are a significant departure from the Agencies' previous interpretation and implementation of the CRA statute.

7.      After publication of the Proposed Rules, ABA conducted a survey of banks regarding the potential impacts of the Proposed Rules. Over 100 banks ranging in size from small community banks to the largest national financial institutions responded to the survey. The survey results show that in the first 12 months, 30 Large Banks with assets of $2 billion to $10 billion will have average implementation costs of $121,649, and 31 Large Banks with assets over $10 billion will have average implementation costs of $3,223,081. Extrapolating these numbers nationally to the 417 Large Banks with assets between $2 billion to $10 billion, and the 160 Large Banks with assets over $10 billion, results in estimated implementation costs of approximately $566 million in the first year. After factoring in costs for intermediate and small banks, which are also encompassed by ABA's membership, the initial implementation costs increase to over $650 million. These significant compliance costs will not be recoverable if the Final Rules are struck down.

8.      As heavily regulated entities, banks are required to demonstrate to the examiners at the Agencies that they maintain an effective compliance management system, and that they are

"anticipating and evaluating changes in the institutions' operating environment and implementing responses across impacted lines of defense." *See* FDIC Consumer Compliance Examination Manual Section II 3.1. To comply with this supervisory expectation, when there is a presence of new or significantly amended regulations, examiners often require banks to begin to demonstrate "readiness" for implementation of new regulations well in advance of implementation dates. ABA and its members believe there is an existing supervisory expectation to demonstrate "readiness" for implementation of the Final Rules in advance of the implementation dates.

9.     Intermediate and Large banks must begin implementation immediately due to the complexity and extensive change-management processes that will be required to comply with the Final Rules. Banks must take steps now to determine whether they will have Retail Lending Assessment Areas ("RLAAs") or Outside Lending Assessment Areas ("ORLAs"), and then calculate whether their CRA performance will be adequate under the Final Rules' performance metrics. In addition, banks must begin immediately to evaluate and adjust their business strategies. Banks must also prepare to comply with the Final Rules' massive data collection and reporting requirements. Implementation will be a lengthy and complex process; banks simply cannot wait to begin their preparations until after the court rules on the merits of the case. In fact, banks have already begun to incur implementation costs, and they anticipate implementation expenses will continue through the Final Rules' January 1, 2026, and January 1, 2027, compliance dates. Banks cannot recoup these costs if the court vacates the Final Rules.

10.     Banks anticipate that implementation expenses will take many forms. At present, banks are incurring costs to read and understand the 649 three-columned pages of Final Rule text in the Federal Register, including the 27-page appendix of calculations. Based on conversations

with bankers, Large Banks have devoted between 93 to 160 hours each to review and analyze the Final Rules. Significantly, these banks are in the preliminary stages of their review and anticipate spending many more hours studying the regulatory text.

11.     Along with analyzing the Final Rules' text, banks must begin now to apply the Final Rules' calculations, benchmarks, thresholds, and ratings methodologies to their loan origination and purchased loans in each of their assessment areas. This step is necessary to predict the bank's CRA performance under the new tests. A bank CRA vendor estimates that for *each* Facility-Based Assessment Area ("FBAA") and *each* RLAA, a bank must collect 114 data points and perform 166 computations to predict its CRA performance rating. Banks typically have multiple assessment areas, which compounds the time necessary to make these evaluations. Moreover, evaluating a bank's performance in its ORLA is an arduous task involving several confounding computations.[1]

12.     ABA members continue to study the Final Rules to determine how they will fare under the new metrics. However, based on conversations with bankers, CRA staff at some Large banks have already spent approximately 300-1,350 hours measuring their performance under the Final Rules. And some banks are evaluating whether to buy performance monitoring software, which can cost $400,000 annually.

13.     Bank CRA staff are working to brief business line managers, senior executives, and boards of directors on the Final Rules. Staff must distill the 649-page Final Rules into a form

---

[1] A bank must compute the market and community metrics and then convert them to benchmarks for each "component geographic area." The size of an ORLA may vary, but could be comprised of hundreds of geographic component areas. Each market and community benchmark for each component geographic area is weighted by applying a factor related to the bank's relative loan volume in the component geographic area against all the bank's major product line loans in the ORLA.

that executives can understand and use to make major business decisions, including implementation strategies, required by the Final Rules. The time spent preparing for and giving these briefings will be unrecoverable if the Final Rules are vacated.

14.     Based on historical data, the Agencies estimate that over 22% of RLAAs and nearly 29% of ORLAs will receive a rating of "Needs to Improve" or lower. To avoid an unfavorable rating, banks must determine their path forward under the Final Rules and begin executing those plans in the short term. For some banks, this will involve recruiting more staff, standing up CRA infrastructure in new geographies, hiring vendors, and making choices about resource allocation. Banks must begin to recruit and onboard new hires now so these individuals can assist in implementing the bank's compliance with the Final Rules. Banks also anticipate that the recruiting process may be lengthy, as many banks will be competing to hire experienced CRA and data analytics talent that will be necessary to implement the Final Rules and for ongoing compliance. Some banks are also hiring external project management support.

15.     Many banks are in the early stages of strategizing about how to increase the volume of loans to low-and moderate-income individuals, small businesses, and small farms in geographies where their CRA performance has never been evaluated and where the bank does not have a physical, deposit-taking presence. For some banks, this may involve hiring community outreach managers or loan officers in those locations. For others, it may involve forging partnerships with non-profit organizations to identify prospective low-and moderate-income borrowers and to help prepare them for homeownership. Building this kind of infrastructure and loan pipeline takes time—sometimes years—to develop. For this reason, banks that elect to continue lending outside of their branch network are beginning this work now.

16.     Some banks are evaluating whether to adjust their overall business strategy in light of the Final Rules. These are complicated decisions, requiring extensive analysis and deliberation that, in some cases, is already underway or must begin very soon. For example, some banks are engaging outside counsel to evaluate how the Final Rules will affect their growth strategy. Some banks are evaluating whether to stop providing accommodation loans outside of their branch network, while others are evaluating whether to exit mortgage lending given the extensive number of RLAAs and large number of component geographies that will comprise their bank's ORLA. Some banks do not anticipate eliminating lending outside of their geographic footprint, and they are working to create processes and dashboards for shutting down a product line for a month or two at the end of the year to prevent triggering an RLAA. In addition, some banks are re-evaluating their branching and growth strategies, with some analyzing whether merger and acquisition activity will be preferable to organic growth because of the Final Rules' unprecedented interpretation of "community." These are significant decisions—all of which demand the time of senior management and have significant opportunity costs.

