**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

|  |  |
|---|---|
| **TEXAS BANKERS ASSOCIATION et al.,** | |
| Plaintiffs, | **CIVIL NO. 2:24-cv-00025-Z-BR** |
| v. | The Hon. Matthew J. Kacsmaryk |
| **OFFICE OF THE COMPTROLLER OF THE CURRENCY et al.,** | United States District Judge |
| Defendants. | |

**DEFENDANTS' CONSOLIDATED BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick (DC 502279), Senior Special
Counsel
Nicholas Jabbour (DC 500626), Senior Counsel
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, NW
Washington, DC 20551
joshua.p.chadwick@frb.gov
Phone: (202) 263-4835
Fax: (202) 452-3819

*Counsel for Defendants Board of Governors of the
Federal Reserve System and Jerome Powell, in his
Official Capacity*

Harrel M. Pettway, General Counsel
B. Amon James, Assistant General Counsel
Andrew J. Dober (DC 489638), Senior Counsel
Herbert G. Smith II (DC 450811), Counsel
Federal Deposit Insurance Corporation
3501 Fairfax Drive, D-7028
Arlington, VA 22226-3500
adober@fdic.gov
Phone: (703) 562-2460
Fax: (703) 562-2477

*Counsel for Defendants Federal Deposit Insurance
Corporation and Martin J. Gruenberg, in his
Official Capacity*

Benjamin W. McDonough, Chief Counsel
Patricia S. Grady, Deputy Chief Counsel
Peter C. Koch (IL 6225347), Director for Litigation
Ashley W. Walker (DC 488126), Special Counsel,
Litigation
Office of the Comptroller of the Currency
400 7th Street SW, Mailstop 9E-1
Washington, DC 20219
ashley.walker@occ.treas.gov
Phone: (202) 649-6315
Fax: (571) 465-3411

*Counsel for Defendants Office of the Comptroller of
the Currency and Michael J. Hsu, in his Official
Capacity*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 3

      A.     Statutory Background ................................................................................. 3

      B.     The Final Rule............................................................................................ 3

      C.     Support for the Final Rule.......................................................................... 7

      D.     This Lawsuit............................................................................................... 9

LEGAL STANDARD .................................................................................................... 10

ARGUMENT ................................................................................................................. 11

I.     PLAINTIFFS HAVE NOT DEMONSTRATED A SUBSTANTIAL LIKELIHOOD
     THAT THEY WILL PREVAIL ON THE MERITS......................................................... 11

      A.     The FBAs Did Not Exceed Their Statutory Authority By Appropriately
            Applying the Phrase "Entire Community" ............................................... 11

            1.     The CRA requires the FBAs to assess a bank in its "entire community,"
                 which includes all geographic areas where the bank
                 serves its customers.................................................................... 11

            2.     The legislative history reflects that Congress rejected language
                 in which a bank would be assessed only in narrow areas near its deposit-
                 taking facilities, in favor of the "entire community" language................. 14

            3.     Federal agencies are expected to update rules based on changed facts .... 16

            4.     The FBAs have done nothing extraordinary that would warrant
                 application of the Major Questions Doctrine............................................. 18

            5.     Plaintiffs' other arguments are meritless................................................... 20

      B.     The FBAs Have Not Exceeded Their Statutory Authority By Evaluating
            Deposit Products and Services.................................................................. 23

i

    1.   The CRA does not mandate that only certain factors can be considered in evaluating whether a bank is "meeting the credit needs of its entire community." .............................................................. 24

    2.   The FBAs have reasonably explained why evaluating deposit activities is appropriate in determining whether a bank is "meeting the credit needs of its entire community." ....................................................... 27

  C.   Plaintiffs Have Not Established Associational Standing ...................................... 30

II.   PLAINTIFFS HAVE NOT DEMONSTRATED THAT THEIR MEMBERS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION .......... 32

  A.   Compliance Costs Do Not Constitute Irreparable Harm Because Plaintiffs Have Not Demonstrated That They Are Significant in the Context of Banks' Overall Finances ...................................................................................... 33

  B.   Plaintiffs' Assertions of Irreparable Harm from Purported Immediate Activities Fail Because They Are Vague and Speculative ..................................... 35

III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST DO NOT SUPPORT THE INJUNCTIVE RELIEF SOUGHT ....................................................... 38

CONCLUSION .................................................................................................................. 40

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

**Pages**

<u>Cases</u>

*Air Products and Chemicals, Inc. v. GSA*,
    2:23-cv-147-Z, 2023 WL 7272115 (N.D. Tex. Nov. 2, 2023) ......................................... 10

*Air Transportation Association of America, Inc. v. Export-Import Bank of the U.S.*,
    840 F. Supp. 2d 327 (D.D.C. 2012) ............................................................ 34, 35

*Alabama Association of Realtors v. HHS*,
    141 S. Ct. 2485 (2021) ...................................................................... 19

*Allied Marketing Group, Inc. v. CDL Marketing, Inc.*,
    878 F.2d 806 (5th Cir. 1989) ............................................................... 10, 11

*Anderson v. Jackson*,
    556 F.3d 351 (5th Cir. 2009) ................................................................. 10

*Ascendium Education Solutions, Inc. v. Cardona*,
    78 F.4th 470 (D.C. Cir. 2023) ............................................................... 27

*AT&T Corp. v. Iowa Utilities Board*,
    525 U.S. 366 (1999) ...................................................................... 27

*Avmed Inc. v. Browngreer PLC*,
    300 F. App'x. 261 (5th Cir. 2008) .......................................................... 10

*Board of Governors of Federal Reserve System v. First Lincolnwood Corp.*,
    439 U.S. 234 (1978) ...................................................................... 26

*Bissette v. Colonial Mortgage Corporation of D.C.*,
    477 F.2d 1245 (D.C. Cir. 1973) ............................................................ 14

*Black Fire Fighters Association of Dallas v. Dallas*,
    905 F.2d 63 (5th Cir. 1990) ............................................................... 10, 11

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*,
    419 U.S. 281 (1974) ...................................................................... 17

*Cardinal Health, Inc. v. Holder*,
    846 F. Supp. 2d 203 (D.D.C. 2012) ......................................................... 34, 35

*Career Colleges & Schools of Texas v. Department of Education*,
    1:23-cv-433-RP, 2023 WL 4291992 (W.D. Tex. Jun. 30, 2023) ................................ 32, 37

*Cheapside Materials, Ltd. v. Devon Energy Production Co., L.P.*,
    Nos. 23-40591, 24-40026, 2024 WL 886951 (5th Cir. Mar. 1, 2024)............................... 1

*City of Joliet v. New West, L.P.*,
    562 F.3d 830 (7th Cir. 2009) ............................................................................. 14

*Division 80, LLC v. Garland*,
    No. 3:22-cv-148, 2022 WL 3648454 (S.D. Tex. Aug. 23, 2022) ..................................... 33

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)..................................................................................... 17, 18

*Fox Television Stations v. FCC*,
    489 F.3d 444 (2d Cir. 2007) ............................................................................. 17

*Friends of Lydia Ann Channel v. U.S. Army Corps of Engineers*,
    701 F. App'x 352 (5th Cir. 2017) ..................................................................... 37

*Funeral Consumers Alliance, Inc. v. Service Corporation International*,
    695 F.3d 330 (5th Cir. 2012) ............................................................................. 31

*Hunt v. Washington State Apple Advertising Commission*,
    432 U.S. 333 (1977).......................................................................................... 30

*In re Ramirez*,
    204 F.3d 595 (5th Cir. 2000) ............................................................................. 14

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ............................................................................. 32

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022)............................................................................. 33

*Lujan v. National Wildlife Federation*,
    497 U.S. 871 (1990)........................................................................................... 31

*Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mutual
    Automobile Insurance Co.*, 463 U.S. 29 (1983)................................................ 18

*National Association of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012) ......................................................................... 17

*National Council of Agricultural Employers v. DOL*,
    No. 22-3569 (RC), 2023 WL 2043149 (D.D.C. Feb. 16, 2023) ...................................... 33

iv

*National Organization for Women, Inc. v. Scheidler*,
　　510 U.S. 249 (1994) ................................................................................................ 13

*New Prime Inc. v. Oliveira*,
　　139 S. Ct. 532 (2019) .............................................................................................. 22

*NFIB v. OSHA*,
　　595 U.S. 109 (2022) ................................................................................................ 19

*NLRB v. Bell Aerospace Company Division of Textron Inc.*,
　　416 U.S. 267 (1974) ................................................................................................ 26

*Norton v. Southern Utah Wilderness Alliance*,
　　542 U.S. 55 (2004) ........................................................................................... 29, 30

*Patterson v. County of Oneida, N.Y.*,
　　375 F.3d 206 (2d Cir. 2004) ................................................................................... 31

*Perez v. ZTE (USA), Inc.*,
　　3:18-cv-2948-B, 2019 WL 1429654 (N.D. Tex. Mar. 29, 2019) ........................... 22

*Roberts v. Sea-Land Services, Inc.*,
　　566 U.S. 93 (2012) .................................................................................................. 14

*Second Amendment Foundation, Inc. v. ATF*,
　　3:21-cv-0116-B, 2023 WL 7490149 (N.D. Tex. Nov. 13, 2023) ...................... 33, 35

*Summers v. Earth Island Institute*,
　　555 U.S. 488 (2009) ................................................................................................ 31

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
　　566 U.S. 560 (2012) ................................................................................................ 12

*Texas v. Biden*,
　　No. 3:21-cv-309, 2022 WL 18436750 (S.D. Tex. Oct. 20, 2022)........................... 32

*Texas v. EPA*,
　　829 F.3d 405 (5th Cir. 2016) .................................................................................. 32

*Texas v. EPA*,
　　662 F. Supp. 3d 739 (S.D. Tex. 2023)............................................................... 32, 33

*Texas v. EPA*,
　　91 F.4th 280 (5th Cir. 2024) ................................................................................... 17

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015)............................................................... 38

*United States v. Empire Bulkers Ltd.*,
    No. 21-126, 2022 WL 3646069 (E.D. La. Aug. 24, 2022) ............................. 27

*United States v. Jabateh*,
    974 F.3d 281 (3d Cir. 2020) .......................................................................... 22

*United States v. Zavala–Sustaita*,
    214 F.3d 601 (5th Cir. 2000) ......................................................................... 22

*VanDerStok v. Garland*,
    633 F. Supp. 3d 847 (N.D. Tex. 2022) .................................................. 36, 37, 38

*West Virginia v. EPA*,
    597 U.S. 697 (2022)................................................................................. 19, 20

*White v. Carlucci*,
    862 F.2d 1209 (5th Cir. 1989) ....................................................................... 32

*Williams v. D'Argent Franchising, LLC*,
    1:20-cv-1501, 2023 WL 3059192 (W.D. La. April 24, 2023)......................... 31

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)........................................................ 10, 11, 32, 33, 38

