IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **TEXAS BANKERS ASSOCIATION et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**OFFICE OF THE COMPTROLLER OF THE CURRENCY et al.,**<br><br>Defendants. | CIVIL NO. 2:24-cv-00025-Z-BR<br><br>The Hon. Matthew J. Kacsmaryk<br>United States District Judge |

**APPENDIX TO DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

All Defendants jointly file this appendix to their response in opposition to Plaintiffs' motion for a preliminary injunction. This appendix contains the declaration of Douglas D. Robertson.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
- AMARILLO DIVISION -

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION; AMARILLO CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; LONGVIEW CHAMBER OF COMMERCE; INDEPENDENT COMMUNITY BANKERS OF AMERICA; INDEPENDENT BANKERS ASSOCIATION OF TEXAS,<br><br>   Plaintiffs,<br><br>  v.<br><br>OFFICE OF THE COMPTROLLER OF THE CURRENCY and MICHAEL J. HSU in his official capacity as Acting Comptroller of the Currency; BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM and JEROME POWELL in his official capacity as Chairman of the Board of Governors; FEDERAL DEPOSIT INSURANCE CORPORATION; and MARTIN GRUENBERG, in his official capacity as Chairman of the FDIC,<br><br>   Defendants. | CIVIL NO. 2:24-cv-00025-Z-O<br><br>The Hon. Matthew J. Kacsmaryk<br>United States District Judge<br><br><br>**DECLARATION OF DOUGLAS D. ROBERTSON, Ph.D., DIRECTOR, POLICY ANALYSIS DIVISION, OFFICE OF THE COMPTROLLER OF THE CURRENCY** |

**DECLARATION OF DOUGLAS D. ROBERTSON, Ph.D., DIRECTOR, POLICY ANALYSIS DIVISION, OFFICE OF THE COMPTROLLER OF THE CURRENCY**

Def. App. 1

I, Douglas D. Robertson, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Director of the Policy Analysis Division of the Office of the Comptroller of the Currency (OCC). I joined the OCC in 1998. In my position, I oversee the work of ten individuals including financial economists, policy analysts, and a mathematician.

2. Prior to joining the OCC, I was an economist in the Office of Financial Institutions Policy at the United States Department of the Treasury and a research associate in the Research Department of the Federal Reserve Bank of Philadelphia.

3. I received my Ph.D. and Master of Arts degrees in Economics in 1996 and 1991, respectively, from the University of Maryland in College Park, Maryland, and my Bachelor of Arts degree in Economics in 1981 from Grinnell College in Grinnell, Iowa.

4. Unless otherwise stated, this declaration is based on my personal knowledge and belief and my review of publicly available data queried and collated by staff in the Policy Analysis Division.

5. Among projects assigned to the Policy Analysis Division is completion of statutorily mandated regulatory impact analyses for proposed and final regulations of the OCC, including reviews required under the Unfunded Mandates Reform Act of 1995 (UMRA), 2 U.S.C. § 1501 *et seq.*

6. As a first step in assessing the OCC's obligations under UMRA for any proposed or final regulation, my staff will carry out analysis to estimate whether a rulemaking "is likely to result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector of $100,000,000 or more (adjusted annually for inflation) in any one year" under 2 U.S.C. § 1532. If the rule is likely to require estimated expenditures that

exceed the threshold of $100,000,000 (adjusted annually for inflation), my staff will undertake additional analysis as required by statute under 2 U.S.C. §§ 1532, 1535.

7. I am familiar with the UMRA-related analysis conducted by the Policy Analysis Division for the OCC's regulation under the Community Reinvestment Act (CRA), published in the Federal Register on February 1, 2024, at 89 Fed. Reg. 6574 through 7222 (the final rule).

8. The OCC's UMRA-related analysis estimated an approximate cost of $91.8 million for private sector compliance with the mandates of the OCC's final rule to reach preparedness for the applicability dates of the final rule. That figure included: approximately $7.9 million associated with increased data collection, recordkeeping or reporting applicable to OCC-regulated national banks and Federal saving associations subject to CRA that were estimated to have assets of at least $2 billion so to qualify as large banks under the final rule; $82 million for those OCC large banks estimated to have assets greater than $10 billion to collect, maintain, and report annually geographic data on deposits; and $1.9 million for OCC-regulated national banks and Federal savings associations estimated to require revisions to their CRA strategic plans in the course of one year.

9. For the purpose of estimating bank asset sizes and how many banks would be required to fulfill which data reporting requirements, the Policy Analysis Division queried publicly available data on bank asset size from OCC-regulated banks' Consolidated Reports of Condition and Income (Call Reports) reported for the quarters ending December 31, 2021, and December 31, 2022.

10. Quarterly Call Reports are required of all insured depository institutions by statute under 12 U.S.C. § 1817(a)(3) and are publicly available on the Federal Financial Institutions Examination Council's (FFIEC) Central Data Repository's Public Data Distribution website at https://cdr.ffiec.gov/public/ManageFacsimiles.aspx.

