**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | |
|---|---|
| TEXAS BANKERS ASSOCIATION et al., | |
| *Plaintiffs*, | Civil Case No. 2:24-cv-00025-Z-BR |
| v. | The Hon. Matthew J. Kacsmaryk<br>United States District Judge |
| OFFICE OF THE COMPTROLLER OF THE CURRENCY et al., | |
| *Defendants*. | |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY
INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

ARGUMENT ..............................................................................................................................3

I.      Plaintiffs Have Demonstrated a Substantial Likelihood of Success on the Merits..............3

      A.      The CRA Does Not Authorize Assessment of Banks Wherever They Conduct Retail Lending. ..........................................................................................3

              1.      The CRA Requires Lending Assessment in Local Areas Surrounding Banks' Deposit-Taking Facilities. ..........................................3

              2.      The Agencies Cannot Rewrite the CRA in the Name of Modernization. ....................................................................................9

              3.      The Agencies Lack Clear Congressional Authorization to Evaluate Banks' Performance Anywhere They Lend..............................................10

      B.      The CRA Does Not Permit Evaluation of Deposit Services and Products............12

      C.      Plaintiffs Have Standing. ....................................................................................14

              1.      Standing Does Not Require Identifying Harmed Members by Name. ......................................................................................................15

              2.      Plaintiffs Have Standing to Challenge the Evaluation of Deposit Products and Services Under the Final Rules. ...........................................17

II.     Plaintiffs Have Demonstrated Irreparable Harm. .............................................................17

      A.      The Nonrecoverable Compliance Costs Are More Than *De Minimis*.................18

      B.      The Nonrecoverable Compliance Costs Are Not Vague or Speculative. .............20

III.    The Balance of the Equities Weighs in Favor of a Preliminary Injunction. .....................21

CONCLUSION...........................................................................................................................22

# TABLE OF AUTHORITIES

*Adamo Wrecking Co. v. United States*, 434 U.S. 275 (1978) .........................................................14

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586
(D.C. Cir. 2022) ......................................................................................................................16

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485 (2021) ......................21

*Barnhart v. Peabody Coal Co.*, 537 U.S. 149 (2003) ...................................................................12

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) .................................................................................12

*BNSF Ry. Co. v. United States*, 775 F.3d 743, 754 (5th Cir. 2015)..............................................8

*Book People, Inc. v. Wong*, 2023 WL 6060045 (W.D. Tex. Sep. 18, 2023) ................................20

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin., U.S. Dep't of Lab.*, 17
F.4th 604 (5th Cir. 2021) .......................................................................................................19

*Career Coll. Schs. of Tex. v. U.S. Dep't of Educ.*, 2023 WL 4291992 (W.D. Tex. June 30,
2023) ......................................................................................................................................21

*Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) ..........................................................................3

*Chamber of Com. of U.S. of Am. v. CFPB*, 2023 WL 5835951 (E.D. Tex. Sept. 8, 2023) ...........16

*Chamber of Com. of U.S. of Am. v. U.S. Dep't of Lab.*, 885 F.3d 360 (5th Cir. 2018) .................9

*Christian Emp'rs All. v. EEOC*, 2022 WL 1573689 (D. N.D. May 16, 2022) .............................17

*Church of Scientology v. Cazares*, 638 F.2d 1272 (5th Cir. Mar. 1981) ......................................16

*Dialysis Patient Citizens v. Burwell*, 2017 WL 365271 (E.D. Tex. Jan. 25, 2017)......................19

*Division 80 LLC v. Garland*, 2022 WL 3648454 (S.D. Tex. Aug. 23, 2022) ..............................19

*Do No Harm v. Pfizer*, 2024 WL 949506 (2d Cir. Mar. 6, 2024)................................................17

*Draper v. Healey*, 827 F.3d 1 (1st Cir. 2016) ..............................................................................17

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018).............................................................................7

*ESI/Emp. Sols., L.P. v. City of Dallas*, 450 F. Supp. 3d 700 (E.D. Tex. 2020) ............................20

*Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 Fed. Appx. 189 (5th Cir. 2012)  ................................15

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ..............................................14

*Huntington Ingalls, Inc. v. Dir., Off. of Workers' Comp. Programs*, 70 F.4th 245 (5th Cir. 2023) ................................................................................................................3, 6, 9

*Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022) ................................................................13, 19

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................................15

*Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308 (2020)............................................5

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374 (2016)............................4

*Michigan v. EPA*, 576 U.S. 743 (2015) .....................................................................................10

*Nat'l Council of Agric. Emps. v. Dep't of Lab.*, 2023 WL 2042149 (D.D.C. Feb. 16, 2023) ..................................................................................................................................19

*Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015) .......................................17

*Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, 2023 WL 484509 (S.D. Ohio July 28, 2023) ..............................................................................................17

*Rumsfeld v. Forum for Acad. & Institutional Rts.*, 547 U.S. 47 (2006)........................................17

*SEC v. Sloan*, 436 U.S. 103 (1978)............................................................................................14

*Second Amend. Found. Inc. v. ATF*, 2023 WL 7490149 (N.D. Tex. Nov. 13, 2023)...................19

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ..........................................................................14

*Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020) ....................................................14, 16

*Speech First, Inc. v. Shrum*, 92 F.4th 947 (10th Cir. 2024)........................................................16

*Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181 (2023)..........................................15

*Students for Fair Admissions, Inc. v. U.S. Naval Academy*, 2023 WL 8806668 (D. Md. Dec. 20, 2023)...............................................................................................................17

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ..................................................................15

*Tex. Bankers Ass'n v. CFPB*, 2023 WL 4872398 (S.D. Tex. July 31, 2023) ........................19, 20

*Tex. Food Indus. Ass'n v. U.S. Dep't of Agric.*, 842 F. Supp. 254 (W.D. Tex. 1993)...................19

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016)..........................................................................19, 20

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ........................................................9, 11

*VanDerStok v. Garland*, 633 F. Supp. 3d 847 (N.D. Tex. 2022)................................................21

*VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023) ....................................................9

*Welch v. Davis*, 2020 WL 4597079 (N.D. Tex. Aug. 11, 2020)........................................8

*West Virginia v. EPA*, 597 U.S. 697 (2022)....................................................10, 11, 12

## STATUTES AND REGULATIONS

43 Fed. Reg. 47144 (Oct. 12, 1978) ................................................................11

57 Fed. Reg. 10899 (Mar. 31, 1992) ...............................................................11

60 Fed. Reg. 22156 (May 4, 1995) ...............................................................4, 10

81 Fed. Reg. 48506 (July 25, 2016)................................................................11

89 Fed. Reg. 6574 (Feb. 1, 2024) .......................................................... passim

12 U.S.C. § 1813 ..........................................................................................6

12 U.S.C. § 1841 ..........................................................................................6

12 U.S.C. § 2901 ..................................................................1, 4, 6, 12, 13

12 U.S.C. § 2903 ................................................................................ passim

12 U.S.C. § 2905 ..........................................................................................4

12 U.S.C. § 2906 ................................................................................5, 6, 7

Federal Deposit Insurance Act, Pub. L. No. 81-797, 64 Stat. 873 (1950) ........................6

