IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

TEXAS BANKERS ASSOCIATION,
*et al.*,

        Plaintiffs,

v.

OFFICE OF THE COMPTROLLER,
*et al.*,

        Defendants.

2:24-CV-025-Z-BR

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiffs' Motion for a Preliminary Injunction ("Motion") (ECF No. 19), filed February 9, 2024. Defendants filed their response ("Response") (ECF No. 66), on March 8, 2024. Having reviewed the briefing and relevant law, the Court **GRANTS** Plaintiffs' Motion. Defendants are hereby **ENJOINED** from enforcing the regulations published at 89 Fed. Reg. 6574 (Feb. 1, 2024) (to be codified at 12 C.F.R. Sections 25, 228, and 345) against Plaintiffs pending the resolution of this lawsuit. The effective date of April 1, 2024, along with all other implementation dates, are hereby **EXTENDED**, day for day, for each day this injunction remains in place.

BACKGROUND

The Community Reinvestment Act of 1977 ("CRA") was enacted to address "redlining" — the practice of refusing credit in neighborhoods "deemed too risky." ECF No. 4 at 3. Historically, these neighborhoods were "predominantly minority and inner city." ECF No. 20 at 9; R. MARSICO, DEMOCRATIZING CAPITAL: THE HISTORY, LAW AND REFORM OF THE COMMUNITY REINVESTMENT ACT 11 (2005). The CRA requires federal banking agencies ("FBAs") to assess an institution's record "of meeting the credit needs of its entire community, including low- and moderate-income" neighborhoods.

12 U.S.C. § 2903(a)(1). And it requires separate evaluations for each metropolitan area where an institution maintains one or more branch offices. *Id.* § 2906(b)(1)(B). Those evaluations, in turn, result in one of four ratings: "Outstanding," "Satisfactory," "Needs to Improve," or "Substantial noncompliance." *Id.* § 2906(b)(2)(A)–(D).[1]

By most measures, the CRA achieved its goals: "For more than 45 years, banks have extended trillions of dollars of credit to . . . low- and moderate-income individuals in their communities."[2] ECF No. 20 at 10. In 2022 alone, "banks provided more than $227 billion in capital to low- and moderate-income individuals and businesses." *Id.* And they provided "an additional $151 billion in community development loans." *Id.*; *see also* Federal Financial Institutions Examination Council, *Federal Bank Regulatory Agencies Release 2022 Lending Data*, Dec. 20, 2023.

On February 1, 2024, Defendants — a collection of FBAs — published new regulations. ECF No. 20 at 7; *see* 89 Fed. Reg. 6574 (to be codified at 12 C.F.R. §§ 25, 228, and 345). Spanning 649 triple-column pages, those regulations ("Final Rules") are "by far the longest rulemaking the Federal Deposit Insurance Corporation ("FDIC") has ever issued.[3] ECF No. 20 at 11. They establish, *inter alia*, four new performance tests — two of which are relevant here. ECF Nos. 20 at 5–6; 67 at 14.

---

[1] The CRA was predicated on Congress's finding that regulated financial institutions have an "affirmative obligation to help meet the credit needs of the local communities in which they are chartered." 12 U.S.C. § 2901(a)(3).

[2] Some commentators nevertheless argue that the CRA did not go far enough. *See* Kim Vu-Dinh, *Black Livelihoods Matter: Access to Credit as a Civil Right and Striving for a More Perfect Capitalism Through Inclusive Economics*, 22 HOUS. BUS. & TAX L. J. 1, 28 (2021) ("The Community Reinvestment Act . . . was created in 1977 in order to remediate the longstanding practice of redlining but is characterized as 'toothless.' It was intended to hold banks accountable for the effects of their historic disinvestment in the neighborhoods in which communities of color lived and owned businesses. However, the standards to which banks are held under the CRA are vague at best."); *see also* Erika George et al., *Reckoning: A Dialogue About Racism, Antiracists, and Business & Human Rights*, 30 WASH. INT'L L. J. 171, 254 n.257 (2021) ("While technically outlawed in 1977 with the Community Reinvestment Act of 1977, studies indicate that redlining continues to affect housing opportunities and even health outcomes.").

[3] According to FDIC Director Jonathan McKernan — who dissented when the FDIC voted in favor of the Final Rules — "[t]he approximately 60,000 words of rule text (including appendices), which contains more than 40 benchmarks and 20 metrics, are enough to preclude anyone from comprehending the rule as a whole." ECF No. 20 at 11. "More problematically," he continued, "big chunks of the rule remain unfinished works in progress." *Id.*

The first test — the Retail Lending Test — uses retail lending assessment areas ("RLAAs") and outside retail lending assessment areas ("ORLAs") to evaluate a bank's retail lending. ECF No. 67 at 14–15. An RLAA "consists of any metropolitan statistical area or the combined non-metropolitan statistical areas of a state" in which a bank "originated at least 150 closed-end home mortgage loans" or "400 small business loans in each of the two preceding calendar years." ECF No. 20 at 12; *see also* 89 Fed. Reg. 6574, 6577. Likewise, an ORLA "is the nationwide area outside" a bank's Facility Based Assessment Areas ("FBAAs") and RLAAs "where it made any other CRA-relevant loans." ECF No. 20 at 12; *see also* 89 Fed. Reg. 6574, 6577 ("Evaluation in these areas is designed to facilitate a comprehensive evaluation of a bank's retail lending to low- and moderate-income individuals . . . ."). In other words, neither RLAAs nor ORLAs have any connection whatsoever to "a bank's physical, deposit-taking footprint." ECF No. 20 at 12.