17.     Large Banks must also make significant systems changes to collect, analyze, and report multiple types of data not previously mandated under the CRA. Complying with these requirements does not involve simply mining data and writing a few lines of code. In particular, Large Banks with $10 billion or more in assets under the Final Rules must report deposit data at the state, multistate metropolitan statistical area, and county levels. This is expensive and time-consuming. To report information at the county level, banks will first need to geocode depositor addresses, which involves assigning each deposit account to the correct county. This will be a time-consuming undertaking because most banks have a significant number of customer deposit

account addresses that need to be reconciled before geocoding. For example, banks may not have the physical address of customers with post office boxes whose accounts were opened before the Financial Crimes Enforcement Network's "know your customer rules" took effect in 2003. Adding to this challenge, banks may need to confirm the accuracy of customer addresses they have on file (even for accounts opened after 2003) due to the large percentage of deposit customers who have chosen electronic delivery of their monthly statement. Some of these customers may have relocated without updating their address information with the bank. In this situation, banks are unaware that the customer has moved because they have not received returned mail.

18.     In anticipation of the time that it will take to address these data challenges, many banks have begun to engage their information technology and deposit teams and are beginning to spend resources—both internally and on outside vendors—to comply with all the new data reporting requirements and the deposit data provisions in particular.

I declare under penalty of perjury, this 4th day of February, 2024, based on my personal knowledge and investigation, that the foregoing is true and correct to the best of my knowledge, information and belief.

_Virginia O'Neill_

Virginia O'Neill
Executive Vice President
Regulatory Compliance and Policy
American Bankers Association

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

|  |  |
|---|---|
| TEXAS BANKERS ASSOCIATION; AMARILLO CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW CHAMBER OF COMMERCE; INDEPENDENT COMMUNITY BANKERS OF AMERICA; INDEPENDENT BANKERS ASSOCIATION OF TEXAS,<br><br>                Plaintiffs,<br><br>v.<br><br>OFFICE OF THE COMPTROLLER OF THE CURRENCY and MICHAEL J. HSU in his official capacity as Acting Comptroller of the Currency; BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM and JEROME POWELL in his official capacity as Chairman of the Board of Governors; FEDERAL DEPOSIT INSURANCE CORPORATION; and MARTIN GRUENBERG, in his official capacity as Chairman of the FDIC,<br><br>                Defendants. | Case No. _____<br><br>**DECLARATION OF THOMAS QUAADMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

**DECLARATION OF THOMAS QUAADMAN**

I, Thomas Quaadman, declare as follows:

      1.      I am the Executive Vice President of the Center for Capital Markets

Competitiveness ("CCMC") for the Chamber of Commerce of the United States of America

1

("Chamber"). In that capacity, I oversee all of CCMC's operations. CCMC works to advance America's global leadership in capital formation by supporting diverse capital markets that are the most fair, transparent, efficient, and innovative in the world. CCMC advocates on behalf of American businesses to ensure that legislation and regulation strengthen our capital markets, thus allowing businesses—from the local flower shop to a multinational manufacturer—to mitigate risks, manage liquidity, access credit, and raise capital. I have also testified on several occasions before congressional committees on issues covering capital formation, financial reporting, and corporate governance.

2.      The purpose of this declaration is to discuss the effects of the new joint rule adopted by the Office of Comptroller of the Currency, Board of Governors of the Federal Reserve System, and Federal Deposit Insurance Corporation regarding the Community Reinvestment Act ("CRA") of 1977 (hereinafter the "Final Rules").

3.      Unless otherwise stated, this Declaration is based upon my personal knowledge and belief, my review of business records of the Chamber, and my discussions with members of the Chamber. If called as a witness, I could and would testify competently thereto.

## I.      The Chamber's Mission and Members

4.      The Chamber is the world's largest business federation, representing approximately 300,000 direct members and indirectly representing the interests of more than 3 million U.S. businesses and professional organizations of every size and in every economic sector and geographic region of the country.

5.      The Chamber has as members numerous institutions that will be directly regulated by the Final Rules, including some of the nation's largest depository institutions and smaller depository institutions, having less than $600 million in total assets. The Chamber also has as

App.0022

members small businesses whose access to credit and lending opportunities may be affected by the Final Rules.  Anonymous Banks A, B, and C are members of the Chamber.

6.      The Chamber's mission is to advocate for policies that help businesses grow and create jobs in their communities.  As part of advancing that mission, the Chamber seeks to ensure that businesses have access to diverse financial service providers and products helping to meet their credit, investment, risk management, and liquidity needs; works to enhance Americans' access to investment options and advice while ensuring strong protections are in place; and advocates for consumer protection and expanded access to responsible consumer financial products.  Proper application of the CRA helps to ensure access to capital opportunities for small businesses, particularly in low- to moderate-income areas.  An important function of the Chamber is to represent the interests of its members before Congress, the Executive Branch, and the courts.

**II.     The Impact of the Final Rules on Members' Businesses**

7.      As Executive Vice President of CCMC, I have worked closely with many Chamber members to understand how the Final Rules will affect member businesses and the substantial and irreparable harm that will result from their adoption.

   **A.      Members have already begun incurring costs to comply with the Final Rules, and those costs will escalate over the next three months.**

8.      Despite a 2-year applicability period for most of the provisions in the Final Rules, the Final Rules' new, burdensome metrics and data collection requirements will require some affected Chamber's members to begin incurring compliance costs long before Plaintiffs could obtain a final judgment on their claims.  Indeed, some members have already begun to incur such costs.

3

9.     To comply with the Final Rules, members will have to build or acquire new information technology to geocode their deposits, as well as to track the new metrics adopted by the Final Rules.  Indeed, the agencies "acknowledge[d] that the final rule will impact bank processes, procedures, programs, systems, and controls," and may be even more challenging for those banks that work with third-party vendors to assist with implementation of rules like these. The implementation task here will be even more expensive and daunting because banks may need to implement both Section 1071 regulations and the amended CRA regulations on overlapping timelines.  Members thus have already begun to take the necessary steps to understand the voluminous requirements, prepare their budgets for implementation, and make decisions about whether they will hire new in-house technical personnel or outside vendors to assist with implementation.

10.    As acknowledged by the Agencies, even setting aside the technical changes that will need to be made to comply with the data collection, maintenance, and reporting requirements, some of our members will need to hire new CRA compliance personnel going forward because of the enormous complexity of the Final Rules and the increased size and number of assessment areas.  To meet the standards for new Retail Lending Assessment Areas or Outside Retail Lending Areas, some members will have to build out new CRA infrastructure in those locations.  For example, members have informed us that they will need to start recruiting now if they hope to find new CRA compliance personnel in those far-flung locations.  And members will face additional challenges in recruiting such personnel because retail lending assessment areas could change between and during evaluation periods.

11.    The Office of the Comptroller of the Currency estimated "that expenditures to comply with mandates during the first 12-month period of the final rule's implementation will be

approximately $91.8 million (approximately $7.9 million associated with increased data collection, recordkeeping or reporting; $82 million for large banks to collect, maintain, and report annually geographic data on deposits; and $1.9 million for banks' strategic plan submissions)." Feedback from our members suggests that this estimate is far too low, but the important point is that our members have already begun to incur some of these costs to ensure that they are prepared for the applicability dates.