**<u>Statutes</u>**

5 U.S.C. § 706(2)(A)....................................................................................... 9

5 U.S.C. § 706(2)(C)....................................................................................... 9

12 U.S.C. § 2901............................................................................................ 13

12 U.S.C. §§ 2901-2908 ................................................................................. 1

12 U.S.C. § 2902(4) ....................................................................................... 21

12 U.S.C. § 2903(a)(1)................................................... 1, 3, 11, 14, 15, 22, 23, 24

12 U.S.C. § 2903(a)(2)...................................................................................... 3

12 U.S.C. § 2905........................................................................................ 1, 11, 29

12 U.S.C. § 2906(b) ......................................................................................... 3

12 U.S.C. § 2906(b)(1)(B) .................................................................................. 21

12 U.S.C. § 2906(d)(1)(B) .................................................................................. 22

The Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994,
    https://www.federalreservehistory.org/essays/riegle-neal-act-of-1994 ........................ 3, 4

**Regulatory Materials**

43 Fed. Reg. 47144 (Oct. 12, 1978) ................................................................ 13, 19, 24, 25

58 Fed. Reg. 67466 (Dec. 21, 1993) .................................................................... 25

60 Fed. Reg. 22156 (May 4, 1995) ...................................................................... 25

61 Fed. Reg. 54647 (Oct. 21, 1996) ..................................................................... 25

81 Fed. Reg. 48506 (July 25, 2016) ..................................................................... 25

87 Fed. Reg. 33884 (June 3, 2022) ................................................................ 4, 5, 16

88 Fed. Reg. 87895 (Dec. 20, 2023) ................................................................. 8, 38

89 Fed. Reg. 6574 (Feb. 1, 2024) ................................................................... *passim*

**Other Authorities**

123 Cong. Rec. 17870 (June 7, 1977) .................................................................. 15

123 Cong. Rec. 30982 (Sept. 26, 1977) ............................................................... 15

123 Cong. Rec. 31887-88 (Oct. 1, 1977) .......................................................... 15, 19

Austin Bank, *Auto & Consumer Loans* (last accessed Mar. 8, 2024),
    https://www.austinbank.com/lending/auto-and-consumer-loans. .................................... 29

Bank of Texas, *Simple Guide to Personal Installment Loan* (last accessed Mar. 8, 2024),
    https://www.bankoftexas.com/-/media/Files/PDF/
    PEW_Documents/Personal_Installment_Simple%20Guide_BOT.pdf .......................... 29

*Banking Goes Mobile*, Time Magazine (Apr. 2, 2007),
    https://content.time.com/time/business/article/0,8599,1605781,00.html. ......................... 3

Comment Letter of ABA et al. (Aug. 5, 2022),
    https://www.regulations.gov/comment/OCC-2022-0002-0484 ................................ 12, 39

Comment Letter of Bank in Minnesota (July 19, 2022),
https://www.federalreserve.gov/SECRS/2022/November/20221122/R-1769/R-1769_071922_141866_463638826187_1.pdf ..................................................................... 9

Comment Letter of Bank in Mississippi (Aug. 5, 2022),
https://www.regulations.gov/comment/OCC-2022-0002-0337 ................................... 8, 9

Comment Letter of Bank in Missouri (Aug. 4, 2022),
https://www.regulations.gov/comment/OCC-2022-0002-0267 ........................................ 8

Comment Letter of Bank in Nebraska (Aug. 1, 2022),
https://www.regulations.gov/comment/OCC-2022-0002-0144 ........................................ 8

Comment Letter of Bank in New Hampshire (Aug. 1, 2022),
https://www.regulations.gov/comment/OCC-2022-0002-0674 ........................................ 9

Comment Letter of Bank in Ohio (Aug. 4, 2022),
https://www.regulations.gov/comment/OCC-2022-0002-0360 ........................................ 8

Comment Letter of Bank in Texas (Aug. 4, 2022),
https://www.regulations.gov/comment/OCC-2022-0002-0469 ........................................ 8

Comment Letter of ICBA (Aug. 5, 2022),
https://www.regulations.gov/comment/OCC-2022-0002-0315 ..................................... 39

Comment Letter of Independent Bankers Association of Texas (July 27, 2022),
https://www.regulations.gov/comment/OCC-2022-0002-0055 ..................................... 39

Comment Letter of U.S. Chamber of Commerce (Aug. 5, 2022),
https://www.regulations.gov/comment/OCC-2022-0002-0448 ..................................... 39

Community Reinvestment Act Examination Procedures (Dec. 1978),
https://fraser.stlouisfed.org/title/district-notices-federal-reserve-bank-dallas-5569/regulation-bb--community-reinvestment-act-542590 ............................................... 13

FDIC Quarterly Banking Profile Graph Book, Q3 2023, Number of FDIC-Insured Institutions,
https://www.fdic.gov/analysis/quarterly-banking-profile/graph-book/2023sep/DSTRUA1.html ................................................................................................ 5

FDIC Consumer Compliance Examination Manual (updated Jan. 12, 2024),
https://www.fdic.gov/resources/supervision-and-examinations/consumer-compliance-examination-manual/documents/compliance-examination-manual.pdf ............................................................................................ 37

H.R. 4893, 106th Cong. (2000) ...................................................................................... 23

H.R. 865, 107th Cong. (2001) ........................................................................ 23

H.R. 1289, 110th Cong. (2007)........................................................................ 23

H.R. 1479, 111th Cong. (2009)........................................................................ 23

H.R. 8833, 117th Cong. (2022)........................................................................ 23

Jeanne Hogarth & Kevin O'Donnell, *Banking Relationships of Lower-Income Families and the Governmental Trend toward Electronic Payment*,
    Federal Reserve Bulletin (July 1999),
    https://www.federalreserve.gov/pubs/bulletin/1999/0799lead.pdf .................................. 28

Jeanne Hogarth & Kevin O'Donnell, *If You Build it, Will they Come? A Simulation of Financial Product Holdings Among Low-to-Moderate Income Households*,
    Journal of Consumer Policy (2000), https://doi.org/10.1023/A:1007222700931 ........... 29

Texas Department of Banking, *FAQs*, "General Loan Information" (last accessed Mar. 8, 2024)
    https://www.dob.texas.gov/banks-trust-companies/faqs ................................................... 29

*Webster's New Collegiate Dictionary* (1976) ....................................................... 12, 24

Defendants Board of Governors of the Federal Reserve System and Chairman Jerome Powell ("Federal Reserve"), Office of the Comptroller of the Currency and Acting Comptroller of the Currency Michael J. Hsu ("OCC"), and Federal Deposit Insurance Corporation and Chairman Martin J. Gruenberg ("FDIC")—collectively, the federal banking agencies ("FBAs")—respectfully submit this opposition to Plaintiffs' Motion for a Preliminary Injunction (ECF 19) and the memorandum of law in support (ECF 20, "Pl. Br.").

## **<u>INTRODUCTION</u>**

This lawsuit is straightforward: Plaintiffs seek to rewrite the Community Reinvestment Act, 12 U.S.C. §§ 2901-2908 ("CRA"), to suit their ends, while the FBAs have faithfully applied its text in the Final Rule being challenged (89 Fed. Reg. 6574 (Feb. 1, 2024)). The CRA commands that the FBAs "assess [a bank's] record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods" as part of the examination of that bank. 12 U.S.C. § 2903(a)(1). Yet the Plaintiffs ask this Court to graft onto this unambiguous language two exclusions that are found nowhere in the CRA's text: (1) an exclusion of geographic areas where a bank conducts retail lending from the scope of a bank's "entire community," and (2) an exclusion of a bank's deposit activities from the scope of the assessment as to whether a bank is meeting its entire community's "credit needs." Plaintiffs' request that the Court impose exceptions that do not exist is a classic "rewrit[ing] of the statute, which [courts] may not do." *Cheapside Materials, Ltd. v. Devon Energy Prod. Co., L.P.*, 2024 WL 886951, at *6 (5th Cir. Mar. 1, 2024).

In contrast, the FBAs have acted consistently with Congress's command to publish "[r]egulations to carry out the purposes of" the CRA. 12 U.S.C. § 2905. Following Congress's direction to evaluate a bank's record within its "entire community," the FBAs have indicated in

the Final Rule that they will assess a bank both in the geographic areas where the bank maintains deposit-taking facilities and in other geographic areas where the bank conducts retail lending. And consistent with Congress's direction to assess the degree to which a bank is meeting the "credit needs" of its entire community, the FBAs have indicated in the Final Rule that they will assess various factors that are associated with "credit needs," including the provision of deposit products and services, which facilitate the ability to access credit.[1]

Plaintiffs' motion seeking preliminary relief also fails because they cannot show irreparable harm. The Final Rule largely does not apply until 2026 and 2027, and Plaintiffs have failed to demonstrate that timely and satisfactory preparation for the Final Rule requires costs that are significant when properly considered in the context of banks' overall finances. Further, the public interest and balance of equities favor allowing the Final Rule to proceed. Among other widely supported provisions, the Final Rule provides significant regulatory relief and lower compliance costs for smaller institutions by increasing the asset size thresholds that determine which performance tests apply to an institution. Granting Plaintiffs' motion would delay this relief for hundreds of smaller institutions for the benefit of comparatively fewer large institutions.

Because Plaintiffs cannot satisfy any of the factors necessary to obtain a preliminary injunction, the FBAs respectfully request that their motion be denied.

---

[1] In addition to the problems with Plaintiffs' lawsuit based on the CRA's plain text, Plaintiffs also are unlikely to succeed because they lack standing. Every plaintiff in this action is an association purporting to sue on behalf of its members, Compl. ¶¶ 7-14, but they have not satisfied the requirement that they identify by name at least one member who would have standing in its own right or show all members of the association are affected by the challenged activity.

## STATEMENT OF FACTS

### A.     Statutory Background

The CRA was enacted in 1977 following years of "redlining" by banks, a practice in which banks did not lend in certain communities, including those comprised primarily of low- and moderate-income ("LMI") neighborhoods. The CRA requires the FBAs, in examining an institution, to "assess the institution's record of meeting the credit needs of its entire community, including [LMI] neighborhoods." 12 U.S.C. § 2903(a)(1). The statute requires the FBAs to assign one of four ratings to an institution and to publicly disclose the rating and a portion of the agency's written evaluation. *See* 12 U.S.C. § 2906(b). The statute also instructs the FBAs to take an institution's record of meeting the credit needs of the entire community "into account in its evaluation of an application for a deposit facility." 12 U.S.C. § 2903(a)(2).

### B.     The Final Rule

The FBAs published the first CRA regulations in 1978. *See* 89 Fed. Reg. at 6580. Since that time, the FBAs have revised and updated the regulations on various occasions, with the most recent comprehensive update completed in 1995. *Id.* Yet the way that banking services are provided has changed dramatically since then. For example, the "assessment areas" construct of the 1995 rule, which refers to the geographic areas in which banks' CRA performance is evaluated, reflected the reality of how banks provided financial services at that time. There was no mobile banking,[2] and the comprehensive regime for interstate banking was in its infancy.[3]

---

[2] Mobile banking through cell-phone based applications began in the U.S. in 2007. *See Banking Goes Mobile*, Time Magazine (Apr. 2, 2007), *available at* https://content.time.com/time/business/article/0,8599,1605781,00.html.

[3] The Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994 established a comprehensive statutory scheme for interstate branching by removing many of the restrictions on opening bank branches across state lines. Among other things, the law allowed banking

In promulgating the Final Rule at issue in this litigation, the FBAs determined that the CRA regulations required revision to keep pace with technological and other changes in banking. *Id.* at 6581. For instance, the increased decoupling of bank services from physical locations explains why the Final Rule assesses a bank's CRA performance in geographic areas where the bank does not maintain deposit-taking facilities to effectuate the CRA's instruction to assess how well banks are meeting the credit needs of their "entire community." *See, e.g.*, *id.* at 6575.