11. Based on this 2021 and 2022 historical data, the Policy Analysis Division determined that 54 OCC-regulated banks had assets over $10 billon year-end both years and, as a result, would have been subject to requirements of the OCC's final rule to collect, maintain, and report annually geographic data on deposits in 2023, had the new rule hypothetically been in effect in 2023.

12. Based on this same historical data, 139 OCC-regulated banks had assets of at least $2 billion year-end both years and would have been subject to the other large bank data collection, record-keeping, and reporting requirements of the final rule— including requirements relating to data on small business loans and small farm loans, automobile loans, home mortgage loans, and community development loans and community development investments—had the new rule hypothetically been in effect in 2023.

13. In 2023, fourteen (14) OCC-regulated banks had CRA strategic plans, and, for the purpose of the UMRA-related analysis, the Policy Analysis Division estimated that half of them, seven (7), would revise their strategic plans in one year.

14. Separate from the analysis related to UMRA, the Policy Analysis Division has estimated the aggregate total noninterest expenses for these same groups of banks in 2023.

15. Total noninterest expense is comprised of regulatory accounting figures reported by most federally insured deposit institutions on their quarterly Call Reports. Total noninterest expense appears on line 7(e) of forms FFIEC 031, 041, and 051 and includes: Salaries

and employee benefits; Expenses of premises and fixed assets; Goodwill impairment losses; Amortization expense and impairment losses for other intangible assets; Data processing expenses; Advertising and marketing expenses; Directors' fees; and other noninterest expense.  Among other items, other noninterest expense includes Printing, stationery, and supplies; Postage; Legal fees and expenses; FDIC deposit insurance assessments; Accounting and auditing expenses; Consulting and advisory expenses; Automated teller machine (ATM) and interchange expenses; Telecommunications expenses; Other real estate owned expenses; and Insurance expenses (not included in employee expenses, premises and fixed asset expenses, and other real estate owned expenses).

16. From an economics perspective, total noninterest expense is an appropriate accounting figure against which to compare the estimated costs associated with the final rule.  Total noninterest expense is a comprehensive measure of a financial institution's operational costs or costs of doing business.  For instance, the Policy Analysis Division uses total noninterest expense to help determine if a rule has a significant economic impact on OCC-supervised small entities under the Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.*  We use noninterest expense rather than other metrics such as revenue because noninterest expense reflects reported spending while revenue tends to be more volatile and depends on a variety of factors not directly related to regulatory compliance.

17. The aggregate total noninterest expenses for all FDIC-insured depository institutions in the United States was $586,380,719,000.00 (or roughly $586 billion) for the year ending December 31, 2023.  This figure excludes the expenses of U.S. branches and agencies of foreign banks, which are not required to report expenses.  Insured branches of foreign

banks and uninsured branches of a foreign bank resulting from certain acquisitions under the International Banking Act, 12 U.S.C. § 3103(a)(8) are subject to CRA.

18. For the 54 large banks estimated to be subject to the requirement under the OCC's rule to collect, maintain, and report annually geographic data on deposits, those banks that report expenses reported an aggregate total noninterest expense figure of $366,089,283,000.00 (or roughly $366 billion) for the year ending December 31, 2023. The estimated compliance cost, to collect, maintain, and report annually geographic data on deposits, of $82 million represents 0.0224% of $366 billion in aggregate total noninterest expenses of the 54 banks.

19. For the 139 large banks estimated to be subject to other new requirements under the OCC's rule to collect, maintain, and report data—including requirements relating to the data on small business loans and small farm loans, automobile loans, home mortgage loans, and community development loans and community development investments—those banks that report expenses reported an aggregate total noninterest expense figure of $375,359,070,000.00 (or roughly $375 billion) for the year ending December 31, 2023. The estimated compliance cost, to collect, maintain, and report this data, of $7.9 million represents 0.0021% of $375 billion in aggregate total noninterest expenses of the 139 banks.

20. To estimate the aggregate total noninterest expenses of the seven (7) banks estimated to revise their strategic plans in one year under the OCC's rule, the Policy Analysis Division computed the aggregate total noninterest expenses for all fourteen (14) banks under strategic plans in 2023 and divided it by two (2), for a figure of $6,438,660,000.00 (or roughly $6.4 billion) for the year ending December 31, 2023. The estimated compliance

cost, for seven (7) banks to revise their strategic plans in one year, of $1.9 million represents 0.0297% of $6.4 billion in aggregate total noninterest expenses estimated for the seven (7) banks.

21. These estimates of aggregate total noninterest expenses do not include expenses for federal branches and agencies of foreign banks because they do not report income and expenses on their Call Reports, form FFIEC 030.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of March 2024, at Washington D.C.

Douglas D. Robertson