Housing and Community Development Act, Pub. L. No. 95-128, 91 Stat. 1147 (1977) ...............6

Riegle-Neal Interstate Banking and Branching Efficiency Act, Pub. L. No. 103-328, 108
    Stat. 2338 (1994)..................................................................................6

## OTHER AUTHORITIES

123 Cong. Rec. 31888 (Oct. 1, 1977) ...............................................................8

123 Cong. Rec. 17630 (June 6, 1977).................................................................9

Community Reinstatement Act Supplemental Rule (Mar. 21, 2024)...................................2, 18, 20

Governor Michelle W. Bowman, *Statement on the Interim Final Rule and Final Rule
    Amending the Community Reinvestment Act Regulations* (Mar. 21, 2024)..........................20

*Hearings on S. 406 Before the S. Comm. on Banking, Housing, and Urban Affs.*, 95th
    Cong. 247 (1997) ................................................................................8

v

H.R. 865, 107th Cong. § 102 (2001)...........................................................................11

H.R. 1289, 110th Cong. § 102 (2007).........................................................................11

H.R. 1479, 111th § 102 (2009) ....................................................................................11

H.R. 4893, 106th Cong. § 102 (2000)..........................................................................11

*Webster's Third New International Dictionary* (1981) .................................................4

## INTRODUCTION

Plaintiffs demonstrated in their opening brief that the Agencies exceeded their statutory authority under the Community Reinvestment Act of 1977 ("CRA") by issuing the Final Rules, which radically transform the nature of CRA performance assessments in two critical respects. First, the CRA provides that the Agencies must assess banks' record of meeting the credit needs of their "communities," which consist of the areas surrounding their deposit-taking facilities. *See* 12 U.S.C. § 2901 *et. seq*. But under the new Retail Lending Test, the Agencies assert the novel, expansive authority to assess certain banks where they have *no* deposit-taking facilities at all. Instead, the Agencies will assess banks (1) where they are "conducting meaningful banking activity by making a substantial number of retail loans" ("Retail Lending Assessment Areas"), and (2) where any of their "retail loan borrowers are located" ("Outside Retail Lending Areas"). 89 Fed. Reg. 6574, 6738, 6759 (Feb. 1, 2024). Second, the CRA directs the Agencies to assess banks on their "credit" products and programs, but under the new Retail Services and Products Test, the Agencies upend the CRA's plain text by asserting authority to assess banks' *deposit* services and products. *Id.* at 7120–21.

The Agencies, in their Opposition, fail to justify their expansive assertions of authority. The Agencies defend the Final Rules only by taking isolated phrases of statutory text out of context and claiming authority that they lack to update the CRA to better fit the modern banking industry. Their drastic reinterpretation is at odds with the CRA's text, read in context and in light of the statute's structure. As to standing, the Agencies do not dispute the substance of Plaintiffs' declarations confirming they have members that are subject to — and harmed by — the Final Rules, but rather contend Plaintiffs must specify the names of those particular members. Courts have repeatedly rejected that argument and it finds no support in Fifth Circuit caselaw.

As to irreparable injury, the Agencies do not dispute that banks will incur, at a minimum, tens of millions of dollars in costs to prepare for the Final Rules' implementation. Plaintiffs' declarations attest that the true costs exceed *hundreds* of millions of dollars. The Agencies' contention that the Court must "compare those costs to affected banks' overall economic positions" is not the law in the Fifth Circuit, which has recognized that complying with a regulation later held invalid almost inevitably produces irreparable harm. The final two factors, balance of harms and the public interest, are of no persuasive weight where, as here, Plaintiffs have strong arguments on likelihood of success and irreparable harm. Nothing in the Opposition, therefore, provides a basis for the Court to deny an injunction.

*     *     *

The evening before Plaintiffs' reply deadline, the Agencies issued a supplemental rule consisting of both a new interim final rule and technical amendments to the Final Rules at issue in this litigation. *See* ECF No. 70; Community Reinvestment Act Supplemental Rule ("Suppl. Rule") (Mar. 21, 2024). The only amendment directly relevant to Plaintiffs' preliminary-injunction motion concerns OCC's estimate of costs to comply with the Final Rules' mandates. OCC's original cost estimate, issued contemporaneously with the Final Rules and cited in Plaintiffs' opening brief, was $91.8 million in the first 12 months, starting April 1, 2024. 89 Fed. Reg. at 7106; ECF No. 20 at 24. OCC has now issued a "correction" to "clarif[y]" this estimate. Suppl. Rule at 27. OCC now states that, "[w]ere the final rule to require full compliance within the first 12 months of the transition period," compliance costs during this hypothetical first year of full compliance "would not exceed approximately $91.8 million." *Id.* OCC notes that "for most substantive provisions," banks have until January 1, 2026 — *i.e.*, 21 months — for full compliance. *Id.* OCC does not posit a revised cost estimate for the first year of implementation.

2

As Plaintiffs explain below, this late-stage alteration does not impact the propriety of a preliminary injunction.

## ARGUMENT

### I.      Plaintiffs Have Demonstrated a Substantial Likelihood of Success on the Merits.

#### A.      The CRA Does Not Authorize Assessment of Banks Wherever They Conduct Retail Lending.

The Agencies assert that the phrase "entire community" authorizes them to assess some banks' CRA performance anywhere they lend, no matter how distant from their physical, deposit-taking facilities.  This interpretation contravenes two textual limitations.  First, the "community" of a bank is a local area, not a vast, nationwide area.  Second, this local area must surround a bank's deposit-taking facilities and does not include simply any location where the bank lends.

##### 1.      The CRA Requires Lending Assessment in Local Areas Surrounding Banks' Deposit-Taking Facilities.

Whether the new assessment areas pass statutory muster is a question of interpretation that requires the Court to utilize the "traditional tools of statutory construction" — text, structure, history, and purpose (and in that order).  *Huntington Ingalls, Inc. v. Dir., Off. of Workers' Comp. Programs*, 70 F.4th 245, 248–52 (5th Cir. 2023).  Because *Chevron* deference "must be raised by the Government in order to apply," the Agencies have waived its application here.  *Cargill v. Garland*, 57 F.4th 447, 465 (5th Cir. 2023), *cert. granted on other grounds*, 144 S. Ct. 374 (2023).  The Agencies' myopic focus on one isolated phrase of the CRA's text, bolstered only by equivocal legislative history and at the expense of statutory context, history, and purpose, cannot support the new assessment areas.