The second test — the Retail Services and Products Test — requires the FBAs to assess the availability and usage of a bank's deposit products and "whether [those] . . . deposit products offer low-cost features." ECF No. 67 at 16. As for digital services, the Final Rules require the FBAs to consider "[t]he number of checking and savings accounts opened each calendar year during the evaluation period digitally and through other delivery systems in low-, moderate-, middle-, and upper-income census tracts" and the accounts active at year-end. *Id.* at 17; 89 Fed. Reg. 6574, 7121.

Plaintiffs argue the Final Rules run afoul of the CRA by analyzing banks (1) outside the geographies where they operate physical facilities and accept deposits; and (2) on deposit products — not how they meet the credit needs of the community. ECF No. 20 at 8. Defendants respond that (1) the CRA "requires the FBAs to assess a bank in its 'entire community,' which includes all geographic areas where the bank serves customers," and (2) Plaintiffs fail to demonstrate irreparable injury, or that the "balance of equities and the public interest" support their Motion. ECF No. 67 at 48.

STANDARDS

A preliminary injunction may be issued if the movant shows: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest. *Robinson v. Ardoin*, 86 F.4th 574, 587 (5th Cir. 2023); *Air Prod. & Chemicals, Inc. v. Gen. Servs. Admin.*, No. 2:23-CV-147-Z, 2023 WL 7272115, at *2 (N.D. Tex. Nov. 2, 2023).

The first two factors are most critical, and the latter two merge when the government is an opposing party. *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020); *Nken v. Holder*, 556 U.S. 418, 435 (2009). That said, no factor has a "fixed quantitative value." *Mock v. Garland*, 5 F.4th 563, 587 (5th Cir. 2023). On the contrary, "a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* "This requires a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury that possibly could flow from the denial of preliminary relief." *Med-Cert Home Care, LLC v. Azar*, 365 F. Supp. 3d 742, 749 (N.D. Tex. 2019) (internal marks omitted). In sum, "[t]he decision to grant or deny a preliminary injunction lies within the sound discretion of the trial court[.]" *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989); *Cottonwood Fin. Ltd. v. Cash Store Fin. Servs., Inc.*, 778 F. Supp. 2d 726, 741 (N.D. Tex. 2011).

ANALYSIS

I.      **Plaintiffs have associational standing.**

Standing is a threshold question this Court must address before addressing the merits. *People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*, 7 F. Supp. 3d 1, 7 (D.D.C. 2013) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998)). Under the doctrine

4

of associational standing, an association may bring suit on behalf of its members when (1) those members would otherwise have standing to sue; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. Appx. 189, 195 (5th Cir. 2012) (citing *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010)).

Here, Defendants aver that Plaintiffs lack standing for two reasons: (1) they have not identified by name at least one member with standing in their own right; and (2) they do not assert that the challenged activity affects all members of their associations.[4] ECF No. 67 at 40. Both objections fail.

First, Defendants rely — almost exclusively — on *Summers v. Earth Island Institute*. 555 U.S. 488 (2009). But *Summers* does not hinge on the *anonymity* of the declarant.[5] *Id.* at 495. Instead, the Supreme Court denied standing because the plaintiffs failed "to allege that *any* particular . . . sale or other project claimed to be unlawfully subject to the regulations [would] impede a specific and concrete plan." *Id.* (emphasis in original). Nor has the Supreme Court adopted a "naming requirement" — such as the one proposed by Defendants — in the wake of *Summers*. *See, e.g.*, *Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181, 200–201 (2023) (holding that an organization had standing "when it filed suit" where it "identified" individual harmed members but did not provide names).

---

[4] Here, Defendants take issue with Plaintiffs' use of anonymous declarations and statements. *See* ECF No. 67 at 41 ("Plaintiffs submitted unsworn statements from three anonymous bankers purporting to be members of one or more of the plaintiff associations.").

[5] The Tenth Circuit recognized that "[a]nonymity was not even an issue before the Supreme Court in *Summers*." *Speech First, Inc.*, 92 F.4th at 949. "Although one might read language in that opinion to require that only persons identified by their legal names can have standing, that was clearly not the intent of the Court." *Id.* "The opinion provided no hint, much less an emphatic statement, that it was abrogating decades of precedent." *Id.*

Defendants also misstate and misapply *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 (5th Cir. 2012). There, the Fifth Circuit explained an organization lacks standing "if it fails to adequately 'allege . . . there is a threat of . . . injury to any individual member of the association' and thus 'fail[s] to identify even one individual' member with standing." *Id.* (quoting *Nat'l Treasury Employees Union v. U.S. Dep't of Treasury*, 25 F.3d 237, 242 (5th Cir.1994)). But nothing in *Funeral Consumers* addressed — or even purported to address — the sufficiency of anonymous or pseudonymous declarations to establish standing.