12.     For sovereign immunity and other reasons, the Chamber's members have no expectation that they could recover these compliance costs from the government if the Final Rules were to be enjoined or vacated.

**B.     The Final Rules will harm members if allowed to take effect.**

13.     On an ongoing basis, the Final Rules will be more expensive to comply with than the existing framework. Because the Final Rules will assess banks on geographic areas outside of their facility-based assessment areas, members will need to conduct additional compliance efforts, in many cases involving additional compliance personnel. For example, members will have to track constantly their closed-end home mortgage loans, small business loans, small farm loans, and automobile loans to see whether they are approaching thresholds where such loans could become "Major Product Lines" and trigger new assessment areas. And the fact that new assessment areas can be identified *during* an evaluation period only increases the costs for compliance, as members will need to adjust their compliance efforts over the course of the year, often at increased cost.

14.     Given the significant compliance costs associated with new assessment areas outside of their deposit-taking footprint, some members have already started taking concrete

steps to scale back lending in certain areas to avoid incurring new assessment areas, costing them valuable business opportunities.

15.     To top it off, the ongoing data collection, maintenance, and reporting requirements that underlie some of the Final Rules' metrics—i.e., geocoding deposits, tracking new responsive checking and savings accounts as they are opened—will represent an increased cost on an ongoing basis, even if the initial investment represents the most dramatic outlay.

16.     Depending on the outcome of the Basel III Endgame rulemaking proposal, banks may face additional costs in implementing the Final Rules.  At a high level, the Basel III Endgame rulemaking proposes to require some banks to maintain larger reserves for loans that are riskier, which increases the costs for those banks seeking to lend to low- and moderate-income borrowers.  In the case of a small business credit line, for example, members may be required to put reserves against the whole credit line, even if that line is not used, decreasing the ability of banks to meet the lending standards in the Final Rules.  To the extent that the implementation periods of the two rules coincide, that will only increase the costs for members in terms of personnel and vendors.

17.     The idiosyncratic standards adopted in the Final Rules will also result in fewer banks being able to achieve scores of "Satisfactory" or above, despite only 1 percent having a "Needs to Improve" rating today.  If the Final Rules' Retail Lending Test had been applied to the facility-based assessment areas in the 2018-2020 time period, 13 percent of banks would have been rated as less than "Satisfactory."  Had the test been applied to anticipated retail lending assessment areas and outside retail lending areas, 22 percent and 29 percent of the respective assessment areas would have received failing grades, significantly affecting the banks' ability to achieve an overall "Satisfactory" rating.  This results from the imposition of either "community

6

benchmarks" based purely on demographic information that does not accurately reflect the institution's record of meeting the credit needs of its entire community or "market benchmarks" that view one bank's success as another bank's failing.

18.     A less than "Satisfactory" CRA rating has important real-world consequences for the Chamber's members.  That rating is taken into account by the Agencies when they decide whether to approve a new deposit facility, the relocation of a main office or branch, and various mergers, among other things.  That rating can last for *years* until the Agencies deem the bank's performance to be satisfactory.  That rating is also publicly available, and a Needs to Improve rating can have negative effects on customer good will.

### III.     Enjoining the Final Rules Would Remedy Harms to Members.

19.     Preliminarily enjoining the Final Rules before members are forced to begin incurring even more substantial compliance costs, as described above, would temporarily remedy their harms.

20.     Vacating the Final Rules would remedy the harms discussed above on a more lasting basis, ensuring that members can continue to do important work to reinvest in their local communities without undue disruption, consistent with the expressed will of Congress.

App.0027

I declare under penalty of perjury that the foregoing is true and correct.

Executed this **15** day of February, 2024, at Washington, D.C.

Thomas Quaadman

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION; AMARILLO CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW CHAMBER OF COMMERCE; INDEPENDENT COMMUNITY BANKERS OF AMERICA; INDEPENDENT BANKERS ASSOCIATION OF TEXAS, | Case No. _____ <br><br> **DECLARATION OF KELLY HALL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
|               Plaintiffs, <br><br> v. <br><br> OFFICE OF THE COMPTROLLER OF THE CURRENCY and MICHAEL J. HSU in his official capacity as Acting Comptroller of the Currency; BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM and JEROME POWELL in his official capacity as Chairman of the Board of Governors; FEDERAL DEPOSIT INSURANCE CORPORATION; and MARTIN GRUENBERG, in his official capacity as Chairman of the FDIC, <br><br>               Defendants. | |

**DECLARATION OF KELLY HALL**

I, Kelly Hall, declare as follows:

      1.      I am the President and CEO of the Longview Chamber of Commerce ("the

Chamber").  As the President and CEO, I oversee all of the Longview Chamber's operations.

App.0029

The mission of the Longview Chamber is to promote economic growth within the Longview trade area by focusing on education, promotion, and development of the business community, and those areas of the community affecting business.

2.  The purpose of this declaration is to discuss the effects of the new joint rule adopted by the Office of Comptroller of the Currency, Board of Governors of the Federal Reserve System, and Federal Deposit Insurance Corporation regarding the Community Reinvestment Act ("CRA") of 1977 (hereinafter the "Final Rules").

3.  Unless otherwise stated, this Declaration is based upon my personal knowledge and belief, my review of business records of the Longview Chamber, and my discussions with members of the Longview Chamber.  If called as a witness, I could and would testify competently thereto.

## I.  The Longview Chamber's Mission and Members

4.  The Longview Chamber of Commerce is a voluntary, membership-based organization that promotes projects that have a positive economic impact on the Longview Trade Area.  The Longview Chamber's goal is to be recognized as an effective resource, providing relevant, innovative, and impactful programming that ensures a healthy business climate and an enhanced quality of life for Longview and Gregg County.  The Longview Chamber is pleased to advocate for and represent its members' interests in front of various government bodies.

5.  The Longview Chamber has as members multiple institutions that will be directly regulated by the Final Rules.

II.    **The Impact of the Final Rules on Members' Businesses**

6.    As President and CEO of the Longview Chamber, I have worked closely with our members to understand how the Final Rules will affect member businesses and the substantial and irreparable harm that will result from them.

A.    **Members have already begun incurring costs to comply with the Final Rules, which will only escalate over the next three months.**

7.    Despite a 2-year applicability period for most of the provisions in the Final Rules, the Final Rules' new, burdensome metrics and data collection requirements will require some affected members to begin incurring compliance costs long before Plaintiffs could obtain a final judgment on their claims.  Indeed, some members have already begun to incur such costs.