On June 3, 2022, the FBAs published a notice of proposed rulemaking ("NPR") "to update how CRA activities qualify for consideration, where CRA activities are considered, and how CRA activities are evaluated." 89 Fed. Reg. at 6574; *see also* 87 Fed. Reg. 33884 (June 3, 2022). The FBAs received approximately 950 unique comment letters in response to the NPR from a variety of individuals and entities, including trade associations, banks, consumer and public interest groups, and civil rights groups. 89 Fed. Reg. at 6584. While the Federal Register notice for the Final Rule is 649 pages, 115 are devoted to the rule itself, with most of the remaining 534 pages describing the evolution of the rule and responding to comments. Within the 115 pages of the Final Rule's regulatory text, there are four main performance tests—(1) the Retail Lending Test, (2) the Retail Services & Products Test, (3) the Community Development Financing Test, and (4) the Community Development Services Test—and each performance test is only applicable to certain banks based on asset size and business model. *See, e.g.*, Complaint ¶ 41 (distilling the Final Rule into a single chart on less than half a page).

At issue in Plaintiffs' motion are two of the four tests. First, as part of the Retail Lending Test, the Final Rule uses retail lending assessment areas ("RLAAs") and outside retail lending

---

organizations to acquire banks in any other state under a uniform, nationwide standard. *See* https://www.federalreservehistory.org/essays/riegle-neal-act-of-1994.

assessment areas ("ORLAs") to evaluate a bank's retail lending in its entire community. 89 Fed. Reg. at 6735, 6738, 6758-59. Second, as part of the Retail Services and Products Test, the FBAs evaluate a bank's deposit products and digital services that are responsive to the needs of LMI individuals. 89 Fed. Reg. at 6943.

*Retail Lending Assessment Areas*. In addition to evaluating a bank's record of meeting community credit needs in the geographic areas where a bank maintains its deposit-taking facilities ("facility-based assessment areas" or "FBAAs"), the Final Rule expands the current assessment area framework by also evaluating certain banks' retail lending performance in RLAAs—areas where a bank has certain concentrations of retail lending outside of the bank's FBAAs. 89 Fed. Reg. at 6735. This approach recognizes that changes in banking have resulted in banks serving communities that may extend beyond the geographic footprint of the bank's deposit-taking facilities. *Id.*; *see also* 87 Fed. Reg. at 33916. RLAAs apply only to large banks, which are banks with assets of at least $2 billion (89 Fed. Reg. at 6598), and are only used in the Retail Lending Test. Primarily branch-based large banks—*i.e.*, large banks that conduct more than 80% of their retail lending within their FBAAs—are exempt from RLAAs. 89 Fed. Reg. at 6735. Based on historical data, the FBAs estimate that the requirement to delineate RLAAs would have applied to only 63 large banks if it had been in effect from 2018 to 2020. 89 Fed. Reg. at 6740.[4]

*Outside Retail Lending Areas.* In addition to RLAAs, the Final Rule requires certain banks to be evaluated in the bank's ORLA, which consists "of the nationwide area outside of the

---

[4] To put this figure into context, at the end of the third quarter of 2023, there were 4,614 insured depository institutions. *See* FDIC Quarterly Banking Profile Graph Book, Q3 2023, Number of FDIC-Insured Institutions, *available at* https://www.fdic.gov/analysis/quarterly-banking-profile/graph-book/2023sep/DSTRUA1.html.

bank's facility-based assessment areas and applicable retail lending assessment areas, excluding certain nonmetropolitan counties." 89 Fed. Reg. at 6577.[5] By evaluating retail lending in geographic areas that do not meet the lending thresholds captured by the RLAAs, the ORLA "is designed to facilitate a comprehensive evaluation of a bank's retail lending to low- and moderate-income individuals and communities under the Retail Lending Test, and to adapt to changes in the banking industry, such as mobile and online banking." *Id.* at 6577. Although phrased as a "nationwide" construct, only those component geographic areas of the ORLA where a bank actually conducts retail lending can impact the bank's performance conclusion in the ORLA. *Id.* at 7148.

*Consideration of Deposit Products and Digital Services*. Plaintiffs' motion also challenges the FBAs' authority to consider certain banks' deposit products and digital services as part of the Retail Services and Products Test.[6] With respect to deposit products (which serve only as a "plus factor" and cannot adversely affect a bank's performance), the Final Rule requires the FBAs to assess the availability and usage of the bank's deposit products responsive to the needs of LMI individuals, families, and households, including whether deposit products offer low-cost features (*e.g.*, accounts with no or low minimum balance requirements or monthly fees), features facilitating accessibility (*e.g.*, in-network ATM access, debit cards, and immediate access to

---

[5] Every large bank is evaluated in its ORLA. 89 Fed. Reg. at 7115. An intermediate bank, or a small bank that opts into the Retail Lending Test, is also evaluated on a mandatory basis in its ORLA if it conducts a majority of its retail lending outside of its FBAAs. *Id.* An intermediate or small bank that conducts less than a majority of its retail lending outside of its FBAA may choose to have its ORLA evaluated on an optional basis. *Id.*

[6] The Final Rule requires evaluation of deposit products only for banks with more than $10 billion in assets. 89 Fed. Reg. at 7121. The digital services evaluation being challenged by Plaintiffs applies only to banks with more than $10 billion in assets, and to large banks that had assets less than or equal to $10 billion and do not operate branches. *Id.* at 7120. All other large banks can have deposit products, as well as digital and other delivery systems, evaluated at their option. *Id.* at 7120-21.

6

funds when cashing certain checks), and other features facilitating access to individuals without banking or credit histories. 89 Fed. Reg. at 7121. With respect to digital services, the Final Rule requires the FBAs to consider, as part of an evaluation of the bank's digital and other delivery systems for delivering retail banking services, "[t]he number of checking and savings accounts opened each calendar year during the evaluation period digitally and through other delivery systems in low-, moderate-, middle-, and upper-income census tracts" and the number of accounts active at year-end. *Id.*

As the Final Rule explains, "the agencies have found that there is a sufficient nexus between deposit products and the provision of credit such that . . . it is appropriate to evaluate deposit accounts responsive to the needs of [LMI] individuals, families, or households." *Id.* at 6943. With respect to digital services, the FBAs noted that "[b]ecause usage of online and mobile banking delivery systems by households is pervasive and is expected to continue to grow, . . . these trends support a renewed focus on the evaluation of digital and other delivery systems" with respect to how products are accessed. *Id.* at 6934.

*Final Rule Effective Dates*. The Final Rule is effective on April 1, 2024, with staggered applicability dates of April 1, 2024, January 1, 2026, and January 1, 2027. Provisions with few changes or limited effects—for example, the provisions on authority, purpose, scope, schedule of planned examinations, and public engagement—and the transition rules, are applicable April 1, 2024. Other provisions, including those dealing with RLAAs, ORLAs, and the assessment of deposit products and services, become applicable January 1, 2026, except for the data reporting requirements, which become applicable January 1, 2027. 89 Fed. Reg. at 6578-79.

C.     **Support for the Final Rule**

In addition to other stakeholders, various banks expressed support for different aspects of

7

the Final Rule. For example, there was widespread support for the FBAs' efforts to adapt the CRA regulations based on how banking has evolved. A bank in Texas noted that "the need to modernize the CRA grows more pressing as technology and the financial services industry evolve to serve the needs of customers."[7] Similarly, a Mississippi bank indicated that CRA regulation had "become out of sync with the way [that] consumers expect to use technology to access financial products and services," and therefore "[t]he need to update CRA has been present for years and will grow more pressing as technology and the financial services industry continue to evolve."[8] A Nebraska bank noted that "[t]he need to update CRA has existed for years," especially as banks use "technology advances to generate growth outside of traditional assessment areas."[9] And a bank in Ohio noted that "the current CRA regulations are outdated . . . [and] impose unnecessary compliance burdens."[10]

There was also significant support for the increased asset thresholds for small and intermediate banks. Specifically, the threshold for classifying an institution as "small" currently includes banks with assets under $391 million, and the Final Rule raises this figure to $600 million. 88 Fed. Reg. 87895, 87897 (Dec. 20, 2023); 89 Fed. Reg. at 6575. Likewise, the threshold for intermediate banks is currently at a maximum of $1.564 billion, and is being raised to $2 billion. 88 Fed. Reg. at 87897; 89 Fed. Reg. at 6575. A bank in Missouri with $1.16 billion in assets supported the higher threshold for intermediate banks, which "would allow community banks room for expansion in continuing to meet the needs of their communities without facing the additional burden of collecting [] data that is required for Large Banks."[11] A Mississippi

---

[7] https://www.regulations.gov/comment/OCC-2022-0002-0469.
[8] https://www.regulations.gov/comment/OCC-2022-0002-0337.
[9] https://www.regulations.gov/comment/OCC-2022-0002-0144.
[10] https://www.regulations.gov/comment/OCC-2022-0002-0360.
[11] https://www.regulations.gov/comment/OCC-2022-0002-0267.

bank, with $1 billion in assets, expressed support for adjusting the caps "to avoid imposing regulatory burden on the smallest banks."[12] A bank in New Hampshire, with $350 million in assets, likewise "appreciate[d] the agencies' effort to tailor the proposal to avoid imposing regulatory burden on smaller community banks like us," and noted that the "proposed caps would save us time and money to invest back into our community."[13] And a Minnesota bank indicated that it would fall under the $600 million threshold for small banks, which would allow it "to remain focused on providing the best service that we can . . . rather than spending valuable time and resources on additional tracking, paperwork, retraining staff, etc.," and "that if measures such as increasing these thresholds are not taken, . . . [a]dded regulatory burden will increase our overhead costs, forcing us to find ways to increase our income through pricing and fees."[14]

### D.    This Lawsuit

In their Complaint, Plaintiffs bring two claims for relief: (1) a claim that the FBAs exceeded their statutory authority under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C), because the Final Rule assesses banks "on their responsiveness to credit needs outside of their geographic deposit-taking footprint" and on "their digital delivery systems and deposit products" (ECF 4 ¶¶ 96-97); and (2) a claim that the Final Rule is "arbitrary and capricious" under the APA, 5 U.S.C. § 706(2)(A). Among other relief, Plaintiffs seek an "order and judgment holding unlawful, enjoining, and setting aside the Final Rule as illegal or otherwise impermissible." ECF 4 at 56.

---

[12] https://www.regulations.gov/comment/OCC-2022-0002-0337.
[13] https://www.regulations.gov/comment/OCC-2022-0002-0674.
[14] https://www.federalreserve.gov/SECRS/2022/November/20221122/R-1769/R-1769_071922_141866_463638826187_1.pdf.

Shortly after filing their Complaint, Plaintiffs filed their motion for a preliminary injunction. The motion seeks relief based only on the first claim, that the FBAs exceeded their statutory authority. The motion asks that the entire Final Rule be enjoined "pending the resolution of this lawsuit," and "that the effective date of April 1, 2024, and all implementation dates be extended day for day for each day the injunction remains in place." ECF 19-1 at 4-5.