As an initial matter, the Agencies badly misread the "entire community" phrase of 12 U.S.C. § 2903(a)(1), even in isolation.  The adjective "entire" indicates completeness and bars the exclusion of component parts.  *See Webster's Third New International Dictionary* (1981) ("with

no element or part excepted").  Nothing about the adjective "entire" is so "sweeping in scope," ECF No. 67 at 22, as to radically change the nature of the noun it modifies.  As Plaintiffs explained in their opening brief, the ordinary meaning of the term "community" is a geographic subunit of a state or region, along the lines of a town.  ECF No. 20 at 16.  An "entire" community is the *entirety* of that geographic subunit.  The text immediately following "entire community" identifies the component parts: all of the community's "neighborhoods," no matter the income level.  12 U.S.C. § 2903(a)(1).  Congress used the adjective "entire" to require inclusion of all neighborhoods, not to attach an unnaturally expansive meaning to "community."

Statutory context and structure further confirm that the term "community" retains its ordinarily local character in section 2903(a)(1).  The CRA repeatedly refers to "local communities" in both the congressional findings and purpose section and the operative text.  *See* 12 U.S.C. §§ 2901(a)(3), 2901(b), 2903(b); *see also id.* § 2905 (incorporating the "purpose[]" in section 2901(b)).  The Agencies dismiss the word "local" because it is absent from section 2903(a)(1), invoking the presumption that different statutory language implies different meaning.  ECF No. 67 at 24.  But different statutory language *can* mean "exactly the same thing."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 384 (2016) (quotation omitted).  The adjective "entire" rather than "local" in section 2903(a)(1) emphasizes completeness but does not transform a "community" into something else.[1]  Flouting plain meaning, the Agencies stretch the concept of "community" beyond recognition to include the "nationwide area" — "*the entirety of the United States and its territories*" — where a bank conducts retail lending.  89 Fed. Reg. at

---

[1] The Agencies have recognized the interchangeability of these adjectives in the past, stating in their 1995 CRA regulations that "[t]he CRA requires the agencies to assess an institution's record of helping to meet the credit needs of its *local* community."  60 Fed. Reg. 22156, 22170 (May 4, 1995) (emphasis added); *see id.* at 22163 (using the adjective "entire" in place of "local" in a similar sentence).

6619, 6763, 7115 (emphasis added).   No conceivable "community," composed of "neighborhoods," is that enormous.

The Agencies' new delineation of assessment areas also fails because under the CRA, a bank's "community" is the area surrounding its deposit-taking facilities, not the area where it conducts retail lending.[2]  Two key provisions of the CRA prove this point.

First, section 2906 states that the Agencies "shall prepare a written evaluation" of banks' CRA performance record, which "shall" include the Agencies' conclusions for each assessment factor and the supporting facts and data.  12 U.S.C. § 2906(a)(1), (b)(1)(A)(i), (b)(1)(A)(ii).  That information "shall be presented separately for each metropolitan area in which a regulated depository institution maintains one or more domestic branch offices," and, for state-level evaluations, "the remainder of the nonmetropolitan area of the State" where the institution maintains one or more "domestic branch offices."  *Id.* § 2906(b)(1)(B), (d)(3)(A).  For purposes of section 2906, "domestic branch" means "any branch office or other facility of a regulated financial institution *that accepts deposits*, located in any State."  *Id.* § 2906(e)(1) (emphasis added).  The word "shall" is "mandatory language."  *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020).  Section 2906 thus requires the Agencies to conduct their assessments separately for each geographic area surrounding a bank's deposit-taking facilities.

---

[2]  Strangely, the Agencies object to Plaintiffs' decision *not* to challenge the Community Development Financing Test, which evaluates banks' community development performance in Facility-Based Assessment Areas as well as at the state, multistate MSA, and nationwide levels. ECF No. 67 at 22 n.16.  This test affords banks "flexibility in allocating community development loans and investments."  89 Fed. Reg. at 6965.  Banks may allocate community development loans and investments only in Facility-Based Assessment Areas without affecting their performance assessment.  *Id.* at 7122–25, 7150.  This test therefore does not impermissibly divorce CRA performance assessment from banks' deposit-taking facilities.

Congress defined "domestic branch" in section 2906 with care, adding it to the CRA through the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994 ("Riegle-Neal"). Pub. L. No. 103-328, § 110, 108 Stat. 2338, 2364 (codified at 12 U.S.C. § 2906(e)(1)). Elsewhere in Riegle-Neal, Congress defined "domestic branch" more broadly to mean any branch or office "at which deposits are received *or checks paid or money lent*," as defined in section 3 of the Federal Deposit Insurance Act. *Id.* § 101(c), 108 Stat. at 2342 (codified at 12 U.S.C. § 1841(o)(3)); Federal Deposit Insurance Act, Pub. L. No. 81-797, § 2, 64 Stat. 873, 875 (1950) (codified as amended at 12 U.S.C. § 1813(o)) (emphasis added). Congress's circumscribed definition of "domestic branch" for purposes of the CRA in section 2906 reflects its deliberate choice to cover only deposit-taking facilities and their surrounding territories, while excluding other kinds of banking facilities that involve other services, in accordance with the CRA as originally drafted.[3] *See* Pub. L. No. 95-128, § 802(a)(1), 91 Stat. 1147, 1147 (1977) (codified at 12 U.S.C. § 2901(a)(1)) (focusing on the way "deposit facilities" serve community needs).

The Agencies' reinterpretation creates a direct conflict with the mandatory language in section 2906. Like section 2903(a)(1), section 2906's written-evaluation provisions involve "the institution's record of meeting the credit needs of its entire community." 12 U.S.C. § 2906(a)(1). These sections thus have coextensive coverage. Moreover, section 2906's written-evaluation scheme is detailed and comprehensive, and the Agencies do not purport to have authority to ignore or supplement its requirements. If the Agencies assess a bank's CRA performance in geographic areas where it maintains no deposit-taking facilities, they must either (a) fail to "prepare a written

---

[3] The Agencies suggest that section 2906 cannot inform the meaning of "entire community" because this language was not in the CRA as originally enacted. ECF No. 67 at 32. Of course, the Agencies are bound by current law, and surrounding statutory text can clarify meaning no matter when enacted. *See Huntington*, 70 F.4th at 250 (analyzing "structural interactions between . . . historical amendments").

evaluation" of that record of performance, in violation of section 2906(a)(1), or (b) fail to present the required information "separately for each metropolitan area" and "separately for the remainder of the nonmetropolitan area of the State" where the bank's deposit-taking facilities are located, in violation of section 2906(b)(1)(B) or (d)(3)(A).  The "canon against reading conflicts into statutes" precludes this interpretation.  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 521 (2018).