In sum, the proffered Supreme Court and Fifth Circuit precedents do not support Defendants' "identify-by-name" requirement. *See Hancock Cnty. Bd. of Sup'rs*, 487 F. Appx. at 195 (affirming use of anonymous declarations); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (holding same); *Blanchard v. Bergeron*, 489 U.S. 87 (1989). Other Circuits have reached the same conclusion. *See, e.g.*, *Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024) ("Longstanding and well-established doctrine in the federal courts establishes that anonymous persons may have standing to bring claims."). Other District Courts in Texas hold the same. *See, e.g.*, *Chamber of Com. of U.S. of Am. v. Consumer Fin. Prot. Bureau*, No. 6:22-CV-00381, 2023 WL 5835951, at *6 (E.D. Tex. Sept. 8, 2023) ("[D]efendants argue that no plaintiff has shown that an 'identified member' suffers harm because some plaintiffs have used pseudonyms . . . . That argument fails."); *id.* (finding that anonymous declarations "credibly show that plaintiffs have identified members . . . currently suffering cognizable harm").

Defendants' second objection — that Plaintiffs "do not assert that the challenged activity affects all members of their associations"— is no more successful. That is because "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022);

*Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-CV-0278-P, 2023 WL 3869323, at *3 (N.D. Tex. June 5, 2023). And here, the Texas Bankers Association "has 20 members with over $10 billion in assets" — and those banks with less than $10 billion "may [nevertheless] be assessed under these tests[.]" ECF No. 73 at 23; 89 Fed. Reg. 6574, 7121.

## II.    Plaintiffs demonstrate a substantial likelihood of success on the merits.

### A.  The FBAs' reading of "entire community" clashes with the text of the CRA.

Plaintiffs first argue that the Final Rules violate the CRA's instruction to assess banks based only on their performances within their communities. ECF No. 20 at 17. In their view, a bank's community is "the geograph[y] in which [it has] a physical presence and accept[s] deposits." *Id.* at 8; *see also id.* at 17 ("[T]he CRA focuses on lending in the particular, defined, and limited geographic areas in which a bank's deposit-taking facilities are located."); *id.* at 17 ("The [a]gencies have always required bank examiners to focus on bank-designated 'assessment areas,' which are 'geographies in which the bank has its main office, its branches, and its deposit-taking ATMs[.]'") (quoting 12 C.F.R. §§ 228.41(a)–(b) and (g)).

Defendants respond that the CRA "take[s] an expansive view in assessing a bank's performance[.]" ECF No. 67 at 21. That "expansive" view, in turn, is predicated on the CRA's usage of the phrase "*entire* community." *Id.* (emphasis added); *see also* 12 U.S.C. § 2903(a)(1). Accordingly, Defendants claim authority to articulate — via the Final Rules — "that a bank's 'entire community' includes both the geographic areas where a bank maintains deposit-taking facilities *and other geographic areas* where a bank conducts retail lending." ECF No. 67 at 21–22 (emphasis added). Such authority is necessary, per Defendants, because "federal agencies are expected to update rules" in response to changes. *Id.* at 26. And here, those changes include how a "community exists today." *Id.* at 26–28.

7

Because this is a question of statutory interpretation, the Court begins with the text. *United States v. Lauderdale Cnty., Miss.*, 914 F.3d 960, 961 (5th Cir. 2019). When a statute includes an explicit definition, the Court follows that definition — even if it varies from a term's ordinary meaning. *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018). Here, all parties agree the CRA does not define "community." *See* ECF No. 20 at 16 ("Congress did not itself define the word 'community[.]'"); *see also* ECF No. 67 at 30 ("The FBAs' Final Rule appl[ies] the undefined term 'entire community'"). Thus, this Court "begin[s] with the assumption that the words were meant to express their ordinary meaning." *United States v. Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015); *United States v. Boeing Co.*, 617 F. Supp. 3d 502, 508 (N.D. Tex. 2022). Here, the text reads as follows:

> In connection with its examination of a financial institution, the appropriate Federal financial supervisory agency shall — (1) assess the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods, consistent with the safe and sound operation of such institution[.]

12 U.S.C. § 2903(a)(1).

That the word "community" necessarily involves a limited geographic area is indisputable. Webster's Third New International Dictionary defines "community" as "the people living in a particular place or region and usually linked by common interests." Alternatively, it is "an aggregation of mutually related individuals in a given location." *Community*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002). And even today, "community" is defined in nearly identical ways: "the people with common interests living in a particular area" and a "population of various kinds of individuals . . . in a common location." *Community*, MERRIAM-WEBSTER, www.merriam-webster.com/dictionary/community, 2024; *see also Community*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A neighborhood, vicinity, or locality.").

The remaining question — and the question that divides the Parties — is whether a bank's community is defined in relation to (1) a bank's physical location, or (2) where a bank serves its customers. *See* ECF No. 20 at 7 ("The statute . . . imposes obligations on banks with respect to credit needs of the communities in which they have a physical presence and accept deposits."); *see also* ECF No. 67 at 31 ("[T]he Final Rule is focused on . . . geographic areas where a bank serves its customers."). Plaintiffs have the stronger argument.