8.    To comply with the Final Rules, some members will have to build or acquire new information technology to geocode their deposits or to track the new metrics adopted by the Final Rules.  Indeed, the agencies "acknowledge[d] that the final rule will impact bank processes, procedures, programs, systems, and controls," and may be even more challenging for those banks that work with third-party vendors to assist with implementation of rules like these. The implementation task here will be even more expensive and daunting because banks may need to implement both Section 1071 regulations and the amended CRA regulations on overlapping timelines.  Members thus have already begun to take the necessary steps to understand the voluminous requirements, prepare their budgets for implementation, and make decisions about whether they will hire new in-house technical personnel or outside vendors to assist with implementation.

9.    As acknowledged by the Agencies, even setting aside the technical changes that will need to be made to comply with the data collection, maintenance, and reporting requirements, some of our members will need to hire new CRA compliance personnel going

3

forward because of the enormous complexity of the Final Rules and the increased size and number of assessment areas.  To meet the standards for new Retail Lending Assessment Areas or Outside Retail Lending Areas, some members will have to build out new CRA infrastructure in those locations.  For example, members may need to start recruiting now if they hope to find new CRA compliance personnel in those far-flung locations.  And members will face additional challenges in recruiting such personnel because retail lending assessment areas could change between and during evaluation periods.

10.     The Office of the Comptroller of the Currency estimated "that expenditures to comply with mandates during the first 12-month period of the final rule's implementation will be approximately $91.8 million (approximately $7.9 million associated with increased data collection, recordkeeping or reporting; $82 million for large banks to collect, maintain, and report annually geographic data on deposits; and $1.9 million for banks' strategic plan submissions)."  Our members have already begun to incur some of these costs to ensure that they are prepared for the applicability dates.

11.     For sovereign immunity and other reasons, the Longview Chamber's members have no expectation that they could recover these compliance costs from the government if the Final Rules were to be enjoined or vacated.

**B.     The Final Rules will harm members if allowed to take effect.**

12.     On an ongoing basis, the Final Rules will be more expensive to comply with than the existing framework.  Because the Final Rules propose to assess banks on geographic areas outside of their facility-based assessment areas, members will need to conduct additional compliance efforts, in many cases involving additional compliance personnel.  For example, members will have to track constantly their closed-end home mortgage loans, small business

loans, small farm loans, and automobile loans to see whether they are approaching thresholds where such loans could become "Major Product Lines" and trigger new assessment areas.  And the fact that new assessment areas can be identified *during* an evaluation period only increases the costs for compliance, as members will need to adjust their compliance efforts over the course of the year, often at increased cost.

13.     Given the significant compliance costs associated with new assessment areas outside of their deposit-taking footprint, some members may have to scale back lending in certain areas to avoid incurring new assessment areas, costing them valuable business opportunities.

14.     To top it off, the ongoing data collection, maintenance, and reporting requirements that underlie some of the Final Rules' metrics—i.e., geocoding deposits, tracking new responsive checking and savings accounts as they are opened—will represent an increased cost on an ongoing basis, even if the initial investment represents the most dramatic outlay.

15.     The idiosyncratic standards adopted in the Final Rules will also result in fewer banks being able to achieve scores of "Satisfactory" or above, despite only 1 percent having a "Needs to Improve" rating today.  If the Final Rules' Retail Lending Test had been applied to the facility-based assessment areas in the 2018-2020 time period, 13 percent of banks would have been rated as less than "Satisfactory."  Had the test been applied to anticipated retail lending assessment areas and outside retail lending areas, 22 percent and 29 percent of the respective assessment areas would have received failing grades, significantly affecting the banks' ability to achieve an overall "Satisfactory" rating.  This results from the imposition of either "community benchmarks" based purely on demographic information that do not accurately reflect the

App.0033

institution's record of meeting the credit needs of its entire community or "market benchmarks" that view one bank's success as another bank's failing.

16.     A less than "Satisfactory" CRA rating has important real-world consequences for the Chamber's members.  That rating is taken into account by the Agencies when they decide whether to approve a new deposit facility, the relocation of a main office or branch, and various mergers, among other things.  That rating can last for *years* until the Agencies deem the bank's performance to be satisfactory.  That rating is also publicly available, and a Needs to Improve rating can have negative effects on customer good will.

## III.     Enjoining the Final Rules Would Remedy Harms to Members.

17.     Preliminarily enjoining the Final Rules before members are forced to begin incurring even more substantial compliance costs, as described above, would temporarily remedy their harms.

18.     Vacating the Final Rules would remedy the harms discussed above on a more lasting basis, ensuring that members can continue to do important work to reinvest in their local communities without undue disruption, consistent with the expressed will of Congress.

6

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of February 2024, at Longview, Texas.

Kelly R Hall

## DECLARATION OF INDEPENDENT COMMUNITY BANKERS OF AMERICA

I, Anne Balcer, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I am currently the Senior Executive Vice President, Chief of Government Relations & Public Policy at the Independent Community Bankers of America ("ICBA").

2.    The ICBA is the only national trade association dedicated exclusively to community banks. ICBA's membership consists of thousands of community banks—more than one half of the total depository institutions in the United States. With nearly 50,000 locations nationwide, community banks employ nearly 700,000 Americans. ICBA members are located in each of the fifty States and the District of Columbia, including some that operate in this District.

3.    The ICBA has one mission: to create and promote an environment where community banks flourish. As local and trusted sources of credit, America's community banks leverage their relationship-based business model and innovative offerings to channel deposits into the neighborhoods they serve, creating jobs and fostering economic prosperity.

4.    Beyond their typically smaller size, community banks are defined by their focus on the geographic area, or community, they call home, meaning community bank deposits remain local via loans to neighborhood small businesses and sponsorships of community initiatives. Banking with a community bank is the financial equivalent of shopping locally, and many community banks provide customers physical access to the financial system at bank branches in areas that are traditionally underserved or less well

1

served by other financial institutions.  Community banks are the only physical banking presence in one in three U.S. counties.

5.      I have been personally involved in ICBA's advocacy regarding efforts by the Board of Governors of the Federal Reserve, Office of the Comptroller of the Currency, and the Federal Deposit Insurance Corporation (collectively the "Agencies") to modernize regulations issued pursuant to the Community Reinvestment Act of 1977 ("CRA"), including the proposed regulations published in the Federal Register on June 3, 2022, and the Final Rules approved by the Agencies on October 24, 2023 and published in the Federal Register on February 1, 2024 (hereinafter the "Final Rules").  As part of my efforts, I have spoken directly with hundreds of bank representatives about the proposed and final CRA rules to understand how changes to the CRA framework will impact community banks and the neighborhoods and customers they serve.

6.      I submit this declaration in support of the Complaint filed by the ICBA, Texas Bankers Association, Amarillo Chamber of Commerce, American Bankers Association, Chamber of Commerce of the United States of America, Longview Chamber of Commerce, and Independent Bankers Association of Texas.  I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge.