## LEGAL STANDARD

"A preliminary injunction 'is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries a burden of persuasion.'" *Black Fire Fighters Ass'n of Dallas v. Dallas*, 905 F.2d 63, 65 (5th Cir. 1990). "The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Avmed Inc. v. Browngreer PLC*, 300 F. App'x. 261, 264 (5th Cir. 2008) (quotation omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

A preliminary injunction "should only be granted when the movant has clearly carried the burden of persuasion" on each of four factors: "(1) a substantial likelihood that plaintiff will prevail on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the plaintiff outweighs the threatened harm the injunction may do to [the] defendant; and (4) that granting the preliminary injunction will not disserve the public interest." *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009); *Air Prods. and Chems., Inc. v. GSA*, 2023 WL 7272115, at *2 (N.D. Tex. Nov. 2, 2023). The third and fourth factors "merge when the Government is the opposing party," *Air Prods.*, 2023 WL 7272115, at *15 (internal quotation omitted), and "[a] plaintiff's failure to demonstrate any one of these factors is sufficient to deny injunctive relief." *Id.* at *2 (citing *Allied Mktg. Grp., Inc. v.*

*CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989)); *see also Black Fire Fighters Ass'n*, 905 F.2d at 65 ("denial of a preliminary injunction will be upheld where the movant has failed sufficiently to establish *any one* of the four criteria" (emphasis in original)). A preliminary injunction will not issue "simply to prevent the possibility of some remote future injury;" rather, irreparable injury must be "likely [to occur] . . . before a decision on the merits can be rendered." *Winter*, 555 U.S. at 22 (internal quotations omitted).

## ARGUMENT

## I.   PLAINTIFFS HAVE NOT DEMONSTRATED A SUBSTANTIAL LIKELIHOOD THAT THEY WILL PREVAIL ON THE MERITS

### A.   The FBAs Did Not Exceed Their Statutory Authority By Appropriately Applying the Phrase "Entire Community"

Contrary to Plaintiffs' argument, the FBAs have not exceeded their statutory authority in issuing a rule that, among other provisions, appropriately applies the phrase "entire community." As reflected in the CRA, that phrase unambiguously includes the geographic areas where a bank serves its customers.

#### 1.   The CRA requires the FBAs to assess a bank in its "entire community," which includes all geographic areas where the bank serves its customers.

The CRA commands the FBAs to take an expansive view in assessing a bank's performance under the statute, indicating that the FBAs should "assess the institution's record of meeting the credit needs of its *entire* community, including low- and moderate-income neighborhoods, consistent with the safe and sound operation of such institution." 12 U.S.C. § 2903(a)(1) (emphasis added). And the CRA directs the FBAs to publish "[r]egulations to carry out the purposes of this chapter." 12 U.S.C. § 2905. The FBAs have not exceeded this broad grant of authority in the statute by articulating in the Final Rule that a bank's "entire community"

11

includes both the geographic areas where a bank maintains deposit-taking facilities and other geographic areas where a bank conducts retail lending.

Plaintiffs fail to meet their heavy burden to demonstrate likelihood of success because their theory ignores that the term "entire" modifies "community." The term "entire" is sweeping in scope and means "having no element or part left out." *Webster's New Collegiate Dictionary* 381 (1976).[15] And "community" generally has a geographic meaning, such as "the people with common interests living in a particular area." *Id.* at 228. Consistent with these definitions, in the Final Rule, the areas in which banks' retail lending performance is evaluated—FBAAs, RLAAs, and ORLAs—are geographic in nature and capture those areas where a bank serves its customers. *See, e.g.*, 89 Fed. Reg. at 6577 (describing these three concepts under the heading "Geographic Areas in Which a Bank's Activities Are Considered"). Thus, the FBAs applied Congress's command that a bank must be assessed based on its performance in its "entire community," which means that no part of the geographic areas where a bank's customer base is located should be "left out." In particular, Congress did not require that the FBAs exclude geographic areas where a bank provides customers with retail loans from a bank's "entire community," and the FBAs did not do so in the Final Rule.[16]

Indeed, from the earliest days of implementing the CRA, the FBAs have acted

---

[15] Terms undefined in a statute receive ordinary meanings. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).

[16] Notably, the Final Rule provides for state, multistate, and nationwide consideration of (and beneficial credit for) community development activities for large banks under the Community Development Financing Test and for limited purpose banks under the Community Development Financing Test for Limited Purpose Banks. 89 Fed. Reg. at 6577-78. While this broad geographic consideration of performance for community development activities is similar to that for retail lending activities, Plaintiffs inconsistently have not mounted a challenge to the aspect of the Final Rule addressing community development activities because it is something they like. *See, e.g.*, Comment Letter of ABA et al., at 31 (Aug. 5, 2022) (noting "strong[] support" for this provision) (*available at* https://www.regulations.gov/comment/OCC-2022-0002-0484).

consistently with Congress's mandate to assess a bank's performance in its "entire community." The first rule implementing the CRA stated: "Each [bank] shall prepare, and at least annually review, a delineation of the local community or communities that comprise its entire community, without excluding low- and moderate-income neighborhoods." 43 Fed. Reg. 47144, 47149 (Oct. 12, 1978). Similarly, the first examination manual implementing the CRA indicated that "a statewide branching institution [might] serve a number of 'local communities,' the sum total of which would constitute its 'entire community.'" Community Reinvestment Act Examination Procedures 9 (Dec. 1978).[17] And "entire community" was not understood to exclude areas where a bank conducted retail lending. To the contrary, the first rule indicated that a bank could define "community" as its "effective lending territory, which is defined as that local area or areas around each office or group of offices where it makes a substantial portion of its loans." 43 Fed. Reg. at 47149.

        In their discussion of the concept of "community," Plaintiffs argue that "Congress limited CRA assessment areas to those communities surrounding a bank's deposit-taking facilities" and claim that this desired limitation is found in the "local communities" language in 28 U.S.C. § 2901. Pl. Br. at 10. But section 2901 does not contain any textual limits as to CRA assessment areas. Moreover, that section is titled "Congressional findings and statement of purpose." Congress imposes obligations through the operative sections of a statute, not through statements about findings and purpose. *See, e.g.*, *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 260 (1994) ("the quoted statement of congressional findings is a rather thin reed upon which to base a requirement . . . neither expressed nor, we think, fairly implied in the operative sections of the

_____

[17] *Available at* https://fraser.stlouisfed.org/title/district-notices-federal-reserve-bank-dallas-5569/regulation-bb--community-reinvestment-act-542590.

Act"); *City of Joliet v. New West, L.P.*, 562 F.3d 830, 836-37 (7th Cir. 2009) (rejecting reliance on "findings and purpose" clause because, "in legislation details matter," and courts must apply "the concrete rules that the political branches have selected"); *Bissette v. Colonial Mortg. Corp. of D.C.*, 477 F.2d 1245, 1246 n.2 (D.C. Cir. 1973) (a "general section setting forth legislative goals neither constitutes an operative section of the statute nor prevails over the specific provisions"). The operative language of the CRA at issue here is "entire community" in 12 U.S.C. § 2903(a)(1).

Moreover, even if Plaintiffs were correct that the phrase "local communities" implies an unwritten limitation based on the locations of a bank's deposit-taking facilities (Pl. Br. at 10), Congress opted for the broader formulation of "entire community." 12 U.S.C. § 2903(a)(1). This is significant. It is a "well settled rule of statutory construction that where different language is used . . . in different parts of a statute it is presumed that the Legislature intended a different meaning and effect." *In re Ramirez*, 204 F.3d 595, 599 (5th Cir. 2000); *accord Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 102 n.5 (2012) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." (quotation omitted)). Plaintiffs' construction of the CRA to require that certain communities be ignored in CRA examinations is irreconcilable with Congress's use of the phrase "entire community" in the operative text and should be rejected.

      **2.**    **The legislative history reflects that Congress rejected language in which a bank would be assessed only in narrow areas near its deposit-taking facilities, in favor of the "entire community" language.**

Although the breadth of the term "entire community" is apparent from the statutory text, the legislative history further supports the conclusion that Congress chose not to limit a bank's CRA evaluation solely to locations where that bank maintains deposit-taking facilities.

Specifically, as first introduced, the original CRA bill expressly defined a bank's community with reference to the areas where it maintains deposit-taking facilities, but Congress abandoned that narrow construction in favor of the broader "entire community" language. In particular, the original version of the legislation indicated that assessments would be conducted based on a bank's "primary savings service area." 123 Cong. Rec. 17870 (June 7, 1977). The phrase "primary savings service area" was, in turn, defined as "a compact area contiguous to a deposit facility from which such facility obtains or expects to obtain more than one-half of its deposit customers." *Id.* However, by the time the CRA was enacted, Congress had replaced "primary savings service area" with "entire community, including low-and moderate-income neighborhoods." 12 U.S.C. § 2903(a)(1).

The Congressional Record confirms that House and Senate conferees agreed to amend the bill to "substitute consideration of the credit needs of 'the entire community, including its low and moderate income neighborhoods,' for the credit needs of its 'primary [savings] service area.'" 123 Cong. Rec. 30982 (Sept. 26, 1977). Senator Proxmire, who authored the legislation, elaborated on this change as follows:

> What this legislation does, in contrast to what [originally] passed, is to . . . redefine[] the primary service area to be served on a broader basis, *so that there be no question that it is not simply the immediate community where the bank was located.*

123 Cong. Rec. 31887-88 (Oct. 1, 1977) (emphasis added).

Had the original CRA legislation, with its definition of a bank's "primary savings service area," been enacted into law, it would have been clear that a bank's CRA obligations are tied to the geographies where the bank has its deposit-taking facilities. However, the enacted legislation deleted the "primary savings service area" language, and its associated definition, and replaced it with the "broader" requirement that the FBAs assess the bank's "entire community." Thus, the

15

legislative history supports the Final Rule's focus on assessing banks where they lend, not just in areas with immediate proximity to deposit-taking facilities.

### 3. Federal agencies are expected to update rules based on changed facts.

Changes in the banking industry have been dramatic since the CRA was enacted in 1977 and the most recent comprehensive regulations were issued in 1995. These changes strongly support the FBAs' decision to adjust their approach to delineation of assessment areas to capture a bank's "entire community" and to issue the Final Rule now being challenged.

As the FBAs described in their rulemaking proposal, "[t]he financial services industry has undergone transformative changes since the CRA statute was enacted, including the removal of national bank interstate branching restrictions and the expanded role of mobile and online banking." 87 Fed. Reg. at 33887. Specifically, "[o]ver the past two decades, technology and the expansion of interstate banking has transformed the financial services industry and how banking services are delivered and consumed." *Id.* at 34009. For example, according to the 2019 FDIC Survey of Household Use of Banking and Financial Services, a majority of customers now use online and mobile banking as their primary method for accessing their accounts, and "[t]he usage of online and mobile banking delivery systems is expected to continue to grow." *Id.* at 33964. In addition, the removal of interstate banking restrictions through the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994 allowed banking organizations to operate more readily in multiple states and to complete mergers and acquisitions across state lines. *See id.* at 33887. These changes in the ways that banks conduct business have been profound, "affect[ing] all banks, regardless of size or location," and have been "most evident in banks that have a limited physical presence or that rely heavily on technology to deliver their products and services." 87 Fed. Reg. at 34009. It follows that, "[a]s banking has evolved, banks' communities

16

are not solely identifiable by the areas that surround their physical locations." *Id.*

In cases like this—where an agency engages in a rulemaking in response to such changed circumstances and articulates the reasons for the rulemaking—the bar for successfully challenging the agency's conduct is high. Specifically, an agency "need not demonstrate . . . that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The agency need not even describe "why the original reasons for adopting the displaced rule or policy are no longer dispositive." *Id.* at 514 (quotations omitted); *see also Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037-38 (D.C. Cir. 2012) (agencies need not identify "new evidence" or a "change in circumstances"). All that is required is that the agency "provide reasoned explanation for its action." *Texas v. EPA*, 91 F.4th 280, 299 (5th Cir. 2024) (quoting *Fox*, 556 U.S. at 515); *accord, e.g.*, *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) ("While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision . . . if the agency's path may reasonably be discerned." (citation omitted)).