The Agencies do not explain how their reading of "entire community" in section 2903(a)(1) is consistent with section 2906.  They observe that evaluations of banks with interstate branches involve a separate evaluation "for each State in which the bank maintains 1 or more domestic branches," 12 U.S.C. § 2906(d)(1)(B), but they overlook that these state-level evaluations occur only in areas where a *deposit-taking facility* exists.  *Id.* § 2906(d)(3)(A); ECF No. 67 at 32–33. The Final Rules put the Agencies' mistake on display.  Under the new assessment-area paradigm, the Agencies will report "supporting conclusions" for each Retail Lending Test area, including any Retail Lending Assessment Area and the bank's Outside Retail Lending Area.  89 Fed. Reg. at 6883, 7119.  Those assessment areas are "by definition, geographic areas where a bank has no deposit-taking facility," ECF No. 67 at 48, so they are irreconcilable with section 2906.

Second, section 2902(4)'s limited and specific carveout allowing military banks to delineate their "entire community" to include their "entire deposit customer base without regard to geographic proximity" informs the "entire community" of other banks.  *See* ECF No. 20 at 18–19.  The Agencies recognize the negative implication that section 2902(4) carries, but only part-way.  They first suggest that section 2902(4) allows military banks to have an "entire community" that is *demographic*, not geographic.  This does not match the Final Rules, which geographically define military banks' Facility-Based Assessment Areas as "the entire United States and its territories."  89 Fed. Reg. at 6735, 6774, 7114, 7116.  The Agencies next suggest that, because

7

military banks' "entire community" can be defined without geographic proximity, the negative implication for other banks is that their "entire community" must be geographic.   But that suggestion does nothing to explain away the word "proximity."   The better reading is that the "entire community" of non-military banks must capture the bank's deposit customer base *with* "geographic proximity."   The Agencies' reading renders section 2902(4) senseless.   If *all* banks could define their "entire community" without regard to geographic proximity, this provision offering a limited carveout to military banks would be surplusage.   *See BNSF Ry. Co. v. United States*, 775 F.3d 743, 754 (5th Cir. 2015).

Besides the isolated text of "entire community," the only other interpretive tool the Agencies rely on is legislative history, which courts may consider when interpreting *ambiguous* statutory language.   *See Welch v. Davis*, 2020 WL 4597079, at *2 (N.D. Tex. Aug. 11, 2020) (Kacsmaryk, J.).   The Agencies argue that because Congress chose the phrase "entire community" over "primary savings service area" (the area surrounding deposit-taking facilities that includes more than 50% of deposit customers), the enacted text is not "tied to the geographies where the bank has its deposit-taking facilities" at all.   ECF No. 67 at 25.   The Agencies overread this edit. The trouble with the initial formulation was not the tie to deposit-taking facilities, but size.   The draft language would "in many cases lead to an area that is quite small, perhaps with a radius of one mile or less."   *Hearings on S. 406 Before the S. Comm. on Banking, Housing, and Urban Affs.*, 95th Cong. 247 (1997) (statement of Garth Marston, Chairman of the Federal Home Loan Bank Board).   Such a small area would have left out some neighborhoods near deposit-taking facilities, which would have undermined the CRA's anti-redlining purpose.   Congress substituted the phrase to reach beyond the "*immediate* community where the bank was located" and include the broader community surrounding banks' deposit-taking facilities.   123 Cong. Rec. 31888 (Oct. 1, 1977)

(statement of Sen. Proxmire) (emphasis added). This legislative history is thus fully consistent with the ordinary reading of the statute. And even if it could be read to pull in "both directions," it would only illustrate the danger of relying on legislative history instead of "the text and structure of the statute." *Huntington*, 70 F.4th at 252.

What is evident in the CRA's text, structure, and history is further confirmed by its purpose. Congress's purpose was to address redlining. *See* 123 Cong. Rec. 17630 (June 6, 1977) (statement of Sen. Proxmire). Congress intended the CRA to boost reinvestment in the communities from which banks drew deposits by incentivizing banks to improve their record of meeting credit needs there, without differentiating between neighborhoods of varying income. Assessing banks' ability to meet credit needs in the faraway locations where they do some lending does nothing to encourage reinvestment in the communities from which they draw deposits.

## 2. The Agencies Cannot Rewrite the CRA in the Name of Modernization.

Though the Agencies repeatedly cite the expansion of mobile and online banking as the impetus behind their regulatory overhaul, they may not "rewrite" laws that Congress has enacted, no matter how "laudable" their policy goals. *Chamber of Com. of U.S. of Am. v. U.S. Dep't of Lab.*, 885 F.3d 360, 373 (5th Cir. 2018); *VanDerStok v. Garland*, 86 F.4th 179, 195 (5th Cir. 2023). Nor can they invest statutory terms with radical new meanings, as that impermissibly usurps the role of Congress and upsets settled expectations based on the text's original meaning. *See VanDerStok*, 86 F.4th at 189, 195. Original meaning controls. Well before Congress enacted the CRA, "many banks place[d] loans and solicit[ed] deposits outside their home area." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 325 (1963). Until now, the Agencies have understood that industry developments do not change statutory meaning. The Agencies' 1995 regulations acknowledged banking-by-telephone and banking-by-computer, which similarly facilitate banking across distances, but the Agencies then still based assessment areas only around deposit-taking

facilities.  *See* 60 Fed. Reg. 22156, 22166, 22184 (May 4, 1995).  The Agencies also cite the incipience of interstate banking, ushered in by Riegle-Neal.  But Congress itself already amended the CRA, in Riegle-Neal, to accommodate interstate banking.  The Agencies have no power to amend it further.

The Agencies' "reasons" for recognizing these industry developments have no bearing here.  ECF No. 67 at 27; *see Michigan v. EPA*, 576 U.S. 743, 750 (2015).  The Agencies entreat the Court to rubberstamp their new reading on the ground that they provided "ample detail as to the changed facts and related reasoning."  ECF No. 67 at 26–28.  But Plaintiffs' preliminary injunction motion rests on Count I of their Complaint, which alleges the Agencies exceeded their statutory authority, not on the portions of their Complaint alleging arbitrary and capricious decision-making.  ECF No. 4 ¶¶ 94–99; *see* ECF No. 20 at 15.  The proffered rationales are non sequiturs to Plaintiffs' statutory-authority challenge.

### 3.  The Agencies Lack Clear Congressional Authorization to Evaluate Banks' Performance Anywhere They Lend.

The Agencies have failed to "point to clear congressional authorization" to delineate assessment areas the way they do.  *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation omitted).  Under the Major Questions Doctrine, that showing is required when "the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority."  *Id.* at 721 (quotations and brackets omitted).  Ample reasons for hesitation exist here.