First, Defendants lean hard on the word "entire" in the phrase "entire community." *See* ECF No. 67 at 22 ("Plaintiffs fail to meet their heavy burden . . . because their theory ignores that the term 'entire' modifies 'community.'"). True, "[t]he word 'entire,' . . . should not be read out of [the statute]." *Stewart v. Metro. Lloyds Ins. Co. of Tex.*, 855 F. Appx. 198, 201 (5th Cir. 2021). But it does not have the effect Defendants attribute to it. In modifying "community," the word "entire" merely clarifies that the *whole* community must be served — it does not change what a "community" *is*. If a statutory "community" is created around every individual *customer* with whom a bank does business — regardless of whether that customer is within the geography of the bank's physical presence — the term becomes meaningless and the statute ineffectual.

Accordingly, Congress expressly stated in Section 2901(a)(3) — the CRA's "Congressional findings and statement of purpose" section — that "regulated financial institutions have [a] continuing and affirmative obligation to help meet the credit needs of the local communities in which they are chartered." 12 U.S.C. § 2901(a)(3). And Section 2901(b) repeats that language. *See id.* § 2901(b) ("It is the purpose of this chapter to require each appropriate . . . agency to . . . encourage such institutions to help meet the credit needs of the local communities in which they are chartered[.]"). Defendants disregard these examples because "a statement of congressional findings is a rather thin reed upon which to base a requirement neither expressed

9

nor fairly implied from the Act's *operative* sections." *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 250 (1994) (emphasis added). Defendants' argument would prevail if Plaintiffs' reading of "community" was "neither expressed nor fairly implied" elsewhere in the CRA. But Plaintiffs' reading is more consistent with the totality of the CRA's text.

For starters, Section 2903 — the same section on which Defendants ground their "entire community" argument — provides that the FBAs "may consider as a factor capital investment, loan participation, and other ventures undertaken by the institution" provided these activities "help meet the credit needs *of local communities in which such institutions and credit unions are chartered*." 12 U.S.C. § 2903(b) (emphasis added). And "local" is ordinarily defined as: (1) "not general or widespread" and (2) "primarily serving the needs of a particular limited district, often a community or minor political subdivision . . . applicable in or relating to such a district only." *Local*, Webster's Collegiate Dictionary (1974); *Local*, Webster's Third New International Dictionary (1981). Moreover, Section 2906 directs the FBAs to separately address "each metropolitan area in which a regulated depository institution maintains one or more domestic branch offices." 12 U.S.C. § 2906(b)(1)(B).

These sections underscore the CRA's focus on geographic areas surrounding a bank's *physical* facilities. Otherwise, Congress's repeated focus on "local communities," "low- and moderate-income neighborhoods," and "metropolitan areas" with "domestic branch offices" is inexplicable. *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012) ("[T]he whole-text canon . . . calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts[.]"); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (explaining that courts must look to "the language and design of the statute as a whole").

10

Finally, and perhaps most persuasively, Section 2902(4) undermines Defendants' reading.
It expressly states:

> A financial institution whose business predominately consists of serving the needs of military personnel who are not located within a defined geographic area may define its "entire community" to include its entire deposit customer base without regard to geographic proximity.

12 U.S.C. § 2902(4).

In other words, *if* a bank primarily serves customers *not* clustered near its physical facility — *e.g.*, military personnel stationed across the globe — *then* it can "define its 'entire community'" pursuant to wherever its customers happen to be. But not otherwise. *See Baptist Mem'l Hosp. - Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 694 (5th Cir. 2020) ("[T]he canon of *Expressio Unius Est Exclusio Alterius* . . . provides that 'expressing one item of [an] associated group or series excludes another left unmentioned.'"). To be sure, "a 'proper *expressio unius* inference' as to a specific statutory provision's exclusivity must consider the provision as 'viewed in the context of the overall statutory scheme.'" *Janvey v. Democratic Senatorial Campaign Comm.*, 793 F. Supp. 2d 825, 845 (N.D. Tex. 2011) (quoting *Christensen v. Harris County*, 529 U.S. 576, 583 (2000)). But "the context of the overall statutory scheme" — for all the reasons discussed *supra* — serves only to strengthen Plaintiffs' interpretation of "community."

Next, Defendants turn to a tool disfavored by textualists: legislative history. *See*, *e.g.*, *Thomas v. Reeves*, 961 F.3d 800, 819 (5th Cir. 2020) ("Scouring legislative detritus prone to contrivance is more likely to yield confusion than precision.") (citing *Zedner v. United States*, 547 U.S. 489, 511 (2006) (Scalia, J., concurring) ("[T]he use of legislative history is illegitimate and ill-advised in the interpretation of any statute."). Here, Defendants cite (1) preliminary drafts of the CRA, (2) a series of edits made to those drafts prior to the CRA's finalization, and

(3) legislators' discussions memorialized in the Congressional Record. ECF No. 67 at 24–26. From these suspect sources, Defendants divine that the FBAs may analyze banks "where they lend" — not just in areas with deposit-taking facilities. *Id.* at 26.