7.      I have confirmed that Anonymous Member Banks A and B are members of the ICBA.

8.      ICBA's membership includes depository institutions that are currently subject to the CRA and its implementing regulations, and its members will be covered by

2

the Final Rules and designated under the Final Rules as either "small banks," "intermediate banks," or "large banks" by the Agencies.

9.      As set forth in detail in ICBA's Comment Letter on the Proposed Rules, as well as in the Complaint, the Final Rules are a significant departure from the Agencies' previous interpretation and implementation of the CRA statute and will greatly increase compliance costs and other regulatory burdens on community banks.

10.      After publication of the Proposed Rule, ICBA conducted a survey of banks regarding their potential impacts. Over 100 banks ranging in asset size from banks between $100,000 to $100 million to banks $1 billion and greater participated in the survey.  In response to the question "how do you think the new CRA revisions will change your annual recurring compliance costs," 62.8% of respondents indicated their costs will somewhat or significantly increase.

11.      Collectively, the midpoint of estimated one-time implementation costs reported by survey respondents for the new CRA revisions exceeds $3.7 million.

12.      When asked "the CRA was revised to create Retail Lending Assessment Areas for large banks.  Do you think your bank will reduce lending in those areas to avoid triggering an RLAA," 28.2% of survey respondents replied they will reduce lending and another 25.6% of survey respondents responded they did not know whether their bank will reduce lending.

13.      ICBA members submitted individual comment letters to the Agencies expressing their concerns about the Proposed Rules, and specifically explained how the

3

Proposed Rules will have a significant negative impact on community banks. Some of those comments may be found at the following URL addresses, respectively:

https://www.regulations.gov/comment/OCC-2022-0002-0515

https://www.regulations.gov/comment/OCC-2022-0002-0141

14.     I have reviewed the comments submitted by many member banks, and the concerns expressed therein about the cost-burden of the Proposed and Final Rules to community banks are consistent with the concerns I have heard from hundreds of ICBA members. For example, a $3.1 billion community bank headquartered in Texas stated in the public administrative record: "We estimate that three additional full-time employees at an absolute minimum of $100,000 in payroll expenses, will be necessary in order to fully comply with the requirements of the proposal. Additionally, we estimate $500,000 in annual costs for our bank to comply . . . Additionally, the impact of this annual cost will have a direct impact on a bank's ability to provide investments and donations to organizations in its communities because that money would be reallocated to operational expenses rather than being available for redistribution into our communities."

15.     A $1.2 billion community savings association headquartered in Georgia stated in the public administrative record: "We also believe that the OCC's estimate of the cost burden of these rule changes are too low. First, because these rule changes involve so many key areas for a community financial institution, we will have a significant involvement in the implementation project from more senior managers. We would estimate an average compensation rate of $150 per hour rather than the $114 per hour stated in the proposal. We believe the up-front compliance costs of implementing

4

this new rule will require at least 1,000 hours for a total compensation cost of $150,000 to implement. In addition, we believe the new rule will require substantially more time than the estimated 80 hours per year. We already spend over 200 hours per year on CRA compliance activities. In addition, we spend over $15,000 annually on software to support our CRA performance analysis and compliance activities. With the complexities of the Retail Lending Test calculations and analysis, we believe a more accurate estimate of the increased time needed to comply with the new rule is 200 hours per year, for an increase of $30,000 annually in CRA costs."

16.     The Final Rules require significant expenditures by many ICBA member banks, particularly banks that fall in the intermediate and large bank categories. These banks must incur substantial expense to evaluate and understand the Final Rules; collect, analyze and report required data not previously mandated under the CRA; and attempt to comply with CRA requirements in newly created assessment areas far beyond each member's existing assessment areas. Some member banks report that, to meet the January 1, 2026 implementation deadline, they have begun or will need to immediately begin undertaking rigorous efforts to understand and comply with the Final Rules, initiate change-management processes, and make changes to their overall business strategy. All of these efforts will result in the banks incurring nonrecoverable compliance costs.

17.     As heavily regulated entities, community banks are required to demonstrate to the examiners at the Agencies that they maintain an effective compliance management system, and that they are "anticipating and evaluating changes in the institutions' operating environment and implementing responses across impacted lines of

5

defense." *See* FDIC Consumer Compliance Examination Manual Section II 3.1. To comply with this supervisory expectation, when there is a presence of new or significantly amended regulations, examiners often require community banks to begin to demonstrate "readiness" for implementation of new regulations well in advance of implementation dates. ICBA and its members believe there is an existing supervisory expectation to demonstrate "readiness" for implementation of the Final Rules in advance of implementation dates.

18.     Some of the initial and anticipated preparations and costs for implementation and compliance with the Final Rule include recruiting and training additional staff, investing in changes to software and technology, as well as hiring vendors, consultants, and attorneys to assist with making changes to systems, policies, processes, and products and service offerings.

19.     Community banks and their compliance staff are currently devoting time and expense analyzing and implementing the extraordinarily lengthy and complex Final Rules, have begun to incur compliance costs in preparation and anticipation of implementation of the Final Rules, and do not expect to be able to recover these initial compliance costs if the Final Rules are struck down.

20.     Preliminarily enjoining or vacating the Final Rules before community banks are forced to incur even more compliance costs or changes to their products, services, or branch locations would temporarily relieve community banks from further harm and ensure community banks can continue to reinvest in their local communities,

6

consistent with the statutory purpose of the CRA. Enjoining the Final Rules would remedy the harms the member banks have incurred and will incur in the future.

21.    I declare under penalty of perjury, this 4th day of February, 2024, based on my personal knowledge and investigation, that the foregoing is true and correct to the best of my knowledge, information and belief.

Anne Balcer
SEVP, Chief of Government
Relations & Public Policy
Independent Community
Bankers of America

7

App.0042

**DECLARATION OF THE INDEPENDENT BANKERS ASSOCIATION OF TEXAS**

I, Christopher L. Williston, VI, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am over the age of eighteen (18) years, have never been convicted of a crime, and am otherwise competent to execute this Declaration.  I am the President and Chief Executive Officer at the Independent Bankers Association of Texas (IBAT).  My job duties include oversight of all business activities of the association as well as its subsidiary companies.  Unless otherwise stated, I have gained personal knowledge of the facts stated in this Declaration in the course of performing my duties on behalf of IBAT.

2.      IBAT is an association representing Texas community banks.  IBAT is comprised of more than 300 members, with representation in 700 Texas communities, including the Northern District of Texas.  IBAT member banks range in estimated size from $27 million to $50 billion in assets. IBAT's membership includes depository institutions that are currently subject to the Community Reinvestment Act of 1977 ("CRA"), and its members will be covered by the Final Rules. I have confirmed that Anonymous Member Bank A is a member of IBAT.