*Fox Television* is instructive. There, the Supreme Court examined an FCC policy that prohibited on-air expletives only where those expletives were repeated, which the FCC proposed reversing such that expletives would be prohibited even if they were merely fleeting. 556 U.S. at 509-13. When the FCC promulgated the new rule, the Second Circuit struck it down, stating that the FCC provided "no reasonable explanation for why it ha[d] changed its perception" that fleeting expletives were not "harmful." *Fox Television Stations v. FCC*, 489 F.3d 444, 458 (2d Cir. 2007). But the Supreme Court reversed, finding "no basis" in the APA to scrutinize an

17

agency's judgment in that way. 556 U.S. at 514. It sufficed that the FCC "forthrightly acknowledged" the change and that its reasoning for the new policy was "rational." *Id.* at 517.

The FBAs did far more than necessary under this standard, providing ample detail as to the changed facts and related reasoning that led to the Final Rule. As described above, the FBAs articulated how both the evolution of broad-based interstate banking and the rise in online and mobile banking had radically transformed the business of banking. The FBAs also appropriately articulated how the RLAA and ORLA provisions address this transformation. The "agency's view of what is in the public interest may change, either with or without a change in circumstances," and the agency "must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 57 (1983) (citations omitted). Here, the FBAs have acted well within their latitude to assess each bank's record of meeting the credit needs of its "entire community," as that community exists today.

> **4.     The FBAs have done nothing extraordinary that would warrant application of the Major Questions Doctrine.**

Plaintiffs' invocation of the Major Questions Doctrine should be summarily rejected because that doctrine has no applicability where the agency is acting within its field of expertise and is applying a key provision of a statute. Here, consistent with their expertise and applying the key provision of the CRA, the FBAs have evaluated the extent to which a bank is meeting the credit needs of its "entire community" for nearly five decades. The Final Rule continues to prescribe regulations to do so, and nothing about the FBAs' conduct remotely meets any of the factors required for invocation of the doctrine.

As an initial matter, before applying the Major Questions Doctrine, the Supreme Court has considered whether the challenged action is within the agency's traditional field of expertise,

and whether Congress has expressly considered and rejected the measure in the past. *West Virginia v. EPA*, 597 U.S. 697, 721-22 (2022). Here, the FBAs' field of expertise is the business of banking, and they are well-equipped to understand how banks' "entire communit[ies]" have evolved over time. This case thus contrasts sharply with Major Questions cases involving "an attempt by a public health agency to regulate housing," or "an effort by a workplace safety agency to ordain 'broad public health measures' . . . outside [its] sphere of expertise." *Id.* at 748 (Gorsuch, J., concurring) (citing *Alabama Assn. of Realtors v. HHS*, 141 S. Ct. 2485, 2488 (2021); *NFIB v. OSHA*, 595 U.S. 109, 118 (2022)). And in sharp contrast to *West Virginia*, where the agency had attempted to "enact a program that . . . 'Congress considered and rejected multiple times,'" 597 U.S. at 731, here Congress expressly considered and rejected the narrow formulation of the CRA advanced by Plaintiffs. Specifically, it rejected the concept that banks should be assessed based on a "primary savings service area" or "the immediate community where the bank was located." 123 Cong. Rec. 31887-88 (Oct. 1, 1977).

In addition, the Major Questions Doctrine applies only when an administrative action involves an expansion of regulatory authority premised on "ancillary" statutory provisions. *West Virginia*, 597 U.S. at 710, 724. Here, the phrase "entire community" is not an "ancillary" provision in the CRA; it is central to *the key provision* and, as described above, it was considered carefully by Congress when the CRA was enacted in 1977. Congress entrusted the FBAs with determining how the "entire community" language should be applied, and the FBAs have consistently focused on the "entire community" language in their rulemakings. *See, e.g.*, 43 Fed. Reg. at 47144 (applying the language of the CRA in a 1978 rulemaking, and indicating that "[e]ach institution's entire community will consist of one or more local communities, and guidelines are given on how to define the local community or communities"). This is a far cry

19

from *West Virginia*, where, with respect to the statutory provision at issue, it was "only a slight overstatement . . . to refer to [it] as an 'obscure, never-used section of the law.'" 597 U.S. at 711.

Finally, the Major Questions Doctrine applies only "in certain extraordinary cases" that involve "decisions of vast economic and political significance," assertions of "extravagant statutory power over the national economy," or assertions of "highly consequential power beyond what Congress could reasonably be understood to have granted." *Id.* at 716, 723-24. Examples of such "extraordinary cases" are a rule requiring power plants to shift electricity production away from coal, a nationwide eviction moratorium by the Centers for Disease Control and Prevention, a Covid-19 vaccine mandate for employers with more than 100 employees, and an effort by the Food and Drug Administration to regulate or even ban tobacco products. *Id.* at 721-22. The FBAs' Final Rule applying the undefined term "entire community" in a manner that is consistent with the way that banks now conduct business bears none of the hallmarks of being an "extraordinary case."

### 5.      Plaintiffs' other arguments are meritless.

In cursory fashion, Plaintiffs make a number of other arguments in an attempt to invalidate the FBAs' proposed application of the phrase "entire community." None withstands scrutiny, and they fail to aid Plaintiffs in meeting their burden to demonstrate a substantial likelihood of success.

*First*, Plaintiffs argue that the provision of the CRA addressing institutions serving military personnel supports their contention that "entire community" must be limited to the geographic areas where a bank maintains deposit-taking facilities. *See* Pl. Br. at 12-13. But that provision does more to support the definition of "entire community" in the Final Rule than to undercut it. The provision at issue provides that an institution "whose business predominately

consists of serving the needs of military personnel who are not located within a defined geographic area may define its 'entire community' to include its entire deposit customer base without regard to geographic proximity." 12 U.S.C. § 2902(4). Thus, the provision establishes that for institutions serving military personnel, the bank's "entire community" may not be a geographic area, but rather may consist of its customers without regard to any of their geographic locations. *Id.* This leads to the natural conclusion that, for all other institutions, the term "entire community" must encompass the geographic locations of the bank's customers. And, as with the existing rule, the Final Rule is focused on geography: FBAAs, RLAAs, and ORLAs are all geographic areas where a bank serves its customers. *See, e.g.*, 89 Fed. Reg. at 6577.[18] Thus, while the performance of an institution serving the needs of military personnel (who may be stationed abroad, deployed in combat zones, etc.) is not required to be evaluated in the geographic locations of their customers, the Final Rule continues to require evaluation of performance in customers' geographic areas for other banks (similar to the rule already in place).

*Second*, Plaintiffs contend that Congress's direction to the FBAs to prepare written evaluations focused on "each metropolitan area" where "branch offices" are located supplants Congress's direction to the FBAs to assess the institution's record of meeting the credit needs of the bank's "entire community." Pl. Br. at 10, 13 (citing 12 U.S.C. § 2906(b)(1)(B)). However, Plaintiffs' suggestion that the requirement for written evaluations in section 2906 demonstrates that "entire community" is to be narrowly construed to mean "each metropolitan area in which a bank maintains one or more branch offices" is based on a selective reading of section 2906. In particular, Plaintiffs have chosen to ignore the part of section 2906 which requires, for banks

---

[18] Plaintiffs concede as much when they observe that the Final Rule adds more "*location[s]*" where the bank maintains its customers. Pl. Br. at 12 (emphasis added).

with interstate branches, "a separate written evaluation" for "each State in which the [bank] maintains 1 or more domestic branches," and for the evaluation to encompass the bank's "record of performance within such State." 12 U.S.C. § 2906(d)(1)(B). The fact that the written evaluations must encompass "each metropolitan area" and "each State" in which a bank has a domestic branch fully comports with an expansive definition of "entire community."

Moreover, section 2906 was added to the CRA in 1989 and revised in 1991 and 1994; it was not in the originally enacted law from 1977. Congress, legislating in 1989, 1991, and 1994, could have amended section 2903(a)(1) to replace the "entire community" language to align with any of the geographies for which written evaluations were required under section 2906. However, Congress chose to leave the "entire community" language unchanged in section 2903(a)(1), retaining the operative requirement that the FBAs must "assess the institution's record of meeting the credit needs of its entire community." It is not the function of courts to "invest old statutory terms with new meanings" where Congress has chosen not to amend those old statutory terms itself. *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) ("[I]f judges could freely invest old statutory terms with new meanings, we would risk amending legislation outside the single, finely wrought and exhaustively considered, procedure the Constitution commands" (quotation omitted)); *accord Perez v. ZTE (USA), Inc.*, 2019 WL 1429654, at *3 (N.D. Tex. Mar. 29, 2019) ("Congress is presumed to have knowledge of its previous legislation when making new laws [and] is presumed to be knowledgeable about existing law pertinent to the legislation it enacts" (citing *United States v. Zavala–Sustaita*, 214 F.3d 601, 606 n.8 (5th Cir. 2000)) (internal quotations omitted)); *United States v. Jabateh*, 974 F.3d 281, 296 (3d Cir. 2020) ("new language added to a statute ordinarily ought not be read to alter the meaning of the statute's existing and unchanged text"). Thus, the fact that the "entire community" language was

22

left intact, even as Congress decided to require written evaluations "for each metropolitan area" and "for each State" where a bank has branches, does not support the notion that the "entire community" language had been nullified or redefined.

*Finally*, Plaintiffs compile a string cite of unenacted bills from prior sessions of Congress, which they say indicate that "Congress has considered and either rejected or not acted on legislation that would substantially amend the CRA much like the Final Rules." Pl. Br. at 14. Those bills would have done nothing of the sort. Four of the cited bills were all substantively similar and were designed "to increase homeownership and small business ownership for low- and moderate-income borrowers and persons of color," and "to close the wealth gap in the United States and to increase access to insurance products."[19] The fifth cited bill created new requirements concerning evaluation for illegal or discriminatory activity, partnerships with non-depository lenders, and community service or charity work.[20] None of this legislation would have clarified the meaning of "entire community," or amended the language of 12 U.S.C. § 2903(a)(1) requiring that banks be assessed based on whether they are meeting the needs of the "entire community." Plaintiffs' suggestion that these unenacted bills have any relationship to the Final Rule or otherwise have any bearing on this litigation is totally meritless.