The Agencies' asserted power to assess a bank's CRA performance anywhere it conducts retail lending is unprecedented.  Beginning with the first set of CRA regulations in 1978, the

Agencies have limited assessment to the areas surrounding deposit-taking facilities.[4]  *See*, *e.g.*, 43 Fed. Reg. 47144, 47144 (Oct. 12, 1978); Interagency Questions and Answers, 57 Fed. Reg. 10899, 10899 (Mar. 31, 1992).  Congress has failed to pass legislation to alter this well-established interpretation several times over.  *See* ECF No. 20 at 20–21; *West Virginia*, 597 U.S. at 731.  The Community Reinvestment Modernization Act, introduced four times in the span of nine years, would have shifted assessment areas from those areas surrounding deposit-taking facilities to areas where banks make loans.[5]  Long-dormant power to accomplish by regulation what Congress has several times attempted by legislation beggars belief.

The Agencies' asserted authority also carries vast economic significance.  As the Supreme Court recognized well before the enactment of the CRA, "the broad visitatorial power of federal bank examiners" is "perhaps the most effective weapon of federal regulation of banking."  *Phila. Nat'l Bank*, 374 U.S. at 329.  If a bank disappoints examiners, severe sanctions may follow.  *Id.* at 330.  CRA performance is an "important, and often controlling factor" affecting the Agencies' decisions on key applications, such as merger and acquisition applications.  *See* Interagency Questions and Answers, 81 Fed. Reg. 48506, 48548 (July 25, 2016).  This leads banks to orient day-to-day business around CRA rules and make significant investments in CRA compliance.

Despite the Agencies' attempt to graft prerequisites onto the Major Questions Doctrine, ECF No. 67 at 28–30, these reasons are more than sufficient for the doctrine to apply.  Whether

---

[4] The Agencies incorrectly claim consistency with the 1978 regulations.  The only "areas where a bank conducted retail lending," ECF No. 67 at 23, that the 1978 regulations included were those *surrounding deposit-taking facilities*, like Facility-Based Assessment Areas, 89 Fed. Reg. at 7114.

[5] The bills would have amended section 2906 to require separate written evaluations for "each community in which the regulated financial institution makes more than 0.5 percent of the total amount of loans."  H.R. 4893, 106th Cong. § 102 (2000); H.R. 865, 107th Cong. § 102 (2001); H.R. 1289, 110th Cong. § 103 (2007); H.R. 1479, 111th Cong. § 103 (2009).  That Congress sought to redefine permissible assessment areas by changing section 2906, not the "entire community" phrase of section 2903(a)(1), reflects the close relationship between those sections.

regulators have acted within their field of expertise and whether their claimed authority rests on a provision that is merely "ancillary" are relevant but not controlling considerations. *See West Virginia*, 597 U.S. at 710, 724. When an interpretation is "central to the statutory scheme," as here, courts are less likely to "assume that Congress entrusted that task to an agency without a clear statement to that effect." *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023) (quotation omitted). Considering the CRA's text, structure, history, and purpose, the Agencies lack the asserted authority to evaluate banks outside of local areas surrounding deposit-taking facilities.

### B.    The CRA Does Not Permit Evaluation of Deposit Services and Products.

The Final Rules turn a second aspect of the CRA on its head by evaluating deposit services and products as an aspect of community "credit needs." 12 U.S.C. § 2903(a)(1). Again, the Agencies defend their interpretation by isolating one statutory phrase ("credit needs") in which they seek to find ambiguity, while ignoring the contrary indications of the CRA's structure, history, and purpose. Here, they also add a request for deference, framing a years-old interpretation as decades-old. Neither strategy should prevail.

Congress understood preexisting regulatory and statutory schemes to require banks to "demonstrate that their deposit facilities" serve "the need for *credit* services as well as *deposit* services." 12 U.S.C. § 2901(a)(1)–(2) (emphasis added). But the CRA required the assessment of financial institutions' record of meeting only "*credit* needs." *Id.* § 2903(a)(1) (emphasis added). In this context, "it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it," because Congress explicitly described credit and deposit needs as "members of an associated group or series." *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (quotations omitted). Under the *expressio unius est exclusio alterius* canon, the inclusion of "credit needs" in section 2903(a)(1) excludes services and products that serve "deposit needs." *See id.*

The Agencies offer no response to this text, arguing instead that the absence of a "list of exclusive factors" in the CRA that they must consider when assessing "credit needs" gives them a blank check to evaluate banks on any metric they say has a "sufficient nexus" to "the provision of credit." ECF No. 67 at 34, 37 (citing 89 Fed. Reg. at 6943). But what "nexus" is "sufficient," they do not say. They suggest that anything that improves individuals' "financial stability" or helps them "build wealth," "qualify for loans," or "establish an ongoing relationship with a bank" could fit the bill. *Id.* at 37–38 (citing 89 Fed. Reg. at 6943–44); *see id.* at 40 (asserting authority to evaluate banks on any metric that is "rationally related to accessing credit").

This reading amounts to "nearly unlimited authority." *Louisiana v. Biden*, 55 F.4th 1017, 1027 (5th Cir. 2022). The Agencies excluded "insurance and financial investment products" from the Retail Services and Products Test this time around, but their test would extend to these products just the same. 89 Fed. Reg. at 6937. Perhaps the Agencies could interview customer-facing bank employees to assess, *e.g.*, their *friendliness*, as bearing on banks' ability to maintain "ongoing relationships," or they could penalize banks for not hosting routine financial-wellness seminars. Such metrics only tangentially relate to credit, but the Agencies suggest "no dividing line by which a court might rule out" some metrics but "uphold" others. *Louisiana*, 55 F.4th at 1031. The Agencies' authority to assess factors related to credit needs may be broad, but it is not unlimited. Whatever the line, the CRA makes clear that "deposit" services and products cross it.[6] *See* 12 U.S.C. §§ 2901(a)(2), 2903(a)(1).

The Agencies invoke deference generally, but not *Chevron* deference. At most, the Agencies are eligible for *Skidmore* deference, where the weight a court accords an agency

---

[6] Assessing deposit services and products also does not align with the CRA's purpose of correcting redlining by emphasizing *lending* in local communities. *See* 12 U.S.C. § 2901(b); *supra* at 8–9.

interpretation "depend[s] on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The Agencies posit regulatory consistency, citing vague references to "services" in earlier regulations that make no mention of *deposit* services. ECF No. 67 at 34–35. They also cite two guidance documents and a passing reference to "full-service banking relationships" in a notice of proposed rulemaking. *Id.* at 35. Only in 2016 did the Agencies begin evaluating deposit products and services to a similar extent as the Final Rules. *See* ECF No. 20 at 23. Eight years, out of nearly five decades, is hardly enough to show a "consistent and longstanding" practice favoring deference. *SEC v. Sloan*, 436 U.S. 103, 117 (1978).