But "legislative history is not the law." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018); *see also Wooden v. United States*, 595 U.S. 360, 381 (2022) (Barrett, J., concurring) (explaining that "the problems with legislative history are well rehearsed"); A. SCALIA & B. GARNER, *supra* 46 (2012) ("In the interpretation of legislation, we aspire to be 'a nation of laws, not of men.' This means . . . giving no effect to lawmakers' unenacted desires."). And whatever value legislative history may have generally, there is none when the statutory text is clear. *See Adkins v. Silverman*, 899 F.3d 395, 403 (5th Cir. 2018) ("[T]he Supreme Court has stated repeatedly that where a statute's text is clear, courts should not resort to legislative history.") (citing *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 186 (2004)). Because "[t]he text here is not ambiguous," this Court declines to "introduce ambiguity through the use of legislative history." *Adkins*, 899 F.3d at 403.

## B.  The CRA does not authorize the FBAs to assess deposit products.

Plaintiffs next argue that the Final Rules err in authorizing the FBAs to assess deposit products. ECF No. 20 at 22. They aver that "Congress knew the difference between 'credit' and 'deposit' activities" — and nevertheless instructed the FBAs *only* to "assess the institution's record of meeting the credit needs of its entire community." *Id.* (quoting 12 U.S.C. § 2903(b)(1)). "That focus on credit makes sense," according to Plaintiffs, "as Congress was concerned about the mismatch between banks accepting deposits from low- and moderate-income borrowers but not serving those borrowers with their credit products." ECF No. 20 at 22. In light of the foregoing, Plaintiffs conclude that Defendants have impermissibly "enlarge[d] the authority granted" by the statute. *Id.* at 23.

Defendants respond with two arguments: (1) the CRA does not state that only certain factors may be considered in evaluating whether a bank is "meeting the credit needs of its entire community;" and (2) the FBAs have reasonably explained why evaluating deposit activities is appropriate in determining whether a bank is "meeting the credit needs of its entire community." ECF No. 67 at 34–37. In their view, Plaintiffs "have provided no basis for construing the phrase 'meeting the credit needs of its entire community' to allow for consideration only of factors that Plaintiffs have selected." *Id.* at 36–37. And in any event, "the FBAs described in great detail why evaluating deposit activities is appropriate." *Id.* at 37.

This question is resolved via the statutory provisions already addressed. In review, institutions shall "help meet the credit needs of the local communities in which they are chartered." 12 U.S.C. § 2901. The FBAs shall "assess the institution's record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods." *Id.* § 2903(a)(1). They may consider as a factor "capital investment, loan participation, and other ventures undertaken by the institution" provided that these activities "help meet the credit needs of local communities." *Id.* § 2903(b). And each rating assigned to an institution — "Outstanding," "Satisfactory," "Needs to improve," or "Substantial noncompliance" — are predicated on how well the institution met "community credit needs." *Id.* § 2906(2). The pattern is obvious: not a single foregoing provision — nor any other CRA provision — authorizes the FBAs to assess deposit products.

Nevertheless, Defendants aver that the phrase "credit needs" is sufficiently broad to encompass "what is requisite, desirable, or useful in connection with credit." ECF No. 67 at 34. They argue that "[t]here is a sufficient nexus between deposit products and the provision of credit such that, to comprehensively assess large bank performance . . . it is appropriate to evaluate

13

deposit accounts responsive to the needs of low- and moderate-income individuals, families, or households." *Id.* at 37. And they explicate that nexus throughout the Final Rule:

> [D]eposit products are important for supporting the credit needs of low- and moderate-income individuals, families, or households because they increase credit access by helping individuals improve their financial stability and build wealth through deposit accounts.

89 Fed. Reg. 6574, 6943.

> [D]eposit products can help consumers qualify for loans by facilitating consumers' savings so that they can post collateral and to pay transactions costs . . . . [and] may also assist consumers in improving their credit scores . . . . Data from consumers' use of deposit accounts are also sometimes included in credit evaluations as "alternative data."

89 Fed. Reg. 6574, 6944.

> [D]eposit products are a pathway for a bank customer to establish an ongoing relationship with a bank. Customers who hold deposit products have contact with a bank — either physically or electronically — every time they perform a transaction. Banks can use various touch points to market credit products, explain how credit products can help consumers meet financial needs, and provide services to improve consumers' financial literacy.

*Id.*

But Defendants miss the mark. The question is not whether the FBAs "have articulated a rational relationship" between deposit products and the ability to access credit. ECF No. 67 at 34. It is not whether "a sufficient nexus" exists. *Id.* at 37. Nor is it whether the FBAs' evaluation of deposit products is a good idea. The question is whether Congress *authorized* the FBAs to do so. The totality of the statutory text weighs in the opposite direction.

Congress expressly stated that "the convenience and needs of communities include the need for credit *services as well as deposit services.*" 12 U.S.C. § 2901(a)(2) (emphasis added). It did not forget about them. Yet in every operative provision, Congress specified that only *credit* need be considered. *See, e.g.*, 12 U.S.C. §§ 2903(a)(1); 2903(b); 2906(2)(A)–(D). Hence, the

14

inescapable conclusion is "that Congress considered the unnamed possibility and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003); *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 466 (5th Cir. 2020). Whatever weight is assigned the FBAs' alleged "nexuses," it cannot "overcome the clear contrary indications of the statute[.]" *S.E.C. v. Sloan*, 436 U.S. 103, 117 (1978).