3.      In performing my job duties on behalf of IBAT, I have worked closely with IBAT staff and members to gain an understanding of the requirements of the Final Rules issued by the Board of Governors of the Federal Reserve, Office of the Comptroller of the Currency, and the Federal Deposit Insurance Corporation (collectively the "Agencies") to modernize regulations issued pursuant to the CRA, including the proposed regulations published in the Federal Register on June 3, 2022, and the Final Rules approved by the Agencies on October 24, 2023, and published in the Federal Register on February 1, 2024 (hereinafter "Final Rules").  I have spoken directly with bank representatives about the proposed and final CRA rules.

4.      I submit this declaration in support of the Complaint and Motion for Preliminary

Injunction filed by the IBAT, Texas Bankers Association, Amarillo Chamber of Commerce,

American Bankers Association, Chamber of Commerce of the United States of America,

Longview Chamber of Commerce, and Independent Community Bankers of America.

5.      As discussed in IBAT's Comment Letter on the Proposed Rule, as well as in the

Complaint, the Final Rules contain significant changes from the Agencies' previous

interpretation and implementation of the CRA statute.  This includes changes to asset thresholds

in the categorization of banks as "small," "intermediate," and "large."  Under the Final Rules,

thirty-two (32) of IBAT's member banks will be categorized as "large banks," with thirty (30) of

those falling between $2 billion and $10 billion in assets, according to data from the Federal

Deposit Insurance Corporation ("FDIC") from September 30, 2023.  An additional seventy-two

(72) of IBAT's members will be classified as "intermediate banks" with assets between $600

million and $2 billion, according to data from the FDIC from September 30, 2023.

6.      Upon the finalization of the rules in October of 2023, IBAT conducted outreach to

banks that will be classified as "large" and "intermediate" under the Final Rules.  These banks

have routinely indicated that the Final Rules will necessitate at least one additional full-time

employee in the next twelve (12) months to prepare the bank for implementation, data collection,

training, software selection, and other institutional requirements before the effective date of

January 1, 2026.  According to data compiled by IBAT in 2023 as part of the association's

annual salary survey, we estimate the total employment cost for a compliance officer with CRA

responsibilities to be $120,000 to $140,000 for banks with greater than $2 billion in assets.

Additionally, banks will face overhead and direct expenses related to the selection and

implementation of software to support CRA compliance prior to the implementation date of

January 1, 2026.  Due to sovereign immunity and other considerations, IBAT member banks do not expect to recover these costs if the Final Rules are struck down.

7.    As heavily regulated entities, community banks are required to demonstrate to the examiners at the Agencies that they maintain an effective compliance management system, and that they are "anticipating and evaluating changes in the institutions' operating environment and implementing response across impacted lines of defense." *See* FDIC Consumer Compliance Examination Manual Section II.3.1. To comply with this supervisory expectation, when there is a presence of new or significantly amended regulations, examiners often require community banks to begin to demonstrate "readiness" for implementation of new regulations well in advance of implementation dates. IBAT and its members believe there is an existing supervisory expectation to demonstrate "readiness" for implementation of the Final Rules in advance of implementation dates.

8.    IBAT member banks have already begun their efforts to determine whether they will need to make changes to their CRA compliance efforts with regard to accounting for the new Facility-Based Assessment Areas, Retail Lending Assessment Areas, and/or Outside Retail Lending Areas.  These determinations will be necessary prior to the implementation of the rule for a bank to evaluate whether its CRA performance will be adequate under the Final Rules.  The costs incurred by banks in making these determinations is ongoing and will increase as we approach the effective date for implementation of the rule.  IBAT member banks do not expect that these costs will be recoverable even if the Final Rules are struck down due to sovereign immunity and other considerations.

I declare under penalty of perjury, this 4th day of February 2024, based on my personal knowledge and investigation, that the foregoing is true and correct to the best of my knowledge, information, and belief.


Christopher L. Williston, VI
President and CEO
Independent Bankers Association of
Texas

## DECLARATION OF ANONYMOUS BANK A

I, CEO and President of Anonymous Bank A, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am currently the CEO and President of Anonymous Bank A, a Texas State Bank. I have been personally involved in efforts to evaluate the new Community Reinvestment Act ("CRA") regulations published in the Federal Register on February 1, 2024 (hereinafter "Final Rules"), and their impact on Anonymous Bank A. I submit this declaration in support of the Complaint and Motion for Preliminary Injunction filed by the Texas Bankers Association, Amarillo Chamber of Commerce, American Bankers Association, Chamber of Commerce of the United States of America, Longview Chamber of Commerce, Independent Community Bankers of America, and Independent Bankers Association of Texas. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge and investigation.

2.      Anonymous Bank A is a member of the Texas Bankers Association, Amarillo Chamber of Commerce, Chamber of Commerce of the United States of America, American Bankers Association, Independent Community Bankers of America, and the Independent Bankers Association of Texas. Anonymous Bank A is a community bank headquartered in Amarillo, Texas with full-service bank branches in Amarillo, Perryton, Pampa, Booker, and Hereford and loan production offices ("LPOs") in Fort Worth, Austin, and San Antonio. Anonymous Bank A received a rating of Satisfactory on its most recent CRA examination. Anonymous Bank A is a strong proponent of CRA and the benefits CRA provides to the communities Anonymous Bank A serves. When its communities thrive, Anonymous Bank A thrives. However, the Final Rules will have a dramatic negative effect on Anonymous Bank A as detailed below and will likely impair Anonymous Bank A's ability to support its communities.

3.      Anonymous Bank A currently has assets of approximately $1.8 billion and would be classified as an "Intermediate" bank under the Final Rules. However, Anonymous Bank A is growing rapidly and expects to cross the $2 billion threshold to become a "Large" bank under the Final Rules by 2025.

4.      To date, Anonymous Bank A has incurred approximately $66,000 in costs reviewing and assessing the proposed rules and Final Rules and their potential impact on Anonymous Bank A, including their impact on current and future business plans of Anonymous Bank A.

5.      The Final Rules will impose extensive new data collection and reporting requirements on Anonymous Bank A, particularly once Anonymous Bank A crosses the threshold to become a "Large" bank. These new requirements are extremely burdensome and will require Anonymous Bank A to make extensive changes to its CRA data collection and reporting systems and infrastructure.

6.      Anonymous Bank A will also be required to add additional CRA compliance and information technology personnel. Recruiting a qualified CRA compliance officer to Amarillo, Texas will be challenging, so such efforts will need to begin immediately.

7.      Anonymous Bank A estimates that planning and implementing additional data collection capabilities, personnel changes, and incurring other expenses to prepare for the Final Rules will cost approximately $300,000 over the next 18 months.