### B.  The FBAs Have Not Exceeded Their Statutory Authority By Evaluating Deposit Products and Services

The CRA commands the FBAs to "assess the institution's record of meeting the credit needs of its entire community." 12 U.S.C. § 2903(a)(1). The CRA does not mandate that only specific factors can be considered in determining whether a bank is "meeting the credit needs of

---

[19] H.R. 4893, 106th Cong. (2000); H.R. 865, 107th Cong. (2001); H.R. 1289, 110th Cong. (2007); H.R. 1479, 111th Cong. (2009).
[20] H.R. 8833, 117th Cong. (2022).

its entire community," and throughout history, the FBAs have used a variety of factors. In developing the Final Rule, the FBAs determined that "the availability of bank deposit products that meet the needs of [LMI] individuals, families, or households frequently assume a foundational role in the ability for individuals to access credit responsive to their particular needs." 89 Fed. Reg. at 6943. Plaintiffs do not dispute that the FBAs have articulated a rational relationship between availability of deposit products and services and the ability to access credit (Pl. Br. at 17), and their challenge fails as a result.

### 1.   The CRA does not mandate that only certain factors can be considered in evaluating whether a bank is "meeting the credit needs of its entire community."

The CRA does not contain a list of exclusive factors that must be used to evaluate whether a bank is "meeting the credit needs of its entire community." 12 U.S.C. 2903(a)(1). Indeed, the very formulation chosen by Congress and never changed since 1977—"meeting the credit needs of its entire community"—is broad. Congress did not write that banks should be assessed based on "providing credit," "extending credit," or "originating loans," but instead Congress chose a more expansive formulation. The phrase "credit needs" encompasses what is requisite, desirable, or useful in connection with credit.[21] Plaintiffs' suggestion that the FBAs can only examine whether a bank is providing "credit products" to customers (Pl. Br. at 16) is an attempt to rewrite the statute.

The FBAs have historically developed a range of factors to comply with the CRA's broad mandate. Shortly after the enactment of the CRA, the FBAs used twelve "assessment factors" to evaluate whether banks were meeting the credit needs of their entire communities. 43 Fed. Reg.

---

[21] As a noun, "needs" includes "a lack of something requisite, desirable, or useful." *Webster's New Collegiate Dictionary* 768 (1976).

at 47154. These twelve factors were not limited merely to the extension of credit. For example, one factor was "[t]he institution's record of opening and closing offices and *providing services* at offices." *Id*. (emphasis added). Similarly, in the 1990s, in commencing a new rulemaking, the FBAs drew attention to the importance of full-service banking relationships in helping LMI customers access credit:

> Branch availability in a community is critical to the availability of credit, as well as deposit, services. The loan origination process (including initial contacts, pre-application counseling, application completion and application filing) often occurs at branches. Moreover, accessible branches are critical to the development of *the full-service banking relationships that facilitate participation in the credit system*.

58 Fed. Reg. 67466, 67471 (Dec. 21, 1993) (emphasis added).

In the rule that was adopted in 1995, the FBAs changed the twelve assessment factors to three performance tests for large banks, one of which was a "Service Test" that required evaluating "the availability and effectiveness of a bank's systems for *delivering retail banking services*." 60 Fed. Reg. 22156, 22181 (May 4, 1995) (emphasis added). In 1996, in their "Interagency Questions and Answers Regarding Community Reinvestment" guidance, the FBAs explained that financial services such as "low-cost bank accounts" are considered under the Service Test as a type of community development service, provided that the accounts increase access to financial services for LMI individuals. 61 Fed. Reg. 54647, 54651-52 (Oct. 21, 1996). And in 2016, the FBAs reiterated in their guidance that deposit products and services are considered under the Service Test, indicating that "low-cost deposit accounts" are an example of "retail banking services that improve access to financial services, or decrease costs, for [LMI] individuals." 81 Fed. Reg. 48506, 48542 (July 25, 2016). Thus, in assessing CRA performance, examiners review "data regarding the costs and features of loan and deposit products, account usage and retention, [and] geographic location of accountholders." *Id.* at 48543.

25

The Final Rule continues the practice in which "a bank's retail deposit products and services are evaluated." 89 Fed. Reg. at 6942-43. The Final Rule recognizes that, whereas branches were historically critical to customers developing full-service banking relationships that facilitated accessing credit, "the now widespread use of mobile and online banking" also can be the foundation of a banking relationship, such that it makes sense to evaluate deposit activities that are not solely tied to branch locations. 89 Fed. Reg. at 6925; *see also id.* at 6944 (explaining that the Final Rule "modernizes the existing evaluation of a bank's products and services by adding a more explicit focus on the financial inclusion potential of these products"). As the Final Rule explains, the FBAs intended that all of the four main performance tests in the rule "would measure a different aspect of how responsive a bank's retail and community development activities are to the credit needs of the bank's communities." *Id.* at 6767. Where, as here, there is a "long-standing" historical pattern of an agency interpreting a statute in a particular manner, that interpretation is entitled to "great respect." *Bd. of Governors of Fed. Reserve Sys. v. First Lincolnwood Corp.*, 439 U.S. 234, 248 (1978); *accord NLRB v. Bell Aerospace Co. Div. Textron Inc.*, 416 U.S. 267, 274-75 (1974) ("[A] court may accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration."). This is particularly the case "when Congress has refused to alter the administrative construction." *First Lincolnwood*, 439 U.S. at 248 (quotation omitted). Here, while Congress amended the CRA multiple times during its 50-year history, Congress never disapproved of the factors that the FBAs developed over the years to determine whether banks were meeting the credit needs of their communities.

Plaintiffs have provided no basis for construing the phrase "meeting the credit needs of its entire community" to allow for consideration only of factors that Plaintiffs have selected as

being desirable, rather than the factors appropriately chosen by the FBAs.

> **2.** **The FBAs have reasonably explained why evaluating deposit activities is appropriate in determining whether a bank is "meeting the credit needs of its entire community."**

The Final Rule amply describes why consideration of deposit activities is appropriate under the CRA. *See* 89 Fed. Reg. at 6943-44. Because the FBAs' application of the language of the CRA is "rationally related" to the goal of meeting the "credit needs" of communities, the Final Rule is an appropriate exercise of the FBAs' authority. *See, e.g.*, *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 388 (1999) (requiring an agency to act in a way that is "rationally related to the goals of the [statute]"); *Ascendium Educ. Sols., Inc. v. Cardona*, 78 F.4th 470, 482 (D.C. Cir. 2023) ("[We] ask whether the [agency] has reasonably explained how the permissible interpretation it chose is rationally related to the goals of the statute." (quotation omitted)); *United States v. Empire Bulkers Ltd.*, 2022 WL 3646069, at *4 (E.D. La. Aug. 24, 2022) ("[A]n obvious and reasonable means to achieve the legislative directive . . . is not an *ultra vires* exercise of regulatory power.").

Here, the FBAs described in great detail why evaluating deposit activities is appropriate. As explained in the Final Rule, "the agencies have found that there is a sufficient nexus between deposit products and the provision of credit such that, to comprehensively assess large bank performance for banks with more than $10 billion in assets, it is appropriate to evaluate deposit accounts responsive to the needs of [LMI] individuals, families, or households." 89 Fed. Reg. at 6943. Specifically, "the availability of bank deposit products that meet the needs of [LMI] individuals, families, or households frequently assumes a foundational role in the ability for individuals to access credit responsive to their particular needs." *Id.*

The FBAs described various common sense ways that deposit products and services help

individuals access credit. First, "deposit products . . . increase credit access by helping individuals improve their financial stability and build wealth through deposit accounts," and therefore "[a] greater focus on responsive deposit products could strengthen a bank's ability to serve the credit needs of its communities." *Id.* at 6943-44. Second, "deposit products can help consumers qualify for loans by facilitating consumers' savings so that they can post collateral and pay transactions costs." *Id.* at 6944. As part of this point, the FBAs noted that consumers frequently rely on checking and savings accounts "to save for and then fund the down payment for a house, the money down on a car, or the initial capital for a small business." *Id.* In addition, the agencies noted that "[d]ata from consumers' use of deposit accounts are also sometimes included in credit evaluations as 'alternative data.'" *Id.* Third, "deposit products are a pathway for a bank customer to establish an ongoing relationship with a bank." In the course of this relationship, "[b]anks can use various touch points to market credit products, explain how credit products can help consumers meet financial needs, and provide services to improve consumers' financial literacy," and "[s]ome banks rely on 'relationship lending,' or using this 'soft' data based on an ongoing relationship with a customer to make underwriting decisions." *Id.* (citing academic literature). Indeed, "[d]ata and empirical studies support the idea that deposit accounts facilitate lending and improved financial outcomes." *Id.* The Federal Reserve's research also supports the connection between use of deposit products and services and access to credit, noting that "[l]ower-income families with a deposit account are more likely to have a major credit card, a first mortgage, and a vehicle loan."[22]

---

[22] Jeanne Hogarth & Kevin O'Donnell, *Banking Relationships of Lower-Income Families and the Governmental Trend toward Electronic Payment*, Federal Reserve Bulletin (July 1999), at 459, 463, *available at* https://www.federalreserve.gov/pubs/bulletin/1999/0799lead.pdf. The same authors noted in a subsequent paper that "[c]ompared with non-account holders, households with transaction accounts were more likely to have credit cards, first mortgages, car

Among Texas banks, the relationship between deposit accounts and credit services is widely recognized. For example, Austin Bank advises customers that rates for auto loans will be based in part on "[y]our account relationship with Austin Bank."[23] The Bank of Texas similarly advises, with respect to personal loans, that if a borrower "choose[s] not to auto debit from a Bank of Texas checking account, you may be offered a higher interest rate."[24] There is good reason for banks to prefer making loans primarily to customers with existing deposit relationships: for example, as the Texas Department of Banking notes, under Texas law, "[i]f you have a personal account and a loan at the same banking institution, and you are delinquent in your loan payments, the bank generally has a right to access your personal account without notification to you to bring the note current."[25]

Plaintiffs do not contest the relationship between deposit products and services and the ability to access credit. Pl. Br. at 17. Nonetheless, they argue that, by assessing deposit products and services, the FBAs have "enlarge[d] the authority granted" to them by the CRA. *Id.* However, the text of the CRA is broad and leaves it to the FBAs to publish regulations "to carry out the purposes of this chapter." 12 U.S.C. § 2905. It is common that a statute is "mandatory as to the object to be achieved," but leaves "a great deal of discretion in deciding how to achieve it." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004). For example, in *Norton*, the plaintiffs alleged that the Bureau of Land Management ("BLM") failed to comply with its

---

loans, [and] consumer loans." Jeanne Hogarth & Kevin O'Donnell, *If You Build it, Will They Come? A Simulation of Financial Product Holdings Among Low-to-Moderate Income Households*, Journal of Consumer Policy (2000), at 409, 426, *available at* https://doi.org/10.1023/A:1007222700931.
[23] https://www.austinbank.com/lending/auto-and-consumer-loans
[24] https://www.bankoftexas.com/-/media/Files/PDF/PEW_Documents/Personal_Installment_Simple%20Guide_BOT.pdf
[25] https://www.dob.texas.gov/banks-trust-companies/faqs ("General Loan Information" section).

statutory and regulatory mandates by allowing recreational use of off-road vehicles on federal land. *Id.* at 59-60. The relevant statutes instructed BLM to "continue to manage [lands] . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness," and to "manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans." *Id.* at 59-60, 66-67. The Supreme Court held that this language did not require BLM to prohibit the use of recreational vehicles and that BLM had the discretion to determine how to fulfill the broad contours of the statutory mandate. *Id.* at 66. Similarly here, the CRA has prescribed an objective (assessing a bank's record of meeting the credit needs of its entire community), but does not direct how the FBAs must achieve it.