To the extent the Agencies previously interpreted the CRA to cover deposit services and products, those past interpretations add little reason for deference. The Agencies identify no instance in the regulatory history where they "actually addressed in any detail the statutory authorization under which [they] took that action," and the mere issuance of an interpretation devoid of reasoning "obviously lacks power to persuade." *Id.* at 117–18 (quotation omitted); *see Adamo Wrecking Co. v. United States*, 434 U.S. 275, 287 n.5 (1978). Most importantly, consistency cannot "overcome the clear contrary indications of the statute itself." *Sloan*, 436 U.S. at 117.

## C. Plaintiffs Have Standing.

Of the three requirements for associational standing, the Agencies only challenge whether Plaintiffs' members "have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs easily satisfy this requirement. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (requiring movants to "clearly show only that each element of standing is likely to obtain in the case at hand" at the preliminary-injunction stage).

14

Each Plaintiff has submitted declarations attesting that they have members that will be subject to, and directly impacted by, the challenged portions of the Final Rules.  ECF No. 21 at 7–52.  They have also submitted declarations from three member banks (submitted under the pseudonyms A, B, and C), *id.* at 53–65, which provide even further details regarding the harm those banks are suffering, and will continue to suffer, as a result of the Final Rules.  When, as here, a challenged regulation applies to an entity directly, "there is ordinarily little question" about standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992).

The Agencies do not challenge the substance of Plaintiffs' declarations.  Instead, relying on *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), the Agencies contend Plaintiffs fail to establish standing because they did not *name* specific members with standing in their own right.  ECF No. 67 at 40–42.  They also contend Plaintiffs lack standing to challenge the "deposit products and services sections" of the Final Rules because none of the pseudonymous declarants have assets over $10 billion such that they would be required to submit to that assessment.  *Id.* at 41.  Neither argument has merit.

### 1.    Standing Does Not Require Identifying Harmed Members by Name.

The Agencies misread *Summers*.  There, the plaintiff organization did not rely on anonymous or pseudonymous declarations to establish standing; rather, the question was whether it was statistically likely that some of the organization's members would be injured by visiting a national forest.  *See Summers*, 555 U.S. at 497.  Since *Summers* was decided, the Supreme Court has not once read that decision as imposing a naming requirement.  *See, e.g.*, *Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181, 200–01 (2023) (organization had standing "when it filed suit" where it "identified" individual harmed members but did not provide their names).

The Fifth Circuit allows use of anonymous declarants to establish standing.  *See, e.g.*, *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 Fed. Appx. 189, 198–99 (5th Cir. 2012) (unpublished)

(upholding use of anonymous declarations where plaintiffs "were not merely alleging that some members *might* suffer" a violation, but that "some members *were* suffering" a violation).[7]  The Eastern District of Texas recently rejected arguments similarly premised on *Summers* at the summary-judgment stage, in a case involving many of the same plaintiffs as this one.  *See Chamber of Com. of U.S. of Am. v. CFPB*, 2023 WL 5835951, at *6 (E.D. Tex. Sept. 8, 2023) (Barker, J.).  The court concluded the defendant agency "misunderst[ood] *Summers*" and that because the plaintiffs relied "not on what an unidentified member might do in the future, but on what specific members are doing right now[,] [n]othing more is required." *Id.* (finding anonymous declarations "credibly show that plaintiffs have identified members that are currently suffering cognizable harm from the agency action challenged here").

The weight of out-of-circuit authority also rejects the Agencies' theory that anonymous or pseudonymous declarations are insufficient.  Only weeks ago, the Tenth Circuit reversed a district court ruling that relied on *Summers* to reject associational standing when the member who had standing remained anonymous.  *Speech First, Inc. v. Shrum*, 92 F.4th 947 (10th Cir. 2024).  The Tenth Circuit stated that "[l]ongstanding and well-established doctrine in the federal courts establishes that anonymous persons may have standing to bring claims." *Id.* at 949.  As to *Summers*, the court observed: "Anonymity was not even an issue before the Supreme Court . . . . The opinion provided no hint, much less an emphatic statement, that it was abrogating decades of precedent." *Id.*[8]  Should the Court have any concerns regarding the identity of

---

[7] *See also Speech First*, 979 F.3d at 335 (crediting anonymous declarations and holding plaintiff had standing to pursue injunction); *Church of Scientology v. Cazares*, 638 F.2d 1272, 1278–80 (5th Cir. Mar. 1981) (not including naming of members among "the requisite[s] for representational standing"), *abrogated on other grounds*, *Blanchard v. Bergeron*, 489 U.S. 87 (1989).

[8] *See also Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586,

Plaintiffs' members adversely affected by the Final Rules, Plaintiffs will disclose members' names *in camera* and *ex parte*.

> ### 2.      Plaintiffs Have Standing to Challenge the Evaluation of Deposit Products and Services Under the Final Rules.

The Agencies' contention that Plaintiffs lack standing to challenge the evaluation of deposit products and services under the Final Rules fares no better.  The Agencies overlook that the Texas Bankers' Association has 20 members with over $10 billion in assets, to which the deposit-products evaluation will apply.  ECF No. 21 at 8 ¶ 4; *see* 89 Fed. Reg. at 7121.  That is sufficient to demonstrate Plaintiffs' standing to challenge these portions of the Final Rules.  *See Rumsfeld v. Forum for Acad. & Institutional Rts.*, 547 U.S. 47, 52 n.2 (2006) (where multiple plaintiffs seek injunctive relief, only one needs to establish standing).  Moreover, large banks with less than $10 billion in assets, like Anonymous Bank B, may be assessed under these tests "at the bank's option," 89 Fed. Reg. at 7121–22, and in a system in which banks are pitted against each other for key components of their overall scores, *see, e.g.*, *id.* at 7144–49, the Final Rules pressure them to accept such assessment.  After all, banks may need to obtain just such a "plus" in light of the rest of the Final Rules.