## C.  The Major Questions Doctrine weighs in favor of Plaintiffs.

Under the Major Questions Doctrine, courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014); *W. Virginia v. E.P.A.*, 597 U.S. 697, 716 (2022). Stated differently, an agency must "point to clear congressional authorization" when "the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *W. Virginia*, 597 U.S. at 721 (citing *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)).

Here, the "breadth of authority" that Defendants assert is substantial. *See United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 329 (1963) (recognizing that the "power of federal bank examiners" is "perhaps the most effective weapon of federal regulation"). Never before have the FBAs claimed authority to assess banks *wherever* they conduct retail lending. ECF No. 73 at 16. On the contrary, they have — since 1978 — limited themselves to areas surrounding deposit-taking facilities. *Id.* at 16–17; 43 Fed. Reg. 47144, 47144 (Oct. 12, 1978); Interagency Questions and Answers, 57 Fed. Reg. 10899, 10899 (Mar. 31, 1992).

Moreover, Congress could have passed legislation to alter or expand the CRA's terms. As Plaintiffs note, the Community Reinvestment Modernization Act — introduced four times in

nine years — "would have shifted assessment areas from those areas surrounding deposit-taking facilities to areas where banks make loans." ECF No. 73 at 17. It never passed. Thus, the fact that "Congress considered and rejected bills that would have granted the [FBAs] such jurisdiction" undercuts their assertion of authority. *Brown & Williamson Tobacco Corp.*, 529 U.S. at 144. The foregoing — taken together — provide a powerful basis for applying the Major Questions Doctrine in favor of Plaintiffs. This Court does so.

### III.   Plaintiffs demonstrate a substantial threat of irreparable injury.

Next, Plaintiffs argue that the Final Rules "are of such scale and complexity that banks must take immediate steps" to comply. ECF No. 20 at 25. And those steps, they argue, require "substantial costs that will be unrecoverable even if the [Rules] are struck[.]" *Id.* at 26. In support, Plaintiffs cite the Office of the Comptroller of the Currency's ("OCC") "estimate[] [of] the initial compliance burden in the first 12 months" as $91.8 million.[6] *Id.* at 24. They point to "complicated[,] time-consuming system overhauls and database updates" and the need to "conduct program planning," upgrade "vendor relationships, [and] hire more IT." *Id.* And they underscore the FBAs' estimate that banks "will expend between . . . 105,500 and 235,000 hours in reporting, recordkeeping, and disclosures." *Id.* at 25. Defendants aver that Plaintiffs have not proved "irreparable harm" because the alleged compliance costs (1) are not contextualized alongside the banks' overall finances; and (2) are too vague and speculative to satisfy "concreteness" standards. ECF No. 67 at 43–45.

---

[6] This figure has been recontextualized. *See* ECF No. 70 (Defendants' Notice of Supplemental Rulemaking). The OCC now clarifies that "[w]ere the [Rule] to require full compliance within the first 12 months of the transition period, the OCC estimates that expenditures to comply with mandates during those twelve months would not exceed approximately $91.8 million (approximately $7.9 million associated with increased data collection, recordkeeping or reporting; $82 million for large banks to collect, maintain, and report annually geographic data on deposits; and $1.9 million for banks' strategic plan submissions)." *Community Reinvestment Act; Supplemental Rule*, https://www.fdic .gov/news/press-releases/2024/pr24018a.pdf.

First, compliance costs. Defendants aver that Plaintiffs "have failed to provide necessary context for their asserted compliance burdens 'in relation to the overall financial situation' of their members." *Id.* at 43 (quoting *Nat'l Council of Agric. Emps. v. U.S. Dep't of Lab.*, No. CV 22-3569 (RC), 2023 WL 2043149, at *7 (D.D.C. Feb. 16, 2023). In their view, "Plaintiffs must compare those costs to affected banks' overall economic positions, by considering, for example, banks' total noninterest expenses" to "demonstrate that any asserted compliance costs are more than *de minimis*[.]" ECF No. 67 at 43.

True, compliance costs must be "more than *de minimis*." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022); *Second Amend. Found., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:21-CV-0116-B, 2023 WL 7490149, at *14 (N.D. Tex. Nov. 13, 2023). But under Fifth Circuit precedent, "nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023); *see also Louisiana*, 55 F.4th at 1034 ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."). And there is no reason — in fact or in law — to view Plaintiffs' claims as atypical.