8.      More significantly, the Final Rules are having an immediate and dramatic effect on Anonymous Bank A's future strategic business plans. As noted above, Anonymous Bank A is growing rapidly and has opened LPOs in Fort Worth, Austin, and San Antonio.  Anonymous Bank A has plans to convert those LPOs to full-service bank branches.  Anonymous Bank A was already actively investigating locations for a full-service bank branch in Fort Worth.

9.      Under the Final Rules, once it becomes a Large bank, a single bank branch in Fort Worth would require Anonymous Bank A to designate all of Tarrant County, Texas, with a population of over 2 million people, as a facility-based assessment area. Anonymous Bank A would not have the personnel or resources to service all of Tarrant County from a single branch, and any attempt to do so would divert resources from its existing branch network.  Thus, as a direct result of the Final Rules, Anonymous Bank A has put on hold plans to open full-services bank branches in Fort Worth, Austin, and San Antonio. It has also canceled plans to open an additional LPO in Dallas.  This will have a significant negative impact on Anonymous Bank A's revenue and profits, which will reduce Anonymous Bank A's ability to increase its CRA activities within its existing geographic footprint.  It will also impair Anonymous Bank A's future liquidity by denying it access to low-cost stable consumer deposits in the LPO counties.

10.      Anonymous Bank A is also concerned that once it crosses the threshold to become a "Large" bank, Anonymous Bank A will become subject to the Outside Retail Lending Area requirements. Anonymous Bank A makes loans in various jurisdictions across the country. Such loans are often made as an accommodation to existing customers and are often made to small businesses. Anonymous Bank A will no longer be able to accommodate such customers because Anonymous Bank A will have no ability to originate additional loans to Low- and Moderate-Income borrowers in ORLA jurisdictions. If the Final Rule becomes effective, Anonymous Bank A may be required to reduce lending outside its geographic footprint to avoid the likely negative impact of ORLA assessments on its overall CRA rating.

11.      Anonymous Bank A anticipates that the Final Rules will continue to cause economic injury unless the Final Rule is preliminarily enjoined. Preliminarily enjoining the Final Rules would prevent Anonymous Bank A from incurring more unrecoverable compliance costs.

Vacating the Final Rules would redress the economic injury on a more lasting basis ensuring Anonymous Bank A can continue with its plans to expand and to reinvest in its local communities.

12.     I declare under penalty of perjury, this 2nd day of February, 2024, based on my personal knowledge and investigation, that the foregoing is true and correct to the best of my knowledge, information and belief.


/s/ Authorized Signature
AUTHORIZED SIGNATURE FOR
ANONYMOUS BANK A

Signed copy maintained by Plaintiffs' counsel.

## DECLARATION OF ANONYMOUS BANK B

I, Chairman and CEO of Anonymous Bank B, pursuant to 28 U.S.C. § 1746,
hereby declare as follows:

1.      I am currently the President and CEO of Anonymous Bancorporation, the
parent company of Anonymous Bank B.  I am also the Chairman and CEO of
Anonymous Bank B. I have been personally involved in efforts to evaluate the new
Community Reinvestment Act ("CRA") regulations published in the Federal Register on
February 1, 2024 (hereinafter "Final Rules"), and their impact on Anonymous Bank B. I
submit this declaration in support of the Complaint and Motion for Preliminary
Injunction filed by the Texas Bankers Association, Amarillo Chamber of Commerce,
American Bankers Association, Chamber of Commerce of the United States of America,
Longview Chamber of Commerce, Independent Community Bankers of America, and the
Independent Bankers Association of Texas. I am of the age of majority, am competent to
make this declaration, and make this declaration based on my personal knowledge.

2.      Anonymous Bank B is a member of the American Bankers Association,
Independent Community Bankers of America, and Chamber of Commerce of the United
States of America. Anonymous Bank B is a community bank headquartered in West Des
Moines, Iowa with offices in the Des Moines area and one office in each of Coralville,
Iowa, and Rochester, Owatonna, Mankato, and St. Cloud, Minnesota. Anonymous Bank
B currently has assets of approximately $3.8 billion and would be classified as a "Large"
bank under the Final Rules.

3.      Anonymous Bank B recently underwent a CRA examination and received
an "Outstanding" rating under the current CRA regulations.

4.      To date, Anonymous Bank B staff have collectively spent over 130 hours reviewing the Final Rules and assessing their potential impact on Anonymous Bank B, including their impact on current and future business plans. This work, however, is ongoing.

5.      The Final Rules will require Anonymous Bank B to track and analyze data to determine whether it is meeting or falling behind the numerous new metrics included in the Final Rules. The Final Rules will also impose onerous new data collection and reporting requirements on Anonymous Bank B relating to community development loans and investments. These new requirements are extremely burdensome and will require Anonymous Bank B to make extensive changes to its CRA data collection and reporting systems and infrastructure. Anonymous Bank B estimates that the cost for these software upgrades and back-office support will be approximately $100,000.

6.      Anonymous Bank B will also be required to add additional CRA compliance personnel. Before the Final Rules were issued, Anonymous Bank B's CRA compliance efforts were satisfactorily managed by a single employee working part-time in that capacity. Due to the enormous complexity and length of the Final Rules, Anonymous Bank B recently assigned three additional employees plus its in-house legal department to assist with Anonymous Bank B's transition to the new requirements. Anonymous Bank B anticipates that it will immediately need to hire an additional employee to perform some of these employees' previous duties and will need to recruit a full-time CRA compliance officer. Anonymous Bank B expects that recruiting talent to fill these roles will be highly competitive, as other banks will also be hiring additional

staff to meet the demands of the Final Rules. Anonymous Bank B estimates that the costs for these personnel changes will be approximately $247,000 per year.

7.       Although Anonymous Bank B does not anticipate having any Retail Lending Assessment Areas under the Final Rules, Anonymous Bank B will be subject to the new Outside Retail Lending Area (ORLA) provisions. While Anonymous Bank B does not actively market outside its existing Facility Based Assessment Areas (FBAAs), Anonymous Bank B routinely originates consumer and commercial loans outside its geographic deposit-taking footprint, often as an accommodation to existing customers.

8.       The ORLA provisions of the Final Rules will require Anonymous Bank B to assess the potential CRA impact of every mortgage and small business loan that it makes outside of its existing geographic footprint. This will require Anonymous Bank B to make hundreds of calculations to ensure that it is meeting the Final Rule's benchmarks for lending to low-to moderate-income ("LMI") individuals and LMI geographies in the bank's ORLA. Poor CRA performance in Anonymous Bank B's ORLA could negatively affect its overall performance on the new Retail Lending Test. Because Anonymous Bank B does not market in its ORLA and has no CRA infrastructure there, it will be extremely difficult for Anonymous Bank B to meet retail lending benchmarks in those areas. As a result, Anonymous Bank B may curtail lending outside its FBAAs to avoid reputational harm associated with receiving an unfavorable CRA rating in its ORLA. Damage to Anonymous Bank B's reputation could harm the bank's relationship with existing customers and result in a substantial loss of business.