In short, empirical research, banks' practices, and the everyday actions of bank customers confirm what is described in the Final Rule: using deposit products and services is rationally related to accessing credit. Thus, the FBAs are amply justified and acting within their statutory authority in evaluating a bank's deposit activities as part of the larger inquiry into whether that bank is meeting the credit needs of its entire community.

### C.     Plaintiffs Have Not Established Associational Standing

Finally, Plaintiffs are unlikely to succeed on the merits because they lack standing. Every plaintiff in this action is an association purporting to sue on behalf of its members, Compl. ¶¶ 7-14, but they have not satisfied the requirement that they identify by name at least one member who would have standing in its own right or show all members of the association are affected by the challenged activity. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Plaintiffs do not assert that the challenged activity affects all members of their associations, nor can they, given that their associations are comprised of thousands of institutions. Compl. ¶¶ 7-14. Moreover, and critically, no plaintiff has identified by name a single

member with standing.[26] *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009) (holding that the "requirement of naming the affected members has never been dispensed with" except where "all the members of the organization are affected by the challenged activity"); *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 (5th Cir. 2012) ("An organization lacks standing if it . . . 'fail[s] to identify even one individual' member with standing."). Instead, Plaintiffs submitted unsworn statements from three anonymous bankers purporting to be members of one or more of the plaintiff associations. ECF 21 at App. 53-65 (Declarations from Anonymous Bankers A-C). But "[w]hen a preliminary injunction is sought, a plaintiff's burden to demonstrate standing 'will normally be no less than that required on a motion for summary judgment," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990), and therefore anonymous declarations are not a permissible form of evidence. They do not allow the Court to evaluate specific facts giving rise to standing, and the declarants "cannot be held to their statements under penalty of perjury." *Williams v. D'Argent Franchising, LLC*, 2023 WL 3059192, at *14 (W.D. La. April 24, 2023); *see also Patterson v. Cty. Of Oneida, N.Y.*, 375 F.3d 206, 223 (2d Cir. 2004) (finding the requirement to "set forth specific facts" was not "satisfied by an affiant whose identity is not disclosed").

Moreover, none of the anonymous declarants represent that they are banks with over $10 billion in assets, or that they have under $10 billion in assets and no branches (ECF 21 at App. 54 ¶ 3, 57 ¶ 2, 62 ¶ 2), such that they would be impacted by the applicable parts of the deposit products and services sections of the Final Rule. 89 Fed. Reg. at 6757-58, 7120-21. Therefore,

---

[26] In their certificate of interested persons, Plaintiffs answered "None" in response to the inquiry as to whether there are any "persons, associations of persons, firms, partnerships, corporations, guarantors, insurers, affiliates, parent or subsidiary corporations, or other legal entities that are financially interested in the outcome of the case." ECF 2.

even the anonymous Plaintiffs would lack standing to challenge that aspect of the rule. Plaintiffs'

lack of standing further demonstrates that they have not shown a likelihood of success on the

merits and that their motion should be denied.

## II.    PLAINTIFFS HAVE NOT DEMONSTRATED THAT THEIR MEMBERS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

Plaintiffs seeking preliminary relief must demonstrate that "irreparable injury is *likely* in

the absence of an injunction." *Winter*, 555 U.S. at 22. To meet this burden, the injury must be

"imminent," "more than mere speculation," and "substantial" or "significant." *Texas v. Biden*,

2022 WL 18436750, at *1 (S.D. Tex. Oct. 20, 2022) (quoting *Janvey v. Alguire*, 647 F.3d 585,

601 (5th Cir. 2011)); *see also Texas v. EPA*, 829 F.3d 405, 433-34 (5th Cir. 2016). The Fifth

Circuit also requires more from "private-sector plaintiffs' efforts to show irreparable harm"—

requiring "more specificity" and ascription of "more urgency to the consequences of a

challenged action." *Texas v. EPA*, 662 F. Supp. 3d 739, 756-57 (S.D. Tex. 2023) (finding

government, but not industry, plaintiffs established irreparable harm); *Career Colleges &

Schools of Texas v. Dep't of Educ.*, 2023 WL 4291992, at *10 (W.D. Tex. Jun. 30, 2023).

Furthermore, "the irreparable harm element must be satisfied by independent proof, or no

injunction may issue." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). Plaintiffs have

failed to carry this burden.

Plaintiffs acknowledge that there are no imminent harms from their members'

performance being assessed under the Final Rule, as most of the Rule's requirements are not

applicable until January 1, 2026, or January 1, 2027 (with first examinations under the Final Rule

following even later). Pl. Br. at 7; 89 Fed. Reg. at 7091-92, 7095. Plaintiffs instead focus on

compliance costs they assert their members would incur *starting now* to prepare for this much

later implementation. Pl. Br. at 18-20. Plaintiffs cite to statements in party declarations (and

improper anonymous statements that should be disregarded, *see supra* at 31). However, these assertions fail to satisfy Plaintiffs' burden to establish that alleged compliance costs constitute irreparable injury under applicable Fifth Circuit law.

### A. Compliance Costs Do Not Constitute Irreparable Harm Because Plaintiffs Have Not Demonstrated That They Are Significant in the Context of Banks' Overall Finances

Plaintiffs fail to demonstrate that their alleged injury would be substantial, or, in other words, that their compliance costs would be "'more than *de minimis*'" in the context of their overall finances. *Texas v. EPA*, 662 F. Supp. 3d at 756 (quoting *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022)). As one district court recently observed, threatened economic harm, including nonrecoverable compliance costs, must be "*significant*, tangible, and likely." *Div. 80, LLC v. Garland*, 2022 WL 3648454, at *2, 4 (S.D. Tex. Aug. 23, 2022) (emphasis added). A contrary position would find irreparable harm in every case in which a litigant challenges a new regulation, thereby transforming the "extraordinary remedy" of equitable relief, *Winter*, 555 U.S. at 22, from the exception to the norm.

Here, Plaintiffs have failed to provide necessary context for their asserted compliance burdens "in relation to the overall financial situation" of their members. *Nat'l Council of Agric. Emps. v. DOL*, 2023 WL 2043149, at *7 (D.D.C. Feb. 16, 2023); *see also Second Amend. Found., Inc. v. ATF*, 2023 WL 7490149, at *15-16 (N.D. Tex. Nov. 13, 2023) (holding plaintiffs had not shown likely irreparable harm regarding asserted financial losses where they provided no context for total monthly revenues or percentages of average monthly income derived from sales before and after final rule became effective). To demonstrate that any asserted compliance costs are more than *de minimis* in the context of banks' overall finances, Plaintiffs must compare those costs to affected banks' overall economic positions, by considering, for example, banks' total noninterest expenses. Those noninterest expenses for all FDIC-insured depository institutions are

33

estimated at $586 billion for the year ending December 31, 2023. *See* Declaration of Douglas D. Robertson, Ph.D., Director, Policy Analysis Division, OCC, dated March 7, 2024 (Robertson Decl.), ¶ 17; *cf. Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 212 (D.D.C. 2012) (finding alleged unrecoverable economic loss of $1 billion insufficient in the context of movant's $102 billion in revenues); *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 338 (D.D.C. 2012) (finding alleged $2.1 billion loss insufficient in the context of movant's $31.8 billion in revenues).

Plaintiffs fail to demonstrate, let alone acknowledge, the overall financial situation of their members as context for the estimated regulatory impact figure of $91.8 million referenced in the Final Rule's preamble. *See* Pl. Br. at 18-19.[27] Put in the context of the banks' overall expenses, the estimate of these compliance costs are mere *hundredths or thousandths of a percentage point* of the affected banks' aggregate total noninterest expenses. *See* Robertson Decl. ¶ 18 ("The estimated compliance cost, to collect, maintain, and report annually geographic data on deposits, of $82 million represents 0.0224% of $366 billion in aggregate total noninterest expenses of the 54 [affected] banks."); ¶ 19 ("The estimated compliance cost, to collect, maintain, and report [other] data, of $7.9 million represents 0.0021% of $375 billion in aggregate total noninterest expenses of the 139 [affected] banks."); ¶ 20 ("The estimated compliance cost, for seven (7) banks to revise their strategic plans in one year, of $1.9 million represents 0.0297% of $6.4 billion in aggregate total noninterest expenses estimated for the seven (7) [affected]

---

[27] The OCC notes that the preamble to the Final Rule described this $91.8 million figure as an estimate of the cost of compliance activities to be incurred during the first 12 months of implementation. 89 Fed. Reg. at 7106 (summarizing the OCC's analysis related to the Unfunded Mandates Reform Act). The OCC intends to soon issue a correction in the Federal Register revising the paragraph discussing this estimate. The correction will clarify that these compliance activities to prepare for the applicability dates may take place over the entire transition period, lasting until January 1, 2026 and January 1, 2027 (as opposed to over the first 12 months).

banks.").

Likewise, Plaintiffs fail to acknowledge any appropriate context for the FBAs' annual burden estimates under the Final Rule. Pl. Br. at 18-19; 89 Fed. Reg. at 7106. Plaintiffs reference annual burden figures of 105,455 hours for *all* Federal Reserve-regulated banks; 130,891 hours for *all* OCC-regulated banks; and 234,974 hours for *all* FDIC-regulated banks subject to the CRA. But they fail to note that the Final Rule indicates that the estimated annual burden for all institutions regulated by all three FBAs is only 51,271 hours more than the FBAs' most recent published burden estimates for current CRA compliance. *See* 89 Fed. Reg. at 7106 (identifying increases of 3,392 hours, 17,540 hours, and 30,339 hours for banks supervised by the FDIC, the OCC, and the Federal Reserve, respectively). Put into context, these estimated increases in annual burden *across more than 4,500 institutions* (89 Fed. Reg. at 7102-06 (*see* "Burden Estimates" chart)), are *de minimis* for purposes of assessing whether Plaintiffs have met the standard for the extraordinary relief of a preliminary injunction. *See Cardinal Health*, 846 F. Supp. 2d at 212; *Air Transp. Ass'n of Am., Inc.,* 840 F. Supp. 2d at 338.

Due to the lack of any demonstrated substantial harm, Plaintiffs fail to meet their heavy burden of establishing that their members will likely suffer irreparable injury in the absence of a preliminary injunction. *Second Amend. Found., Inc.*, 2023 WL 7490149, at *15-18.

### B.   Plaintiffs' Assertions of Irreparable Harm from Purported Immediate Activities Fail Because They Are Vague and Speculative

Plaintiffs also argue imminent compliance costs for "immediate" activities associated with preparing for the Final Rule's 2026 and 2027 applicability dates. *See* Pl. Br. at 19-20. Assertions by Plaintiffs and their declarants that large-scale preparation efforts are required immediately to comply with far-off applicability dates are not based on any regulatory text, however, and their assertions are vague and speculative. *VanDerStok v. Garland*, 633 F. Supp. 3d

847, 858 (N.D. Tex. 2022) (rejecting argument that it would be "virtually impossible" for an organizational plaintiff to achieve its mission given "onerous" and "conflicting" laws; "Not only is this argument vague and purely speculative, it does not even address ATF's Rule.").