## II.      Plaintiffs Have Demonstrated Irreparable Harm.

Plaintiffs established — based both on declarations from themselves and their members,

---

594 (D.C. Cir. 2022); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015); *Students for Fair Admissions, Inc. v. U.S. Naval Academy*, 2023 WL 8806668, at *9 (D. Md. Dec. 20, 2023); *Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, 2023 WL 484509, at *6 (S.D. Ohio July 28, 2023); *Christian Emp'rs All. v. EEOC*, 2022 WL 1573689, at *4 (D. N.D. May 16, 2022).  The First and Second Circuits have adopted a contrary reading of *Summers. See Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016); *Do No Harm v. Pfizer*, 2024 WL 949506, at *11 (2d Cir. Mar. 6, 2024).  These opinions are not persuasive and contravene the weight of authority.  *See Do No Harm*, 2024 WL 949506, at *17–18 (Wesley, J., concurring).  In any event, the Second Circuit recognized that providing the names of the declarants *ex parte* and *in camera* could resolve concerns associated with unnamed declarants.  *See id.* at *11 (majority op.).

and on the Agencies' own concessions — that they will suffer irreparable harm in the form of nonrecoverable compliance costs absent a preliminary injunction.  ECF No. 20 at 24–26.  The Agencies' claims that these harms are *de minimis* and speculative are meritless.

### A.   The Nonrecoverable Compliance Costs Are More Than *De Minimis*.

Plaintiffs' declarations demonstrate that member banks will collectively incur hundreds of millions of dollars in costs over the next year to prepare for the implementation of the Final Rules.[9] Based on OCC's last-minute adjustment to its cost estimate, the Agencies concede, at the very least, that OCC-regulated banks alone will incur approximately $91.8 million in compliance costs within the first 21 months of implementation (or within 33 months for costs related to reporting requirements).[10]  Suppl. Rule at 27.  Despite the magnitude of these estimated costs, the Agencies contend that such costs are *de minimis* "in relation to the overall financial situation" of Plaintiffs' members.  ECF No. 67 at 43.

The Agencies' argument hinges on their assertion that assessing the irreparability of compliance costs requires the Court to "compare those costs to affected banks' overall economic

---

[9] ECF No. 21 at 21 ¶ 7 (estimating total costs of $566 million for large banks and another $84 million for intermediate and small banks).  Plaintiffs also submitted declarations from three of their members, who attested to compliance costs for their bank alone in the hundreds of thousands of dollars per year.  *See id.* at 54 ¶ 7 (estimating costs of "approximately $300,000 over the next 18 months"); *id.* at 58–59 ¶ 6 (estimating costs for personnel changes of "approximately $247,000 per year"); *id.* at 63–64 ¶¶ 4–5 (estimating costs for software and operating-system upgrades of $100,000 and costs for personnel changes of "at least $100,000 per year" plus "approximately $750,000, much of which will be recurring annual[ly]").

[10] By OCC's own admission, this figure vastly underestimates industry-wide compliance costs of regulated banks, given that it relates solely to OCC-regulated banks — a fact confirmed by OCC's own declarant here, Dr. Douglas Robertson.  *Compare* ECF No. 68 at 5 ¶¶ 11–12 (noting only 54 OCC-regulated banks with assets over $10 billion, and 139 such banks with assets of at least $2 billion), *with* ECF No. 21 at 21 ¶ 7 (noting 160 banks with assets over $10 billion and 417 banks with assets over $2 billion).  OCC's estimate provides no rebuttal, therefore, to the significantly higher industry-wide compliance costs attested to in Plaintiffs' declarations.

positions." *Id.*  But that is not the law in the Fifth Circuit.  The Fifth Circuit holds that "when determining whether injury is irreparable, it is not so much the *magnitude* but the *irreparability* that counts," *Louisiana*, 55 F.4th at 1034 (citation omitted) (emphasis added), and that "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs," *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (citation omitted) (emphasis in original).  Under these guidelines, district courts in this Circuit regularly find that nonrecoverable compliance costs of tens of millions of dollars industry-wide,[11] or $100,000 for individual entities,[12] constitute irreparable harm, without comparing those costs to plaintiffs' overall financial condition.

The Agencies' proffered standard relies predominantly on cases from within the D.C. Circuit, which has *not* adopted the Fifth Circuit's "more than merely *de minimis*" standard and has instead adopted a stricter standard that requires unrecoverable economic loss to be "great, certain, and imminent," and "serious in terms of the effect on the plaintiff."  *See, e.g.*, *Nat'l Council of Agric. Emps. v. Dep't of Lab.*, 2023 WL 2042149, at *6 (D.D.C. Feb. 16, 2023).  The only cases the Agencies cite from within the Fifth Circuit are inapposite because they address claims for lost profits, which are governed by a different and more stringent standard.[13]  Applying the proper Fifth Circuit test, the tens of millions of dollars in compliance costs that the Agencies have conceded — let alone the *hundreds* of millions of dollars that Plaintiffs contend is more accurate,

---

[11] *See, e.g.*, *Dialysis Patient Citizens v. Burwell*, 2017 WL 365271, at *6 (E.D. Tex. Jan. 25, 2017) ($29 million annually imposed upon dialysis providers); *Tex. Food Indus. Ass'n v. U.S. Dep't of Agric.*, 842 F. Supp. 254, 260 (W.D. Tex. 1993) ($35–$75 million imposed on the food industry).

[12] *See, e.g.*, *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., U.S. Dep't of Lab.*, 17 F.4th 604, 618 (5th Cir. 2021) (loss of one employee excluded from working by OSHA mandate constitutes irreparable harm); *Tex. Bankers Ass'n v. CFPB*, 2023 WL 4872398, at *6–7 (S.D. Tex. July 31, 2023) (between $100,000 and $250,000 per bank).

[13] *See Second Amend. Found. Inc. v. ATF*, 2023 WL 7490149, at *14–16 (N.D. Tex. Nov. 13, 2023); *Division 80 LLC v. Garland*, 2022 WL 3648454, at *4 (S.D. Tex. Aug. 23, 2022).

ECF No. 21 at 21 ¶ 7, and that the Agencies do nothing to rebut — easily exceed the "more than merely *de minimis*" threshold.

### B.  The Nonrecoverable Compliance Costs Are Not Vague or Speculative.

The Agencies also claim that Plaintiffs' assertions of "large-scale preparation efforts" are "vague and speculative." ECF No. 67 at 45. But the Agencies have acknowledged banks will have to incur tens of millions of dollars in costs to prepare for the Final Rules, and the types of costs Plaintiffs' members attest to incurring now mirror those the Agencies have acknowledged. *See* Suppl. Rule at 27. Although OCC's last-minute "correction" to its cost estimate now states those costs can be spread over the 21 months before the substantive provisions of the Final Rules take effect, the Agencies do *not* seriously dispute that this compliance work is already underway; as such, they do nothing to refute the declarations from Plaintiffs and their members.[14] *See* ECF No. 20 at 25. Numerous decisions from the Fifth Circuit have found that far-off compliance dates do not preclude a finding of irreparable harm where, as here, attested-to compliance costs are sufficiently supported. *See, e.g.*, *Texas*, 829 F.3d at 433–35 (irreparable harm from a 2016 regulation requiring compliance by 2019 and 2021).[15] The Agencies' two cited cases are not to the contrary, as both deal with claims of speculative future occurrences, not concrete compliance

---

[14] The Agencies' supplemental rule included an interim final rule extending the compliance date related to Facility-Based Assessment Areas to January 1, 2026. Suppl. Rule at 9–12. This change does not directly affect Plaintiffs' preliminary-injunction motion, which challenges provisions of the Final Rules that were already scheduled to become effective on January 1, 2026. 89 Fed. Reg. at 6578. But it does reflect the "rushed, overly complex, and unwieldy nature" of the Final Rules. Governor Michelle W. Bowman, *Statement on the Interim Final Rule and Final Rule Amending the Community Reinvestment Act Regulations* (Mar. 21, 2024).