Moreover, the "key inquiry" here is "not so much the magnitude but the irreparability." *Rest. L. Ctr.*, 66 F.4th at 597. Indeed, "[e]ven purely economic costs may count as irreparable harm 'where they cannot be recovered in the ordinary course of litigation.'" *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). And Plaintiffs' compliance costs — as pled — fall into the standard "nonrecoverable costs" category recognized repeatedly by the Fifth Circuit. *See, e.g.*, ECF No. 21 at 9 (Declaration of Texas Bankers Association) ("To comply with the [Rules], TBA members have begun incurring nonrecoverable compliance costs, including building out new information technology capabilities in order to geocode their deposits and

17

track new metrics adopted by the [Rules].”); *id.* at 15 (Declaration of Jason Harrison) ("Despite a 2-year applicability period for most of the provisions in the [Rules], the [Rules'] new, burdensome metrics and data collection requirements will require some affected members to begin incurring compliance costs long before Plaintiffs could obtain a final judgment . . . . The implementation task here will be even more expensive and daunting because banks may need to implement both Section 1071 regulations and the amended CRA regulations on overlapping timelines."); *id.* at 22 (Declaration of American Bankers Association) ("Intermediate and Large banks must begin implementation immediately due to the complexity and extensive change-management processes that will be required to comply with the [Rules]. Banks must take steps now to determine whether they will have Retail Lending Assessment Areas" or "Outside Lending Assessment Areas," and "then calculate whether their CRA performance will be adequate under the [Rules'] performance metrics."); *id.* at 30 (Declaration of Thomas Quaadman) ("Members thus have already begun to take the necessary steps to understand the voluminous requirements, prepare their budgets for implementation, and make decisions about whether they will hire new in-house technical personnel or outside vendors to assist with implementation."); *id.* at 37–38 (Declaration of Kelly Hall) ("As acknowledged by the Agencies, even setting aside the technical changes that will need to be made to comply with the data collection, maintenance, and reporting requirements, some of our members will need to hire new CRA compliance personnel going forward because of the enormous complexity of the [Rules] and the increased size and number of assessment areas."); *id.* at 46 (Declaration of Independent Community Bankers of America) ("Some member banks report that, to meet the January 1, 2026 implementation deadline, they have begun or will need to immediately begin undertaking rigorous efforts to understand and comply with the [Rules], initiate change-management processes, and make changes to their overall business strategy.

All of these efforts will result in the banks incurring nonrecoverable compliance costs."); *id.* at 51 (Declaration of Independent Bankers Association of Texas) ("IBAT member banks have already begun their efforts to determine whether they will need to make changes to their CRA compliance efforts with regard to accounting for the new Facility-Based Assessment Areas, Retail Lending Assessment Areas, and/or Outside Retail Lending Areas. These determinations will be necessary prior to the implementation of the rule for a bank to evaluate whether its CRA performance will be adequate under the [Rules]" . . . . " The costs incurred by banks in making these determinations is ongoing and will increase as we approach the effective date for implementation of the rule. IBAT member banks do not expect that these costs will be recoverable even if the [Rules] are struck down due to sovereign immunity and other considerations.").

Second, the concreteness of Plaintiffs' allegations. As referenced *supra*, Defendants aver that Plaintiffs "have failed to meet their burden of establishing imminent nonrecoverable compliance costs stemming from activities to prepare for the Final Rule." ECF No. 67 at 48. Such activities, per Defendants, "are vague, unsupported, and contrary to the language in the Final Rule." *Id.* Specifically, they argue that (1) "the [Final Rule's] actual regulatory text is marked by none of the extreme urgency Plaintiffs claim they now face;" (2) "the preamble indicates that implementation guidance and tools are forthcoming from the FBAs with respect to data collection, maintenance and reporting for large banks;" (3) "while declarants raise vague, alarmist assertions about immense complexity necessitating immediate action with respect to new RLAAs, no declarant specifies a single RLAA that any of Plaintiffs' member banks anticipate it will need to delineate;" and (4) "conclusory statements of multiple declarants that a large bank will need to 'build out new CRA infrastructure' . . . contradict the text of the Final Rule." *Id.* at 46–47.

But Defendants misconstrue both Plaintiffs' claims and the precedent that supports them. First — as described *supra* — the Fifth Circuit has long held that "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Louisiana*, 55 F.4th at 1034. Second, that the Rule is not marked by urgency is plainly false. The text itself provides that "this final rule will be effective on April 1, 2024" — with an operational start date of January 1, 2026, and reporting requirements kicking in a year later. 89 Fed. Reg. 6574, 7107. Given the scope of Plaintiffs' operations and the changes required by the Final Rule, the necessity of swift action is obvious. Third, Plaintiffs' assertions are neither "vague" nor "alarmist." On the contrary, they have pled sufficiently clear harms that will be — and are currently being — incurred. *See, e.g.*, ECF No. 21 at 9 (Declaration of Texas Bankers Association) ("TBA members have begun . . . building out new information technology capabilities in order to geocode their deposits and track new metrics adopted by the [Rules]."); *id.* at 22 (Declaration of American Bankers Association) ("Intermediate and Large banks must begin implementation immediately due to the complexity and extensive change-management processes . . . required[.]").

Nor is there any force to the objection that "no declarant specifies a single RLAA that any of Plaintiffs' member banks anticipate it will need to delineate." ECF No. 67 at 47. That is because a core difficulty here — as pled by Plaintiffs — is *determining* where RLAAs will be and how to manage them in accordance with the Final Rules. *See* ECF No. 21 at 22 (Declaration of American Bankers Association) ("Banks must take steps now to determine whether they will have Retail Lending Assessment Areas" or "Outside Lending Assessment Areas," and "then calculate whether their CRA performance will be adequate under the [Rules'] performance metrics."). Same too with Defendants' objection that Plaintiffs' "conclusory statements that a large bank will need to 'build out new CRA infrastructure' . . . contradict the text of the Final Rule."