9.       If Anonymous Bank B elects to continue lending outside of its FBAAs, the bank will either incur significant, long-term costs to build CRA infrastructure in the

ORLA or it will have to purchase qualified LMI loans in the ORLA to maintain a favorable CRA rating. It will take time-perhaps years-to hire the staff and develop local relationships to generate LMI loans outside of Anonymous Bank B's geographic footprint, thereby necessitating that the bank commence this work immediately. Alternatively, if Anonymous Bank B elects to purchase LMI loans in the ORLA, it will need to prepare for the possibility that loan pricing will become distorted in markets where many banks have an RLAA or an ORLA and opt to purchase mortgage or small business loans in lieu of standing up new CRA infrastructure in those locations, which may result in Anonymous Bank B having to pay a premium to purchase loans.

10.     Anonymous Bank B estimates that it will take at least 18 months to comply with the new data collection, reporting and analysis requirements, and even longer to build a robust CRA infrastructure outside its existing geographic footprint. If it is to comply with the Final Rule's onerous provisions, Anonymous Bank B must immediately begin revamping its systems, and recruiting and hiring new personnel, thereby incurring substantial costs that would be unrecoverable even in the event the Final Rules are struck down.

11.     Anonymous Bank B anticipates that the Final Rules will continue to cause economic injury unless the Final Rules are preliminarily enjoined. Preliminarily enjoining the Final Rules would prevent Anonymous Bank B from incurring more unrecoverable compliance costs. Vacating the Final Rules would redress the economic injury on a more lasting basis ensuring Anonymous Bank B can continue to reinvest in its local communities.

App.0054

12.     I declare under penalty of perjury, this 2nd day of February, 2024, based

on my personal knowledge and investigation, that the foregoing is true and correct to the

best of my knowledge, information and belief.


/s/ Authorized Signature
AUTHORIZED SIGNATURE FOR ANONYMOUS
BANK B

 Signed copy maintained by Plaintiffs' counsel.

## <u>DECLARATION OF ANONYMOUS BANK C</u>

I, Chairman and CEO of Anonymous Bank C, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am currently the Chairman and CEO of Anonymous Bank C. I have been personally involved in efforts to evaluate the new Community Reinvestment Act ("CRA") regulations published in the Federal Register on February 1, 2024 (hereinafter "Final Rules"), and their impact on Anonymous Bank C. I submit this declaration in support of the Complaint and Motion for Preliminary Injunction filed by the Texas Bankers Association, Amarillo Chamber of Commerce, American Bankers Association, Chamber of Commerce of the United States of America, Independent Community Bankers of America, and the Independent Bankers Association of Texas. I am of the age of majority, am competent to make this declaration, and make this declaration based on my personal knowledge.

2.     Anonymous Bank C is a member of the American Bankers Association and Chamber of Commerce of the United States of America. It is headquartered in Myrtle Beach, South Carolina, with branches in North Myrtle Beach, Murrells Inlet, Pawleys Island, Georgetown, Charleston, Bluffton, Hilton Head Island and Mount Pleasant, South Carolina. Anonymous Bank C currently has assets of approximately $1.6 billion and would be an "Intermediate" bank under the Final Rules. However, Anonymous Bank C is growing rapidly and expects to cross the $2 billion threshold to become a "Large" bank under the Final Rules by 2026, the date that most provisions of the Final Rules, including new definitions, tests and data collection requirements are applicable. As a result, Anonymous Bank C must begin *now* to prepare to comply with

the requirements of the Final Rules that apply to Large banks, in particular the Retail

Lending Test, the Retail Services and Products Test, the Community Development

Financing Test and the Community Development Services Test.

      3.      To date Anonymous Bank C staff have spent over 125 hours reviewing the

proposed and Final Rules and assessing their impact on Anonymous Bank C.

      4.      The Final Rules will impose extensive new data collection and reporting

requirements on Anonymous Bank C, particularly once it crosses the threshold to become

a "Large" bank. As a Large bank, Anonymous Bank C will have to collect, maintain, and

report Community Development ("CD") financing data in a prescribed format. The bank

will also be required to collect and maintain CD services data. These new requirements

are extremely burdensome and will require Anonymous Bank C to make extensive

changes to its CRA data collection and reporting systems and infrastructure. Anonymous

Bank C will need to make upgrades to Loan Operating Systems (LOS) and to purchase

CRA software to assist with data collection, analysis, and reporting. Anonymous Bank C

estimates that the cost for the software and LOS upgrades will be approximately

$100,000. Because these technology changes are not "plug and play," Anonymous Bank

C must prepare now to make them including review of potential vendors and conducting

third-party risk management analysis, and implementation will require considerable staff

time.

      5.      Anonymous Bank C will need to add additional information technology

personnel and a full-time CRA compliance officer. Recruiting a qualified CRA

compliance officer to Myrtle Beach, South Carolina—particularly one with the requisite

data analytics training and experience to analyze and apply the new metrics, benchmarks

and performance thresholds—will be challenging, so recruitment must begin immediately. Anonymous Bank C estimates that the costs for a qualified CRA compliance officer will be at least $100,000 per year, and likely more as Anonymous Bank C will have to compete with other banks in search of similar expertise that will be required to comply with the Final Rules.

6.      Longer term, Anonymous Bank C will need to hire additional mortgage originators and commercial lenders and increase its marketing and community outreach budget to include new territories once it becomes subject to the Retail Lending Assessment Areas and Outside Retail Lending Area provisions of the Final Rules. In total, Anonymous Bank C estimates that the cost of complying with the Final Rules will be approximately $750,000, much of which will be recurring annual coats.

7.      Anonymous Bank C estimates that it will take a long time—measured not in weeks or months, but years—to comply with the new data collection and reporting requirements, and even longer to build a robust CRA infrastructure outside its existing geographic deposit-taking footprint once it becomes a "Large" bank for CRA purposes. If it is to comply with these onerous provisions of the Final Rule, Anonymous Bank C must begin revamping its systems immediately, and recruiting and hiring new personnel, thereby incurring substantial, unrecoverable costs in the event the Final Rules are struck down.

8.      Anonymous Bank C anticipates that the Final Rules will continue to cause economic injury unless the Final Rules are preliminarily enjoined. Preliminarily enjoining the Final Rules would prevent Anonymous Bank C from incurring more unrecoverable compliance costs. Vacating the Final Rules would redress the economic

injury on a more lasting basis ensuring Anonymous Bank C can continue to reinvest in its local communities.

9.      I declare under penalty of perjury, this 2nd day of February, 2024, based on my personal knowledge and investigation, that the foregoing is true and correct to the best of my knowledge, information and belief.

/s/ Authorized Signature
AUTHORIZED SIGNATURE FOR
ANONYMOUS BANK C

Signed copy maintained by Plaintiffs' counsel.