*First*, the Final Rule represents the culmination of a multiyear rulemaking process in which banks have been actively engaged with the FBAs, providing input regarding forthcoming content. *See, e.g.*, 89 Fed. Reg. at 6581-82. A significant responsive change was extending the implementation period from one to two years, allowing banks substantially more time than proposed to pace and thoughtfully calibrate implementation efforts and costs. *See, e.g.*, *id.* at 7092-93 (describing decision to delay implementation until 2026 and 2027 in response to comments). Thus, the actual regulatory text is marked by none of the extreme urgency Plaintiffs claim they now face.

*Second*, the preamble indicates that implementation guidance and tools are forthcoming from the FBAs with respect to data collection, maintenance and reporting for large banks. *See, e.g.*, *id.* at 7060-62, 7065-67, 7075 (describing forthcoming guidance on and templates for submission of data on delivery systems, deposit products, community development lending and investment, and deposits data); *id.* at 6741 (describing FBAs' intention to develop data tools to identify geographies for RLAAs and distribution benchmarks); *id.* at 6579 ("the agencies expect to develop data reporting guides and technical assistance materials to assist banks in understanding supervisory expectations with respect to the final rule's data reporting requirements"). Because banks subject to the new data collection, maintenance, and reporting requirements are awaiting this assistance, the assertion of irreparable harms from incurring costs associated with building or acquiring new information technology systems immediately is unsupported. *See* ECF 21 at App. 3 ¶ 8, 9 ¶ 8, 16 ¶ 9, 24 ¶ 9, 31 ¶ 8. Neither Plaintiffs (nor their

declarants) offer evidence that a bank has actually taken specific steps to hire or train staff, making the imminent nature of the harms vague and speculative. *See Career Colleges & Sch. of Texas*, 2023 WL 4291992, at *6 ("Speculation built upon further speculation does not amount to a reasonably certain threat of imminent harm and does not warrant injunctive relief." (internal quotation marks omitted) (quoting *Friends of Lydia Ann Channel v. U.S. Army Corps of Eng'rs*, 701 F. App'x 352, 357 (5th Cir. 2017)).[28]

*Third*, while declarants raise vague, alarmist assertions about immense complexity necessitating immediate action with respect to new RLAAs, no declarant specifies a single RLAA that any of Plaintiffs' member banks anticipate it will need to delineate. *See, e.g.*, ECF 21 at App. 16 ¶ 9, 40 ¶ 16, 45 ¶ 8. According to the FBAs' analysis of 2018-2020 bank lending data, only 63 large banks would have been required to delineate RLAAs under the Final Rule, had the Final Rule been in effect over that period. 89 Fed. Reg. at 6740. Of these banks, 19 of the 63 would have had only one RLAA and 20 would have had only two to five RLAAs. *Id.* at 6741. The only description offered by Plaintiffs of any such analysis comes in the unsworn statement of Anonymous Bank B, which tellingly concludes that it, a $3.8 billion institution, does not anticipate that it will have *any* RLAAs. ECF 21 at App. 53.

*Finally*, conclusory statements of multiple declarants that a large bank will need to "build out new CRA infrastructure" in the locations of its new RLAAs and ORLA—*e.g.*, ECF 21 at App. 9-10 ¶ 9, 24 ¶ 10—contradict the text of the Final Rule. There is no expectation that a bank

---

[28] The agency manual that Plaintiffs cite for their assertion that "immediate" readiness is required (ECF 21 at App. 40-41 ¶ 17) contains no such language and instead merely guides examiners to assess the effectiveness of an "institution's change management processes," including timely and satisfactory response to external change. *See* FDIC's Consumer Compliance Examination Manual (updated Jan. 12, 2024), II-13.2-13.3, *available at* https://www.fdic.gov/resources/supervision-and-examinations/ consumer-compliance-examination-manual/documents/compliance-examination-manual.pdf.

establish a physical presence in an RLAA or an ORLA *now*, nor in 2026 when they might be delineated for the first time. Indeed, RLAAs and the ORLA are, by definition, geographic areas where a bank has no deposit-taking facility. 89 Fed. Reg. at 7110, 7114-15.

Accordingly, Plaintiffs have failed to meet their burden of establishing imminent nonrecoverable compliance costs stemming from activities to prepare for the Final Rule. Such activities are vague, unsupported, and contrary to the language in the Final Rule. *See VanDerStok*, 633 F. Supp. 3d at 858.

## III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST DO NOT SUPPORT THE INJUNCTIVE RELIEF SOUGHT

The balance of equities and the public interest also weigh against enjoining the entire rule because many aspects of the Final Rule are indisputably beneficial. "If there is reason to believe that an injunction issued prior to a trial on the merits would be burdensome, the balance tips in favor of denying preliminary relief." *Texas v. United States*, 86 F. Supp. 3d 591, 675 (S.D. Tex. 2015) (citing *Winter*, 555 U.S. at 27).

*First*, and perhaps most importantly, while the provisions Plaintiffs cite in support of their motion apply almost exclusively to large banks, the rule provides significant regulatory relief and lower compliance costs by increasing the asset-size thresholds that determine which performance tests apply to an institution. Specifically, the threshold for classifying an institution as "small" is being raised: currently, it includes banks with assets under $391 million, and the Final Rule raises this figure to $600 million. 88 Fed. Reg. at 87897; 89 Fed. Reg. at 6575. Likewise, the threshold for intermediate banks is currently at a maximum of $1.564 billion, and is being raised to $2 billion. 88 Fed. Reg. at 87897; 89 Fed. Reg. at 6575. The Final Rule estimates that, because of these higher asset thresholds, approximately 216 banks will be reclassified as "intermediate" rather than "large," and approximately 778 banks will be reclassified as "small" rather than

"intermediate" (89 Fed. Reg. at 6596), a significant percentage of total depository institutions (*see supra* footnote 4). Granting Plaintiffs' motion would delay regulatory relief for these small and intermediate institutions, as well as the associated lower compliance costs, for the benefit of comparatively fewer large institutions. *See*, *e.g.*, 89 Fed. Reg. at 6740 (estimating that only 63 large banks would be affected by the Final Rule's approach to RLAAs).

*Second*, Plaintiffs' request to enjoin the entire rule would unnecessarily delay other long-awaited reforms that Plaintiffs do not challenge, and which have been widely supported by members of the industry, including large institutions. The Final Rule contains four main performance tests, yet Plaintiffs' challenges pertain only to certain components of two of the performance tests (*i.e.*, the Retail Lending Test and the Retail Services and Products Test). Plaintiffs do not argue that any component of either the Community Development Financing Test or the Community Development Services Test supports preliminary relief. *See* 89 Fed. Reg. at 6577. With respect to these latter two tests, the Final Rule revises and clarifies the criteria for, and provides for a confirmation of eligibility process and illustrative list of examples of, the types of loans, investments, and services that the agencies regard as supporting community development. *See id.* at 7111-14. These changes have been widely supported and desired by the regulated community.[29] By awarding the relief Plaintiffs seek, the Court would delay these long-

---

[29] *See*, *e.g.*, Comment Letter of ABA et al., at 2 (Aug. 5, 2022) (stating support for "provisions that will give banks greater certainty regarding the activities that will receive credit, allowing them to concentrate their efforts on providing the products and services that will address community needs instead of spending time and resources trying to figure out what will count") (*available at* https://www.regulations.gov/comment/OCC-2022-0002-0484); Comment Letter of ICBA, at 2 (Aug. 5, 2022) ("Modernization of CRA is also needed to provide banks and other stakeholders greater clarity about which loans and investments are eligible for CRA credit") (*available at* https://www.regulations.gov/comment/OCC-2022-0002-0315); Comment Letter of Independent Bankers Ass'n of Tex., at 3 (July 27, 2022) ("maintenance of this list [of qualifying activities] would provide critical certainty as well as appropriate consistency") (*available at* https://www.regulations.gov/comment/OCC-2022-0002-0055); Comment Letter of U.S.

awaited benefits, depriving all stakeholders of greater clarity with respect to community development activities.

*Finally*, the balance of harms with respect to the component of the Retail Services and Products Test focused on deposits tips against Plaintiffs because any claimed harm is illusory. The evaluation of digital delivery systems for deposit services is required only for banks with more than $10 billion in assets, and for large banks with assets less than or equal to $10 billion that do not operate branches. 89 Fed. Reg. at 7120. And for deposit products, the rule requires evaluation only for banks with more than $10 billion in assets. *Id.* at 7121. None of the Anonymous Banks that Plaintiffs proffered fit into these categories. *See* ECF 21 at App. 48 ¶ 3 (assets of approximately $1.8 billion and multiple branches); *id.* at App. 51 ¶ 2 (assets of $3.8 billion and multiple branches); *id.* at App. 56 ¶ 2 (assets of $1.6 billion and multiple branches).

Accordingly, given the significant positive benefits of the Final Rule that have been unchallenged by Plaintiffs, it would be burdensome to many banks and contrary to the public interest to enjoin the Rule.

## **CONCLUSION**

For the foregoing reasons, the FBAs respectfully request that Plaintiffs' motion for a preliminary injunction be denied.

---

Chamber of Commerce, at 3 (Aug. 5, 2022) ("The Chamber appreciates the NPR's inclusion of a non-exhaustive list of activities eligible for CRA consideration. . . . Banks want to have the assurance that the investments they make will receive credit when they make the investment.") (*available at* https://www.regulations.gov/comment/OCC-2022-0002-0448).

Dated: March 8, 2024

Respectfully submitted,

 /s/ *Joshua P. Chadwick*
Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick (DC 502279), Senior
Special Counsel
Nicholas Jabbour (DC 500626), Senior
Counsel
Board of Governors of the Federal Reserve
System
20th Street and Constitution Avenue, NW
Washington, DC 20551
joshua.p.chadwick@frb.gov
Phone: (202) 263-4835
Fax: (202) 452-3819

*Counsel for Defendants Board of Governors of the Federal Reserve System and Jerome Powell, in his Official Capacity*

 /s/ *Ashley W. Walker*
Benjamin W. McDonough, Chief Counsel
Patricia S. Grady, Deputy Chief Counsel
Peter C. Koch (IL 6225347), Director for
Litigation
Ashley W. Walker (DC 488126), Special
Counsel, Litigation
Office of the Comptroller of the Currency
400 7th Street SW, Mailstop 9E-1
Washington, DC 20219
ashley.walker@occ.treas.gov
Phone: (202) 649-6315
Fax: (571) 465-3411

*Counsel for Defendants Office of the Comptroller of the Currency and Michael J. Hsu, in his Official Capacity*

 /s/ *Andrew J. Dober*
Harrel M. Pettway, General Counsel
B. Amon James, Assistant General Counsel
Andrew J. Dober (DC 489638), Senior
Counsel
Herbert G. Smith II (DC 450811), Counsel
Federal Deposit Insurance Corporation
3501 Fairfax Drive, D-7028
Arlington, VA 22226-3500
adober@fdic.gov
Phone: (703) 562-2460
Fax: (703) 562-2477

*Counsel for Defendants Federal Deposit Insurance Corporation and Martin J. Gruenberg, in his Official Capacity*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 8, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel and parties of record registered to receive such notices.

 /s/ *Joshua P. Chadwick*
Joshua P. Chadwick (DC 502279)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, NW
Washington, DC 20551
joshua.p.chadwick@frb.gov
Phone: (202) 263-4835
Fax: (202) 452-3819

42