[15] *See also Tex. Bankers Ass'n*, 2023 WL 4872398, at *7 (compliance not required until Oct. 1, 2024, April 1, 2025, or Jan. 1, 2026); *Book People, Inc. v. Wong*, 2023 WL 6060045, at *26 (W.D. Tex. Sep. 18, 2023) (compliance not required until April 1, 2024); *ESI/Emp. Sols., L.P. v. City of Dallas*, 450 F. Supp. 3d 700, 714 (E.D. Tex. 2020) (compliance not required until Aug. 2021).

costs being incurred now.[16]

The Agencies also claim that no Plaintiff has established any compliance costs specifically with respect to Retail Lending Assessment Areas given that no declarant anticipates having such areas under the Final Rules.  ECF No. 67 at 47.  But Plaintiffs have amply demonstrated substantial nonrecoverable compliance costs from preparing to comply with the Final Rules' improper geographic expansion beyond Facility-Based Assessment Areas — whether that comes in the form of new Outside Retail Lending Areas or new Retail Lending Assessment Areas is irrelevant.[17]

## III.  The Balance of the Equities Weighs in Favor of a Preliminary Injunction.

In the face of Plaintiffs' strong demonstration of likelihood of success on the merits and irreparable harm, the Agencies cannot thwart a preliminary injunction by pointing to alleged injuries to the public interest.  *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021) ("[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends.").  Here, the Agencies do not even contend the public will be harmed by a preliminary injunction.  Instead, they claim the Final Rules have salutary provisions for other banks that would be enjoined.  ECF No. 67 at 49–50.  Notably, the Final Rules never touted any

---

[16] *See VanDerStok v. Garland*, 633 F. Supp. 3d 847, 858 (N.D. Tex. 2022) (rejecting claim of "virtual impossibility" of operating business in future under Final Rule); *Career Coll. Schs. of Tex. v. U.S. Dep't of Educ.*, 2023 WL 4291992, at *6 (W.D. Tex. June 30, 2023) (rejecting claim that rule could "one day" subject plaintiffs' members to potential liability).

[17] Equally meritless is the Agencies' claim that no Plaintiff has "actually taken steps to hire or train staff."  *Id*.  This statement ignores multiple declarants' statements that they have incurred and are *continuing* to incur costs to recruit employees and vendors, reassign employees from existing jobs to take on CRA-related tasks, and divert the time of existing CRA compliance staff to tasks related to the Final Rules.  ECF No. 21 at 9–10 ¶¶ 8–10; *id*. at 15–16 ¶¶ 9–10; *id*. at 23–24 ¶¶ 13–15.  Finally, the Agencies' claim that the Final Rules do not *require* banks to incur costs to establish a physical presence outside their deposit-taking footprints, ECF No. 67 at 47–48, misapprehends Plaintiffs' argument that banks must devote CRA resources to receive a passing score in new, unfamiliar assessment areas where their performance will be assessed against banks that *do* have physical presences in those areas.

purported "significant regulatory relief and lower compliance costs" for banks previously classified as intermediate banks that will be classified as small banks under the Final Rules, *see generally* 89 Fed. Reg. at 6595–96, and the Agencies fail to offer any quantification of such relief for the Court to weigh against Plaintiffs' quantified harms.[18]  Such vaguely defined interests cannot overcome the interest in staying a rule that plainly exceeds the Agencies' statutory authority and will impose irreparable harm on member banks.  *See* ECF No. 20 at 26–27.  Indeed, if delaying possibly salutary provisions were sufficient reason to deny injunctive relief, few claims would ever warrant a preliminary injunction.

## CONCLUSION

For the reasons set forth above, and in their opening brief, Plaintiffs request that the Court issue a preliminary injunction preserving the *status quo* until it renders a decision on the merits.

DATED: March 22, 2024                Respectfully submitted,

*/s/Thomas C. Riney*
UNDERWOOD LAW FIRM, P.C.
Thomas C. Riney (Texas Bar No. 16935100)
Slater Elza (Texas Bar No. 24000747)
PO 9158
Amarillo, Texas 79105
(806) 376-5613
(806) 349-9474
tom.riney@uwlaw.com
slater.elza@uwlaw.com

WILLIAMS & CONNOLLY LLP
Ryan Scarborough (*pro hac vice*)
Jesse Smallwood (*pro hac vice*)
William R. Murray, Jr. (*pro hac vice*)

---

[18] The Agencies also recycle their standing arguments to contend that any harm to Plaintiffs with respect to the Retail Services and Products Test is "illusory" because none of the anonymous declarants have over $10 billion in assets, such that they would be subject to that portion of the rule.  ECF No. 67 at 50.  As noted above, however, this ignores the fact that the Texas Bankers' Association affirmed in its declaration that it has 20 members with assets over $10 billion and that other banks will inevitably be harmed by these provisions.  *See supra* at 17.

22

Richard A. Olderman (*pro hac vice*)
Alex Gaudio (*pro hac vice*)
Armani Madison (*pro hac vice*)
Braden Currey (*pro hac vice*)
680 Maine Avenue SW
Washington, DC 20024
(202) 434-5000
rscarborough@wc.com
jsmallwood@wc.com
bmurray@wc.com
rolderman@wc.com
agaudio@wc.com
amadison@wc.com
bcurrey@wc.com

*Attorneys for Plaintiffs*

AMERICAN BANKERS ASSOCIATION
Thomas Pinder (*pro hac vice*)
Andrew Doersam (*pro hac vice*)
1333 New Hampshire Ave. NW
Washington, DC 20036
tpinder@aba.com
adoersam@aba.com

*Attorneys for Plaintiff American Bankers Association*

U.S. CHAMBER LITIGATION CENTER
Jennifer B. Dickey (*pro hac vice*)
Maria C. Monaghan (*pro hac vice*)
1615 H Street NW
Washington, DC 20062
jdickey@USChamber.com
mmonaghan@USChamber.com

*Attorneys for Plaintiff Chamber of Commerce of the United States of America*