ECF No. 67 at 46–47. That is because "what the Rule requires by its text" may differ from "what the Rule requires in effect." Plaintiffs best understand their businesses and unique operational needs and are therefore best-situated to determine what feasible compliance will require.

### IV. Plaintiffs demonstrate that the balance of equities and the public interest support injunctive relief.

The final two elements necessary to support a grant of injunctive relief — the balance of equities (the difference in harm to the respective parties) and the public interest — "merge" when the government is a party. *VanDerStok v. BlackHawk Mfg. Grp. Inc.*, 639 F. Supp. 3d 722, 730 (N.D. Tex. 2022) (citing *Nken*, 556 U.S. at 435). In this assessment, the Court weighs "the competing claims of injury and . . . consider[s] the effect on each party of the granting or withholding of the requested relief," while also considering the public consequences of granting injunctive relief. *VanDerStok*, 639 F. Supp. 3d at 730 (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008)).

Here, Plaintiffs note that the CRA is working well: "Over 98% of banks achieved an Outstanding or Satisfactory rating in their most recent assessment and there is no evidence that a few months' delay will have a material impact of any kind." ECF No. 20 at 26. And they point out that FBAs make "no finding — and present no evidence — that the Final Rules will result in a single additional CRA loan, much less enough additional CRA lending to offset the Final Rules' substantial compliance costs." *Id.* at 27. On the contrary, Plaintiffs' evidence suggests just the opposite: "When asked 'the CRA was revised to create Retail Lending Assessment Areas for large banks. Do you think your bank will reduce lending in those areas to avoid triggering an RLAA.' 28.2% of respondents replied *they will reduce lending*[.]" ECF No. 21 at 44 (Declaration of Independent Community Bankers of America) (emphasis added).

Defendants respond that [t]he balance of equities and the public interest . . . weigh against enjoining the entire rule because many aspects of the Final Rule are indisputably beneficial." ECF No. 67 at 48. And they offer three reasons in support: (1) "the balance of harms with respect to the component of the Retail Services and Products Test focused on deposits tips against Plaintiffs because any claimed harm is illusory;" (2) "while the provisions Plaintiffs cite in support of their Motion apply almost exclusively to large banks, the Rule provides significant regulatory relief and lower compliance costs by increasing the asset-size thresholds that determine which performance tests apply to an institution;" and (3) "Plaintiffs' request to enjoin the entire Rule would unnecessarily delay other . . . reforms that Plaintiffs do not challenge, and which have been widely supported by members of the industry, including large institutions." *Id.* at 48–50. In sum, "the significant *positive benefits* of the Final Rule" weigh against the requested relief. *Id.* at 50 (emphasis added).

But Defendants' handful of pled benefits do not override Plaintiffs' strong warrant for a preliminary injunction. *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021) ("[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends."). First, the Court has already addressed whether Plaintiffs' harms are "illusory." *See supra* Part III. They are not. And the Texas Bankers Association affirmed in its declaration "that it has 20 members with assets over $10 billion and that other banks will inevitably be harmed by [the Retail Service and Products Test] provisions"— rendering Defendants' objection untenable. ECF No. 73 at 28 n.18; *see also* ECF No. 21 at 8 ("TBA has 56 members that are 'large banks' with assets of at least $2 billion; of these, 20 have assets over $10 billion.").

Second, Defendants offer no persuasive support for their claim that "the Final Rule provides significant regulatory relief and lower . . . costs." ECF No. 67 at 48. Nor could they,

as the 649 triple-column pages comprising the Final Rules offer none either. And even if they had, Defendants offer no quantification as to how those benefits compare to Plaintiffs' harms. Such a showing is insufficient in light of Plaintiffs' pleadings. Furthermore, Defendants' third objection — that Plaintiffs' sought relief would unnecessarily delay other reforms — fails for similar reasons as their first two. *Id.* at 49. As Plaintiffs note, "if delaying possibly salutary provisions were sufficient reason to deny injunctive relief, few claims would ever warrant" such relief. ECF No. 73 at 28.

In any event, as noted above, this Court found that Plaintiffs satisfied factors one and two with ease: (1) a substantial likelihood of success on the merits; and (2) a threat of irreparable injury. *See supra* Part I–II. And "there is generally no public interest in the perpetuation of unlawful agency action[.]" *R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 195 (5th Cir. 2023). "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion. Defendants are hereby **ENJOINED** from enforcing the regulations published at 89 Fed. Reg. 6574 (Feb. 1, 2024) (to be codified at 12 C.F.R. Sections 25, 228, and 345) against Plaintiffs pending the resolution of this lawsuit. The effective date of April 1, 2024, along with all other implementation dates, are hereby **EXTENDED**, day for day, for each day this injunction remains in place.

**SO ORDERED**.

March 29, 2024

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

23